

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK



RECEIVED
JUL 19 2013
U.S.D.C. S.D. N.Y.
CASHIERS

---

HOMEWARD RESIDENTIAL, INC., solely
in its capacity as Master Servicer for the
Option One Mortgage Loan Trust 2006-2, for
the benefit of the Trustee and the holders of
Option One Mortgage Loan Trust 2006-2
Certificates,

               Plaintiff,

    - against -

SAND CANYON CORPORATION, f/k/a
Option One Mortgage Corporation,

           Defendant.

CIVIL ACTION NO. 12-CV-5067(AT)

AMENDED COMPLAINT

---

Plaintiff Homeward Residential, Inc. ("Homeward Residential"), solely in its capacity as

Master Servicer for the Option One Mortgage Loan Trust 2006-2 ("the Trust"), brings this

lawsuit for the benefit of the Trustee of the Trust and the holders of certificates issued by the

Trust, and for its complaint against Sand Canyon Corporation ("Sand Canyon") states as follows:

### Nature of the Action

1.    In 2006, Sand Canyon (then known as Option One Mortgage Corporation) and

certain of its subsidiaries sold a pool of more than 7,500 mortgage loans with a total initial

principal balance of about $1.5 billion to the Trust. In connection with that sale, Sand Canyon

made certain representations and warranties which have now been discovered to have been false.

2.    Sand Canyon made about fifty specific representations and warranties regarding

the mortgage loans it was selling to the Trust. In these representations and warranties -- the

"Specific Representations" -- Sand Canyon represented, among other things, that the loans it was

selling complied with Sand Canyon's stated underwriting guidelines, that the information Sand

Canyon provided about the loans was true and correct, and that there had been no fraud in the origination of the loans. Sand Canyon also made various representations concerning key loan metrics intended to measure whether it was likely that borrowers would be able to repay their loans, and whether it was likely that the Trust would suffer a loss in the event of a borrower default. Sand Canyon agreed that in the event of a material breach of any Specific Representation, it would cure the breach or repurchase the loan in question.

3.     Sand Canyon also represented that it had not made any material false statements or omissions in the loan sale agreement and that no documents it had prepared in connection with the sale contained any material false statements or omissions. Sand Canyon agreed that in the event of a breach of this "No Falsehoods" representation, the Trust could require Sand Canyon to repurchase all the loans it had sold to the Trust.

4.     Despite Sand Canyon's representations to the Trust and its investors that the mortgage loans met defined credit quality standards, the loan pool has been plagued by a high rate of default and foreclosure. To date, the Trust and its investors have realized losses of over $325 million. Over half of the loans in the pool Sand Canyon sold to the Trust have been liquidated, modified, or are seriously delinquent. Moreover, more than half of the loans now remaining in the Trust are delinquent; these delinquencies will produce many millions of dollars in further losses to the Trust.

5.     The huge losses realized by the Trust, and the very high delinquency and default rates, caused some investors to examine whether Sand Canyon's representations about these loans had been truthful. One review of a sample of 392 loans showed that Sand Canyon breached its representations and warranties with respect to almost 7 out of every 10 of these loans.

6.     In addition to reviewing loan files, a retroactive appraisal was conducted for a large sample of loans using an automated valuation model and historical data. This study showed that:

- Sand Canyon inflated the true market value of properties. 760 loans for which retroactive appraisal data was available were studied, and for 580 of these loans, the true market value of the mortgaged property was found to be lower than represented by Sand Canyon. For 347 of these loans, the true market value was overstated by 10% or more and in 88 loans, by 25% or more.

- Sand Canyon understated LTV and CLTV ratios. The corrected valuation of these properties was then used to recalculate the loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios -- key risk metrics that represent the amount of the loan (or all loans) on the property as a percentage of the property's value. The analysis found that Sand Canyon had understated the LTV and CLTV ratios for 75% of the mortgage loans studied. For a substantial portion of the loans, LTV and CLTV ratios were understated by more than 10 percentage points.

- Sand Canyon falsely represented that not a single mortgage had an LTV ratio above 100%. In fact, the analysis found that almost 20% of the mortgages had LTV ratios above 100%, meaning that the loans exceeded the value of the mortgaged properties and so were "underwater" from the date of origination.

- Sand Canyon understated the number of properties that were not owner-occupied. Loan default rates on owner-occupied homes are much lower than on second or third homes or investment properties. An analysis found that Sand Canyon misrepresented owner-occupancy in 14% of the examined loans.

7.     Sand Canyon has been informed of the breaches of its representations and warranties that have so far been discovered and has been asked to cure them or repurchase the non-conforming loans. Sand Canyon has refused to cure or repurchase.

8.     Between October 2009 and October 2011, the Trustee gave notice to Sand Canyon of breaches of its representations and warranties on about 200 separate occasions. Each of these notices included a letter identifying the loan or loans at issue and the representations and warranties Sand Canyon had breached. The notices detailed the nature of the breaches, and in some instances included supporting documents either from loan files or from the investigation that had revealed the breaches. To date, Sand Canyon has neither cured its breaches of its

3

representations nor repurchased the loans. (The Trustee's notices and the documents included with that notice are attached as Exhibit A hereto. All exhibits attached hereto have been redacted to remove personally identifiable information.)

9.     An April 20, 2011 letter from Homeward Residential gave Sand Canyon notice of breaches of its representations and warranties with respect to 206 loans. Sand Canyon responded to this notice asking for further information. On October 13, 2011, Homeward Residential responded to Sand Canyon's request with documents identifying each loan with respect to which Sand Canyon had breached its representations and warranties and describing the nature of the breaches. Homeward also provided Sand Canyon with loan file documents or documentary material supporting the conclusion that Sand Canyon had breached its representation and warranties. Sand Canyon has not further responded to this notice and has neither cured the defects nor repurchased the loans. (Homeward Residential's April 20, 2011 and October 13, 2011 notices and the documents it sent to Sand Canyon concerning the breaches are attached as Exhibit B hereto.)

10.     On January 24, 2012, the Trustee wrote to Sand Canon to give notice of breaches of its representations and warranties with respect to 267 loans. The Trustee's notice enclosed a letter from a certificateholder identifying these loans and describing the nature of the breaches with respect to these loans and the grounds for concluding that there had been such breaches. The Trustee also enclosed a schedule that identified the representations and warranties that were breached for each of the 267 loans and described the defects for each of those loans. Sand Canyon responded to the Trustee's notice on May 25, 2012, asking the Trustee to rescind its repurchase demands and purporting to respond to some of the defects identified by the Trustee. The Trustee declined to rescind its notices and repurchase demands. (The Trustee's January 24,

2012 notice and documents included with that notice are attached hereto as Exhibit C. Sand Canyon's May 25, 2012 response is attached as Exhibit D.)

11.     On May 25, 2012, the Trustee wrote to Sand Canyon to give notice of breaches of its representations and warranties with respect to 725 loans. The Trustee's letter identified these loans, notified Sand Canyon of the representations and warranties breached, and enclosed a letter the Trustee had received from a certificateholder describing the nature of the breaches with respect to these loans and grounds for concluding that there had been such breaches. Sand Canyon did not respond to this letter. (The Trustee's notice and the documents included with the notice are attached hereto as Exhibit E.)

12.     After having received the notices and other materials described in ¶¶ 8-11, on only one occasion did Sand Canyon respond by saying that it needed further information in order to assess and respond to the notices. On that one occasion, on being provided with further information, Sand Canyon chose not to respond further.

13.     In this lawsuit, Plaintiff seeks to require Sand Canyon to honor its contractual obligation to repurchase all the loans in the Trust. In the alternative, Plaintiff seeks to require Sand Canyon to repurchase all the loans with respect to which it has breached its representations and warranties.

## The Parties

14.     Homeward Residential is a Delaware corporation with its principal place of business in Coppell, Texas. Homeward Residential was formerly called American Home Mortgage Servicing, Inc. Homeward Residential is the Master Servicer for the Trust.

15.     Defendant Sand Canyon is a California corporation with its principal place of business in Irvine, California. Until 2008, Sand Canyon was known as Option One Mortgage Corporation.

## Jurisdiction and Venue

16.     This dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs, hence the Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3). The parties have also "irrevocably waive[d] any objection" to venue in this Court in the contracts at issue.

## Factual Background

### A.     The creation of the Trust

18.     In a mortgage-backed securitization, a mortgage originator or sponsor first assembles a pool of mortgage loans. This pool of loans is then typically transferred by the originator or sponsor to an affiliated entity called the "depositor"; the depositor then transfers the loans to a specially-created mortgage trust. This trust then issues securities -- usually referred to as "certificates" -- entitling holders to a certain specified share in the income to the trust as borrowers make their mortgage payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans.

19.     In the present case, Option One / Sand Canyon originated the mortgages or purchased them from the originator, and transferred them to Option One Mortgage Acceptance Corporation, as depositor. This transfer was structured as a sale and purchase of the loans, and is documented in a Mortgage Loan Purchase Agreement between Option One (and some special-purpose Option One "seller trusts") and Option One Mortgage Acceptance Corporation, dated as of June 23, 2006. (The Purchase Agreement is Exhibit F to this complaint.)

20.     Option One Mortgage Acceptance Corporation then conveyed "all right, title and interest" in the mortgage loans to the Trust by means of a Pooling and Servicing Agreement dated as of June 1, 2006. This agreement -- which establishes the Trust and the rights and

obligations of the parties to the securitization -- is governed by New York law. Wells Fargo Bank, N.A., was a party to this Pooling agreement as Trustee. (The Pooling Agreement is Exhibit G to this complaint.) On October 11, 2012, Law Debenture Trust Company of New York was appointed as Separate Trustee of the Trust.

21.     The Trust subsequently issued and sold certificates in various classes (or "tranches"), with each class having a different claim on the income to the Trust. The Trust was structured to provide the certificates with various forms of credit support, including overcollateralization, pool insurance, and an interest rate swap agreement. Credit support was also provided by Sand Canyon's representations and warranties with respect to the quality of the loans in the pool and its obligation to repurchase some or all of the loans in the event of breach of these representations and warranties.

**B.      Sand Canyon's representations and warranties**

22.     In the Purchase Agreement, Sand Canyon made over fifty Specific Representations concerning the quality of the mortgage loans, including that: "the information set forth on each Schedule [of mortgage loans]" -- which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information -- "is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule" (Purchase Agreement § 3.01(a)(4)); the loans have "been acquired, serviced, collected and otherwise dealt with by the Originator and any affiliate of the Originator in compliance with all applicable federal, state and local laws and regulations and the terms of the related Mortgage Note and Mortgage" (id. § 3.01(a)(5)); "[t]here is no material default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note" (id. 3.01(a)(b)); "[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party

involved in the origination of the Mortgage Loan" (id. § 3.01(a)(24)); the mortgage file "contains an appraisal of the Mortgaged Property indicating the appraisal value at the time of origination . . . . Each appraisal has been performed in accordance with provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989" (id. § 3.01(a)(25)); the loans were "originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement" (id. § 3.01(a)(28)); "[a]s of the Cut-off Date, each Mortgage Loan, including any Mortgage Loan seasoned more than 12 months as of the Cut-off Date, had a loan-to-value-ratio that was less than or equal to 100%" (id. § 3.01(a)(43)); and "[e]ach Mortgage Loan conforms, and all Mortgage Loans in the aggregate conform, in all material respects, to the description thereof set forth in the Prospectus Supplement" (id. § 3.01(a)(46)).

23.     Sand Canyon's Specific Representations were material to the Trust and the Certificateholders because they represented that the loans met certain credit quality standards that indicated that borrowers would be able to repay their loans. Breaches of these representations therefore have a material effect on the value of the loans and the interests of the Certificateholders in the loans.

24.     In connection with the securitization, Sand Canyon provided to securitization parties loan tapes, loan schedules, and "other written statements, reports and other documents" concerning the quality and characteristics of the mortgage loans. For example, loan tapes and loan schedules provided by Sand Canyon included loan-to-value ratios, occupancy status, and debt-to-income ratios. Sand Canyon represented in Section 3.02(xi) of the Purchase Agreement that:

> Except with respect to any statement regarding the intention of the Purchaser, or
> any other statement contained herein the truth or falsity of which is dependent

solely upon the actions of the Purchaser, this Agreement <u>does not contain any</u> <u>untrue statement of material fact or omit to state a material fact</u> necessary to make the statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Originator pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate <u>do not contain any untrue statement</u> <u>of material fact or omit to state a material fact</u> necessary to make the statements contained therein not misleading. [Emphasis added.]

25.     This No Falsehoods representation was material to the Trust and the Certificateholders. A breach of this No Falsehoods representation materially and adversely affected the value of the mortgage loans and the interests of the Trust and its Certificateholders because untrue statements of material fact that misrepresent the risk profile of the mortgage pool expose the Trust and its Certificateholders to a greater risk of losses on the Certificates.

## C.     Sand Canyon's obligation to cure or repurchase

26.     Sand Canyon's breaches of its Specific Representations which materially and adversely affect the value of loans or materially and adversely affect the interests of the Trust and its Certificateholders require Sand Canyon to cure the breach within 120 days of discovery or notice of the breach. (Purchase Agreement § 3.04.) If Sand Canyon cannot cure the breach, it is required to repurchase the loan if called upon to do so. (<u>Id.</u>[1]) In the event that Sand Canyon breached a representation or warranty it gave in § 3.02 of the Purchase Agreement -- including the No Falsehoods representation -- Sand Canyon can be required to repurchase "all of the Mortgage Loans . . . at the Purchase Price." The Pooling Agreement defines the "Purchase Price" at which Sand Canyon must repurchase the loans.

27.     For breaches related to a mortgage loan or acquired property already sold from the trust, Sand Canyon must pay the difference between the Purchase Price immediately prior to the liquidation and any liquidation proceeds.

---

[1]     Until June 29, 2008, the repurchase obligation could also have been satisfied by Sand Canyon substituting a conforming mortgage loan for a defective mortgage loan.

28. Sand Canyon also agreed to indemnify the Trust and the Certificateholders and hold them harmless against any "costs, fees, and expenses," including "legal fees and related costs," arising out of any untrue statement made by Sand Canyon in connection with the sale of the loans or related in any way to the origination of the loans. (Id. § 5.01(e).)

**D.    The Master Servicer is authorized to enforce Sand Canyon's loan repurchase obligations for the benefit of the Trustee and the Certificateholders.**

29. In the Purchase Agreement, Sand Canyon "acknowledge[d] and consent[ed] to the assignment by the Purchaser [Option One Mortgage Acceptance Corporation] to the Trustee of all of the Purchaser's rights against each Seller and the Originator [Sand Canyon] pursuant to this Agreement insofar as such rights relate to Mortgage Loans transferred to the Trustee and to the enforcement or exercise of any right or remedy against such Seller or Originator pursuant to this Agreement by the Trustee." (Purchase Agreement § 7.08.)

30. In the Pooling Agreement, Option One Mortgage Acceptance Corporation transferred to the Trustee "all right, title and interest" it had in the loans. (Pooling Agreement § 2.01.) And in § 2.03, the Pooling Agreement expressly states that the Trustee can seek redress for "breach by the Originator of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement."

31. The Pooling Agreement gives Homeward Residential, as Master Servicer of the Trust, the authority to enforce Sand Canyon's obligations -- including Sand Canyon's obligation "to purchase a Mortgage Loan . . . on account of a breach of a misrepresentation, warranty or covenant" -- "for the benefit of the Trustee and the Certificateholders." (Id. § 3.02(b).) "Such enforcement . . . shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans." (Id.)

**E.    Sand Canyon's breaches of its representations and warranties**

32.    Since the sale of the loans to the Trust, the loans have experienced a very high rate of defaults and delinquencies. Investors and others have since uncovered many hundreds of loans with respect to which Sand Canyon has breached its representations and warranties. As detailed in ¶¶ 8-11 above and in the exhibits referred to in these paragraphs, Sand Canyon has been notified of these breaches, but has refused to cure them or repurchase the loans, thus necessitating this lawsuit. The notices of breach and demands for repurchase sent to Sand Canyon and attached to this complaint identify the loans at issue and the nature of the breaches of the representations and warranties for each loan.

33.    Sand Canyon represented that each loan in the Trust was "originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Purchase Agreement § 3.01(a)(28).) The Prospectus Supplement stated that Sand Canyon's underwriting guidelines "are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan." These guidelines require the originator to make a "reasonable determination" that the borrower can repay the loan:

> Each mortgage loan applicant completes an application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. . . . Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed. [Emphasis added.]

34.    A summary of Sand Canyon's June 20, 2006 underwriting guidelines was filed with the Securities and Exchange Commission as an attachment to the Trust's mortgage pool

insurance policy. The summary describes the applicable underwriting guidelines as follows (emphasis added):

- The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and <u>to assess the applicant's ability to repay the mortgage loan</u>.

- Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

- The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations, and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance.

- Except with respect to the No Documentation program that is described below, the Option One Underwriting Guidelines <u>require verification or evaluation of the income of each applicant and</u>, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required to be deposited by the applicant into escrow.

35.     Certain pertinent parts of Sand Canyon's Underwriting Guidelines are attached as Exhibit H to this pleading. These Guidelines state that even for "Stated Income" loans, "<u>the stated income must be reasonably based</u> on factors included, but not limited to the:

- Stated income source,
- Employment position, and/or
- Borrower's current credit profile."

36.     An originator's underwriting standards are intended to provide reasonable assurance that a borrower will be able to repay a loan. To the extent the originator deviates from its underwriting standards, the more likely it is that there will be a loss on the loan. Reviews of

borrowers' loan files have revealed numerous instances in which the originator failed to heed Sand Canyon's Underwriting Guidelines by failing to make a "reasonable determination" of the borrower's ability to repay the loan. In very many cases -- described in detail in the exhibits referred to in ¶¶ 8-11 above -- Sand Canyon breached its representations with respect to adherence to its underwriting guidelines because the originating underwriter failed to assess whether the borrower's stated income and stated debt were "reasonably based" given circumstances and factors such as those described in the Underwriting Guidelines, and ignored clear red flags that indicated that the borrower was unlikely to be able to repay the loan. A key measure of a borrower's ability to repay is the borrower's debt-to-income ratio ("DTI"): the borrower's monthly debt obligations as a percentage of his or her monthly income. The higher the DTI -- i.e., the greater the percentage of monthly income a borrower must devote to his or her debt payments -- the greater the borrower's risk of default on a mortgage. Sand Canyon's underwriting guidelines set maximum DTIs for borrowers to qualify for particular loan products. Failure to ensure that the borrower's income is reasonably based given the borrower's circumstances makes a loan riskier and thus materially less valuable to the Trust and Certificateholders.

37.     As one example of the breach of Sand Canyon's underwriting guidelines by the originating underwriter's failure to make a "reasonable determination" that the borrower's statement of income was "reasonably based," a borrower's May 2006 loan application (loan # XXXX5935) stated that the borrower's income as a self-employed dog breeder was $9,650 per month. The lender's responsibility for assessing the reasonableness of the borrower's income is enhanced when, as was the case with this loan, the borrower's mortgage payment resulted in a payment shock of 96.30%. The fact that this borrower had no verified assets and only one open

revolving credit line with a balance under $100 should have indicated to the originating underwriter that the stated income was unreasonable, but the underwriter did not question the reasonableness of the applicant's stated income. It turned out that the borrower had misrepresented her income in her mortgage application and her 2006 income was actually only $1,424 per month. Another borrower's November 2005 loan application (loan # XXXX0741) stated that he was employed by the U.S. Army as a recruiting consultant with an income of $15,000 per month. The loan was approved under the Stated Income program, but the borrower's high stated income should have been a red flag to the originating underwriter. It turned out that the borrower's income in fact was $3,350 per month.

38.     Proper review of a borrower's existing debt obligations is similarly a key component of loan underwriting. Like income, a borrower's existing debt impacts DTI. Misrepresentations of borrowers' debt loads have material and adverse effects on the value of a loan to the Trust and Certificateholders by disguising the credit risk of the loan. The requirement in Sand Canyon's underwriting guidelines of a "reasonable determination" of a borrower's ability to repay a loan thus requires a determination of whether a borrower's statements with respect to his debts are accurate given his circumstances, and requires underwriters to be aware of red flags that indicate that a borrower's statements of his debts might not be accurate or complete.

39.     Reviews of the loans in the Trust have found numerous loans with respect to which Sand Canyon breached its representation with respect to adherence to its underwriting guidelines because the originating underwriter did not make a reasonable determination with respect to borrowers' stated debts and ignored red flags about such debts. These breaches of Sand Canyon's representations are described in detail in the notices and repurchase demands

attached to this pleading. As one example of such a failure, in an April 2006 loan application (loan # XXXX1836) the borrower did not disclose a $27,555 auto loan obtained two months prior to closing on the mortgage. However, 37 credit inquiries appeared on the origination credit report within the previous 90 days, including several from auto companies, which should have alerted the underwriter to such undisclosed debts. The borrower's recalculated DTI based on the auto loan was 60%, rather than 50% as approved, and exceeded the guideline maximum for the loan. In another case, the borrower's February 2006 loan application (loan # XXXX3958) did not disclose two mortgages that were obtained in the two months prior to closing on the mortgage. However, 30 credit inquiries appeared on the origination credit report within the previous 90 days, which should have alerted the underwriter to such undisclosed debts. In another case, a borrower's March 2006 loan application (loan # XXXX9209) did not disclose all the properties he owned at the time of origination. In the month before closing on the loan, the borrower took out two mortgages for $336,00 and $84,000, neither of which was disclosed on the borrower's loan application. While nine credit inquiries appeared on the origination credit report in the previous 90 days, nothing in the mortgage file shows that the originating underwriter did anything to determine if those had led to additional debt for the borrower.

40.    A borrower's employment is also of great importance in deciding whether to make a loan because employment status is a key determinant of whether a borrower is likely to be able to repay the loan. Proper underwriting practices thus require the underwriter to make a reasonable determination as to the correctness of the borrower's statements about his employment. The exhibits referred to in ¶¶ 8-11 attached to this pleading show the many loans with respect to which Sand Canyon breached its representations about adherence to its underwriting guidelines because the originating underwriter failed to make a reasonable

determination of the borrower's employment. By way of example, in one case, in his April 2006 loan application (loan # XXXX6579) a borrower stated he had been with his current employer for nearly three years and earned $4,900 per month. The loan was approved under the Full Documentation program. The originating underwriter failed to obtained the required verification of employment, and did not address the red flag raised by the fact that the employer listed in the application was not on the origination credit report. A subsequent review found that the borrower's employment and income were misrepresented. In another case, the borrower stated in his January 2006 loan application (loan # XXXX2937) that he was the owner of a company in Florida. In approving the loan under the Stated Income program, the originating underwriter unreasonably ignored a document in the origination file from the Florida Department of State Division of Corporations indicating that the borrower's company had been dissolved nearly two decades earlier. A subsequent review was also unable to identify a person who had written a letter included in the origination file stating the borrower was the owner of the company. In a further case, a borrower stated in a April 2006 loan application (loan # XXXX0568) that he was employed as a finance manager at an auto sales company. The loan was approved under the Full Documentation program. The originating underwriter ignored red flags regarding the borrower's stated income and employment that should also have alerted the underwriter to potential misstatements. For example, the employment verification in the origination file stated that the borrower was paid "commission only," but the applicant submitted a paystub purporting to show that he was an employee with a fixed monthly salary of $6,000. A subsequent review found that the borrower had left this job before the loan closed.

41.    A borrower's failure to accurately and fully describe his income, debts, and employment are material defaults, breaches and violations under the borrower's mortgage and

mortgage note. They thus constitute breaches of Sand Canyon's representation and warranty that there is no material default, breach or violation under the borrower's mortgage or note. (Purchase Agreement §3.01(a)(6).) In addition, the circumstances of many of the loans at issue here indicate that borrowers' statements when seeking a loan were knowingly false or misleading, and so fraudulent, and that the originating underwriter and Sand Canyon knew or should have known of this fraud. These loans thus breach Sand Canyon's representation and warranty that, to its knowledge, there was no fraud involved in the origination of the loan. (Id. §3.01(a)(24).)

42. Loan-to-value ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage. For example, an 80% LTV means that the mortgage equals 80% of the property's value, and the borrower's equity is 20%. That 20% equity provides the borrower with an important incentive not to default (and potentially lose the equity in the property), and also acts as a cushion against loss to the lender in the event a default occurs. Combined loan-to-value ratios also take into account all of the liens on the mortgaged property. Sand Canyon's underwriting guidelines set out maximum limits on the LTV and CLTV ratios for particular loan products. But when a loan is based on an inflated appraisal of the value of a property, the equity cushion that specified loan-to-value ratios are intended to provide is removed or reduced. For very many of the loans in this Trust, the appraised values of the properties used by Sand Canyon in calculating these critical ratios were routinely inflated and that the appraisers could not have honestly and in good faith believed that their appraisals were well-founded or accurate. Sand Canyon thus breached its representation with respect to these loans that its stated LTV ratios and appraised values were correct.

43.     It was later discovered that appraisal fraud was rampant in the mortgage industry at and around the time the loans at issue here were made.  In testimony before the Financial Crisis Inquiry Commission, a former wholesale lender stated that appraisers were "often times pressured into coming in 'at value,' i.e., at least the amount needed for the loan to be approved. The appraisers 'fearing' their 'future business and their livelihoods' would choose properties 'that would help support the needed value rather than finding the best comparables to come up with the most accurate value.'"  One appraiser testified that appraisers had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems.  The president of the industry association, the Appraisal Institute, testified in April 2009 that "in many cases, appraisers [we]re ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again."  A survey of 1,200 appraisers conducted by the market research firm October Research found that in 2007, 90% of appraisers felt pressure to restate, adjust, or change the appraised property values.  The survey also found that 75% of appraisers experienced "negative ramifications" when they declined to provide a higher valuation.  In some cases, mortgage lenders and brokers refused to pay for an appraisal that did not support the value of the loan.  Many appraisers who remained independent were blacklisted.

44.     In statements reported in other lawsuits concerning Option One mortgage loans, and included herein on information and belief in their truth and on reasonable belief that further inquiry and discovery from defendant and others will provide evidence of that truth, Option One employees have stated that Option One violated its stated standards for underwriting and appraisals.  For example, according to the amended complaint filed in <u>Cambridge Place</u>

Investment Management Inc. v. Morgan Stanley & Co., Inc., Case No. 10-2741-BLS1 (Mass. Sup. Suffolk County) (Exhibit I to this complaint):

- "Former employees with first-hand knowledge have confirmed that Option One violated its stated standards for underwriting and appraisals. For example, CW 52, a former underwriter at Option One in Atlanta, Georgia from 2005 to 2006, said that if an underwriter denied a loan and an account executive complained, the loan was escalated to the branch manager, who then got in touch with the underwriter. With account executives, 'the biggest screamer and shaker of trees gets the most fruit.' For a 'top-producing' account executive, whatever red flags there were would be 'overlooked,' and invariably the loan would be pushed through. CW 52 estimated that at least 50% of the total loan volume in Option One's Atlanta branch was approved in this manner. CW 52 also stated that a loan applicant could tell 'a straight up lie' about his income, but the untrue information would be overlooked and the loan would be approved, despite CW 52's initial rejection of the application."

- "Similarly, CW 53, an underwriter at Option One's Marietta, Georgia office in 2005, reported that Option One approved stated income loans 'knowing good and well that those people did not make that much money in the position they were in.' Likewise, CW 54, an underwriter for Option One in Hawaii from November 2004 to January 2006, stated that 'the overwhelming majority of stated income loans were crafted,' meaning that the borrowers were not making 'anywhere near' what they claimed. However, CW 54 stated that he felt pressured to push loans

through because every loan generated income and '[i]f you applied any level of rational thought, you were frowned upon.'"

- "With respect to artificially inflated appraisals, CW 52 stated that '[o]f course they inflated values' and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file. Similarly, CW 55, a staff review appraiser for Option One working throughout the western United States from January 2004 to May 2007, stated that the appraisals 'were all bad.' He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to prevent loans based on the flawed appraisals. He explained, 'Our job is supposed to be stopping bad loans, but no one stopped them.' When CW 55 objected to loans because of flawed appraisals, the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department said to go forward with the loan."

- "Option One was motivated to violate its underwriting and appraisal standards in order to increase the volume of loans it could sell to Wall Street Banks to be securitized. CW 56, an Assistant Vice President of Option One from 2005 to 2007, worked in the Correspondent Lending department, which purchased loans from small mortgage companies. CW 56 stated that Option One purchased loans that raised concerns under the stated guidelines and that when he raised such concerns he was essentially told, 'Shut up, Wall Street will buy it; don't worry about it.'"

- "Similarly, CW 57, who was an underwriter at Option One in Pleasanton, California from October 2005 to October 2007, stated that '[i]f [a borrower] had a FICO and a pulse, they could get a loan' from Option One. CW 57 also stated that:

  'I caught blatant fraud, and the [account executive] would still fight for it. [The account executives and managers] would fight me because they didn't care. They knew they were going to sell it on the secondary market, and they didn't care because it wasn't their money. They were going to get paid regardless . . . At Option One they didn't have a portfolio; they sold everything, so they didn't care . . . [Option One] didn't have to worry about it, because once they're done with these crappy loans, they'd sell them off. They were the investors' problem.'

45.     Because of Option One's disregard for its underwriting guidelines, it approved loans that had a higher rate of default than any investor could have expected. Not surprisingly, given that disregard for its own guidelines, Option One was identified by the Office of the Comptroller of the Currency as one of the "Worst Ten" loan originators in the country during the first half of 2008.

46.     Sand Canyon represented in § 3.01(a)(4) of the Purchase Agreement that the information in the loan schedule -- which included appraised values -- was correct. Sand Canyon also represented in § 3.01(a)(25) of the Purchase Agreement that each loan file contained an appraisal performed in accordance with the requirements of federal law. These requirements are set out in the Uniform Standards of Professional Appraisal Practice ("USPAP"). USPAP requires appraisers to "perform assignments with impartiality, objectivity, and independence," and the corresponding Ethics Rule provides that an appraiser "must not accept an assignment that

includes the reporting of predetermined opinions and conclusions." The rule further provides that appraisers "must not advocate the cause or interest of any party or issue" and "must not communicate assignment results with the intent to mislead or to defraud."

47.     Sand Canyon represented in § 3.01(a)(28) of the Purchase Agreement that the loans it sold to the Trust were originated in accordance with Sand Canyon's underwriting guidelines. As noted above, these underwriting guidelines state that:

> Mortgaged properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

48.     In addition to reviewing the loan files, a sample of mortgage loans was studied to analyze the accuracy of certain quantitative representations that Sand Canyon had made about the loans. In total, over 1,600 loans were analyzed. For each of these loans, public records were reviewed and a retroactive appraisal was made using a state-of-the-art valuation model and historical data. This examination found that Sand Canyon had misrepresented property values, and with them LTV and CLTV ratios, for 75% of the loans for which data was available. Sand Canyon also misrepresented owner-occupancy status with respect to at least 14% of the loans.

49.     The retroactive appraisal was conducted using a state-of-the art automated valuation model ("AVM") and historical pricing data for over 750 loans for which AVM data were available. An AVM produces statistically-derived property valuations using sales data for comparable properties in the same geographic area as the property being evaluated. AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination,

portfolio review, and servicing. This appraisal method has been widely used for many years by originators and servicers to support valuation conclusions and to detect fraud.

50.     Independent testing services have determined that the AVM used to test Sand Canyon's representations is one of the most comprehensive and accurate models available. The model incorporates a database of more than 500 million mortgage transactions covering zip codes that represent more than 97% of all properties in the United States, which are occupied by more than 99.7% of the country's population. A retroactive appraisal for each sampled loan was conducted using this AVM -- an appraisal of the mortgaged property as of the time the loan was originated using the comparable sales data that would have been available to mortgage lenders at the time.

51.     The analysis found that for 580 of the 750 loans for which appraisal data were available, the true market value of the property was lower than represented by Sand Canyon. For 347 of these loans, Sand Canyon had overstated the true market value by 10% or more, and for 88 loans, by 25% or more. Inflated appraised values provided to the Trust and Certificateholders constitute material and adverse breaches of §§ 3.01(a)(4), (25) and (28) of the Purchase Agreement. Exhibit E identifies these false metrics for each of the loans reviewed.

52.     By way of example of Sand Canyon's breaches of its representations and warranties, a loan originated in May 2006 (loan # XXXX5672) was for a property appraised at $265,000. However, the originating underwriter ignored several red flags that indicated that the original appraisal was faulty, including the fact that two of the comparable properties used in the appraisal were located more than a mile from the subject property in an urban market. A review of the property with proper underwriting appraised the property at $200,000. Without the inflated appraisal value, the LTV originally presented as 90% would have been 119%, and the

loan should not have been approved. In a further case, the property for a loan that closed in May 2006 (loan # XXXX2045) was initially appraised at $1.82 million. That appraisal was then reduced to $1.65 million by a field review performed before the loan was approved. Despite having access to the reports lowering the initial appraisal, the originating underwriter chose to rely on the higher $1.82 million appraisal in approving the loan. In fact, a post-closing field review valued the property at only $835,000. Without use of the inflated value, the original LTV of 65% would have been 142%, and the loan should have been ineligible for approval. And the property for a loan originated in May 2006 (loan # XXXX0480) was appraised at $118,000. A June 2011 field review showed that the value of the property in 2006 had been overstated by $33,000, or 41%. Using the more accurate appraisal value the LTV would have been 141%, rendering the loan ineligible for approval.

53.     The analysis of Sand Canyon's representations about appraisals showed that the appraisals on properties underlying the loans in this pool were not made in accordance with the required standards, were neither objective nor independent, and could not have been made with an honest belief in their accuracy. Sand Canyon's representations concerning appraisals for the loans it sold to the Trust were false in very many instances and amount to a breach of representations and warranties made by Sand Canyon in §§ 3.01(a)(4), (25), and (28) of the Purchase Agreement.

54.     An inflated appraisal also skews the loan-to-value and combined loan-to-value ratios for a loan. The corrected appraisals were used to recalculate LTV and CLTV rates for the loans in this pool. The new calculation showed that Sand Canyon consistently understated LTV and CLTV ratios in the loan schedule and in the Prospectus Supplement (which aggregates pool-wide LTV and CLTV data in the Mortgage Pool section), contrary to Sand Canyon's

representations in §§ 3.01(a)(4) and (46) of the Purchase Agreement. In addition, Sand Canyon's underwriting guidelines required loans to be within certain LTV and CLTV thresholds. For loans whose recalculated LTV and CLTV ratios are greater than the thresholds permitted under the guidelines, Sand Canyon also breached § 3.01(a)(28) of the Purchase Agreement.

55.     The recalculation found that for 75% of the loans, Sand Canyon inflated the LTV and CLTV ratios; in 30% of the cases, this inflation exceeded 10%. Sand Canyon also represented in § 3.01(a)(43) of the Purchase Agreement that no loan had an LTV ratio greater than 100%. A loan with an LTV ratio that exceeds 100% is by definition "underwater": the bank has lent the borrower more money than the bank can expect to recoup through foreclosure. In addition, an underwater loan has a greater risk of default because the borrower has no equity in the property. The review found that nearly a fifth of the reviewed loans had an LTV that exceeded 100%. Exhibit E identifies these false metrics for each of the loans reviewed.

56.     The review also examined whether Sand Canyon misrepresented the borrower's occupancy status. As discussed above, Sand Canyon represented in §§ 3.01(a)(4) and (46) of the Purchase Agreement that the information included in the loan schedule and Prospectus Supplement was correct. The loan schedule gives the owner-occupancy status for each loan and the Prospectus Supplement aggregates owner-occupancy data across the mortgage pool. Section 3.01(a)(28) of the Purchase Agreement also represents that the loans were originated in accordance with stated underwriting guidelines, which often limit particular loan product and terms to owner-occupied properties. The review showed that Sand Canyon's representations concerning owner occupancy were false with respect to a significant number of the loans at issue.

57.     To confirm the borrower's owner-occupancy status, public records were analyzed to determine if the borrower owned any other properties at the time he or she owned the mortgaged property. The analysis also examined whether the borrower consistently identified the mortgaged property as his or her mailing address for property tax bills on each concurrently owned property. Inconsistencies in tax bill mailing addresses for concurrently-owned properties strongly suggest that the mortgaged property was not, in fact, owner-occupied.

58.     In addition, the lien records on concurrently-owned properties were reviewed to determine whether the borrower indicated that any property other than the mortgaged property was owner-occupied. The test examines all liens originated after the mortgage was issued and compares owner-occupancy representations with those in the deal documents. It is strong evidence that the borrower does not reside at the mortgaged property if liens on concurrently-owned properties indicate that those properties are owner-occupied.

59.     Mailing addresses identified for liens on concurrently-owned properties were also examined to determine whether the address of the mortgaged property was listed as the mailing address for bills and other correspondence between the borrower and the lienholders. If the property address is not identified, that is also a clear indication that the property is not owner-occupied.

60.     Finally, credit records were reviewed to help determine whether a given borrower occupied the mortgaged property. Specifically, it was determined whether creditors were reporting the mortgaged property's address as the borrower's mailing address six months after the origination of the loan. Within six months of closing on a purchase money mortgage loan, the borrower should be expected to have changed his or her billing address with each of his or

her creditors. If the borrower was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

61.     In assessing the accuracy of Sand Canyon's representations, the review only considered instances in which a mortgage loan failed multiple owner-occupancy tests. Despite this high threshold, the forensic investigation revealed systemic misrepresentations of owner occupancy status.

62.     The analysis shows that Sand Canyon misrepresented owner-occupancy status with respect to 14% of the loans. The results of this loan-level analysis of actual owner-occupancy rates are set forth in Exhibit E.

63.     Breach of the owner-occupancy representation is material and adverse because homeowners who reside in mortgaged properties are less likely to default and abandon the property than owners who purchase properties as investments or vacation homes. As with Sand Canyon's breaches of its other Specific Representations, its misrepresentation about owner occupancy hid from the Trust and the Certificateholders the true nature of the risk of default with the pool of loans that it sold to the Trust.

64.     To underwrite loans in accordance with applicable underwriting standards, an underwriter must have access to all the documents required by the respective loan program to determine whether to approve the loan application. A document missing from a loan file indicates that it was not verified during underwriting or that it was deliberately removed from the loan file by the loan officer or an underwriter because it did not support the information provided in the application. Whatever the reason, a missing document represents a departure from reasonable and customary underwriting practices. Thus, by way of example, a loan that closed in December 2005 (loan # XXXX2007) was approved as a full documentation loan, which required

asset documentation for the funds used to close, but the file contains no asset documentation and there is no evidence that the lender obtained such information. In addition, the file contains no proof of housing payment history, as required by guidelines. In another case, Sand Canyon represented that a loan that closed in December 2005 (loan # XXXX2795) complied with applicable laws and regulatory requirements, including federal law requiring that the loan file include a final HUD-1 with the funding documentation. However, there is no final HUD-1 form in the file.

**F.  Sand Canyon has been given notice of its breaches of representations and warranties.**

65.     As described in ¶¶ 8-11 above, Sand Canyon has received the notice of its breaches of its representations and warranties attached as exhibits hereto. Sand Canyon was informed of the facts and circumstances on which the conclusion that it had breached its representation and warranties was based. Section 3.04 of the Purchase Agreement and § 2.03 of the Pooling Agreement require Sand Canyon to repurchase the defective mortgage loan within 120 days of the discovery. Despite having notice of the breaches, Sand Canyon has to date failed to repurchase any loans.

66.     Section 3.04 of the Purchase Agreement further provides that "[i]n the event that a breach shall involve any representation or warranty set forth in §3.02 [which includes the No Falsehoods representation] and such breach cannot be cured within 120 days of the earlier of either discovery by or notice to the Originator of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Originator at the Purchase Price." Sand Canyon is not able to cure its breach of its No Falsehoods representation within 120 days of the Trustee's notice of breach of this representation, and so is obliged to repurchase all of the loans.

**Causes of Action**

**First Cause of Action:  Sand Canyon's Breaches of its Representations and Warranties**

67.     Plaintiff incorporates all previous allegations as though fully set forth here.

68.     The Purchase Agreement and Pooling Agreement are valid and enforceable contracts.  In these contracts, Sand Canyon represented that statements it made in and pursuant to the Purchase Agreement or in connection with the contemplated transactions did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement contained therein not misleading.

69.     Sand Canyon materially breached this No Falsehoods representation by making untrue and misleading statements in the Purchase Agreement, Pooling Agreement, and Prospectus Supplement, as described in detail in the notices of breach sent to Sand Canyon and made part of this pleading.  These untrue statements were material and adverse.

70.     Sand Canyon has also materially breached many of the Specific Representations it made in these contracts by its false statements with respect to individual mortgage loans it sold to the Trust, with material adverse consequences to the Trust and its Certificateholders.  These breaches are described in detail in the notices of breach and associated documents sent to Sand Canyon and made part of this pleading.

71.     Sand Canyon has received notices of these breaches and demands for it to cure or repurchase the non-conforming loans, but it has refused to remedy its breach of its contractual obligations.

72.     The Trustee, the Certificateholders, and Plaintiff have performed all the conditions, covenants, and promises they were required to perform under the operative agreements.

73.     Because of Sand Canyon's false statements, Plaintiff, for the benefit of the Trustee and the Certificateholders, is entitled to specific performance of Sand Canyon's obligation to repurchase all the loans in the Trust. In the alternative, Sand Canyon should be required to repurchase all the loans with respect to which it has made false or misleading Specific Representations.

74.     Sand Canyon breached its representations and warranties with respect to many of the 5,000 plus loans that are no longer in the Trust, of which many were liquidated with heavy losses to the Trust when borrowers were unable to make their mortgage payments. These losses would have been avoided in many cases had Sand Canyon adhered to the underwriting guidelines it represented that it had followed, or truthfully described the nature of these loans to the Trust in advance of its sale of the loans. If a loan is no longer in the Trust, Sand Canyon must pay the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds. Alternatively, Sand Canyon should be required to pay damages for the losses caused to the Trust and its Certificateholders by its breaches of its representations with respect to that loan.

## Second Cause of Action:  Breach of Contract by Failure to Cure or Repurchase

75.     Plaintiff here incorporates all previous allegations as though fully set forth here.

76.     Sand Canyon agreed that in the event of an uncured breach of any of its representations and warranties with respect to any loan, it would repurchase that loan when notice of breach is given and repurchase demanded.

77.     Sand Canyon has breached its obligation to repurchase loans with respect to which it has breached representations and warranties despite being given notices of these breaches and demands that it repurchase.

78.     Sand Canyon should be required to perform its contractual obligations to repurchase these loans, or to otherwise make the Trust whole for its failure to meet its contractual repurchase obligation.

### Third Cause of Action:  Anticipatory Breach

79.     Plaintiff here incorporates all previous allegations as though fully set forth here.

80.     The Trustee sent repurchase demands to Sand Canyon between October 2009 and 2011 notifying Sand Canyon of breaches of its representations and warranties with respect to hundreds of loans.  The 120-day cure period for the most recent of these demands expired on February 1, 2012.  On April 20, 2011, the Master Servicer sent a repurchase demand to Sand Canyon with respect to 206 loans, and supplemented this demand on October 13, 2011.  The 120-day cure period for this notice expired on February 12, 2012.

81.     On January 24, 2012, the Trustee, on behalf of the Trust and at the direction of Certificateholders, notified Sand Canyon that it had materially breached its representations and warranties with respect to 267 loans, and asked Sand Canyon to either cure these breaches or repurchase the loans.  Sand Canyon did not respond to the Trustee's letter until a couple of days before this litigation commenced.  On May 25, 2012, the Trustee sent a repurchase demand to Sand Canyon with respect to 725 loans and asked Sand Canyon to cure these breaches or repurchase the loans.  Sand Canyon has not responded to that letter.

82.     To date, Sand Canyon has not repurchased a single loan from among the many hundreds with respect to which it has breached its representations and warranties.  Sand Canyon's refusal to respond to the Trustee's January 24, 2012 notice until the eve of litigation, and its refusal to respond to the Trustee's May 25, 2012 notice, confirms that it has no intention to honor its contractual obligations.  Sand Canyon has thus overtly and unequivocally repudiated its repurchase obligations, by its acts (and failures to act) clearly demonstrating that it will not

perform its obligation to repurchase loans concerning which it has breached its representations. In light of this repudiation, Plaintiff has good reason to expect that Sand Canyon will refuse in the future to cure or repurchase non-compliant loans in accordance with its obligations.

83.     Under § 3.04 of the Purchase Agreement and § 2.03(a) of the Pooling Agreement, Sand Canyon must repurchase non-compliant loans identified in all of the repurchase requests. For liquidated loans, Sand Canyon must pay the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds. Alternatively, Sand Canyon should be required to pay damages for the losses caused to the Trust and its Certificateholders by Sand Canyon's breaches of its representations with respect to the liquidated loans.

### Fourth Cause of Action: Indemnity

84.     Plaintiff incorporates all previous allegations as though fully set forth here.

85.     In the Purchase Agreement, Sand Canyon undertook to hold the Trustee and the Certificateholders "harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" the Trustee and the Certificateholders may sustain relating to the origination of the loans and breaches of the originator's representations and warranties.

86.     The Trustee and the Certificateholders have sustained and will continue to sustain losses, costs, fees and expenses arising out of and related to Sand Canyon's origination of the loans it sold to the Trust and its breaches of its representations and warranties.

87.     Sand Canyon should therefore indemnify the Trustee and the Certificateholders for these losses, costs, fees and expenses.

### Fifth Cause of Action: Declaratory Judgment

88.     Plaintiff incorporates all previous allegations as though fully set forth here.

89.     Sand Canyon has thus far failed to repurchase loans when given notice of its breaches of representations. The Trustee reasonably expects that Sand Canyon will refuse to respond to outstanding and future requests for it to repurchase loans, notwithstanding its repurchase obligation. Consequently, there exists a real and justiciable controversy as to the rights and legal relations of the parties under the Purchase and Pooling Agreements.

90.     Because there is a justiciable controversy under CPLR § 3001, Plaintiff seeks a declaration that Sand Canyon must honor its obligations to repurchase loans for which it has been given notice, or will be given notice, of its breach of representations or otherwise make the Trust whole for breaches of its representations and warranties.

## Prayer for Relief

WHEREFORE Plaintiff prays for relief as follows:

91.     On the First Cause of Action, specific performance of Sand Canyon's repurchase obligations under the Purchase Agreement and the Pooling Agreement, and with respect to Sand Canyon's breach of its representations concerning liquidated loans, specific performance and/or payment of the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds for liquidated loans, or, alternatively, damages sufficient to compensate the Trust and its Certificateholders for their losses.

92.     On the Second Course of Action, specific performance of Sand Canyon's repurchase obligations under the Purchase Agreement and the Pooling Agreement, or, in the affirmative, the payment of damages to make the Trust whole.

93.     On the Third Cause of Action, specific performance and/or damages to compensate the Trust and its Certificateholders for Sand Canyon's anticipatory repudiation of its contractual obligations.

94.    On the Fourth Cause of Action, an award sufficient to indemnify the Trustee and the Certificateholders for all losses, costs, fees and expenses sustained as a consequence of Sand Canyon's misconduct.

95.    On the Fifth Cause of Action, a declaratory judgment that Sand Canyon must comply with its contractual obligation to cure its breaches of its representations or repurchase the loans when given notice of such breaches.

96.    Reimbursement of the costs and expenses of maintaining this action, including reasonable attorney and expert fees.

97.    An award of such other and further relief as may be just and proper.

DATED:   New York, New York
              July 19, 2013

                                                HUNTON & WILLIAMS LLP

                                                By: _Brian V. Otero_____
                                                      Brian V. Otero
                                                      Stephen R. Blacklocks

                                                      200 Park Avenue
                                                      New York, NY 10166
                                                      (212) 309-1000

                                                      Attorneys for Plaintiff Homeward
                                                      Residential, Inc.

## DECLARATION OF SERVICE

Bradford C. Mulder, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am Managing Clerk at the law firm of Hunton & Williams LLP, attorneys for Plaintiff Homeward Residential, Inc.

On July 19, 2013, I served a true copy of the attached Amended Complaint, on all counsel of record for Defendant Sand Canyon Corporation, by hand, by leaving same in a properly addressed envelope with a proper person at the address as indicated below, and via First Class Mail, at the addresses as indicated below, by depositing the same in a duly enclosed and sealed wrapper, with the correct postage thereon, in an official letter box duly maintained by the Government of the United States of America within the State of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 19, 2013.

Bradford C. Mulder

TO:   James Goldfarb, Esq.
MURPHY & McGONIGLE, P.C.
One Grand Central Place
60 E. 42nd Street, Suite 5230
New York, New York 10165
(BY HAND)

Jeffrey W. Kilduff, Esq.
Robert M. Stern, Esq.
O'MELVENY & MEYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(BY FIRST CLASS MAIL)

Daniel T. Brown, Esq.
MURPHY & McGONIGLE, P.C.
555 13th Street, NW
Suite 410W
Washington, DC 20004
(BY FIRST CLASS MAIL)

*Attorneys for Defendant Sand Canyon Corporation*