# Exhibit 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| HOMEWARD RESIDENTIAL, INC., solely in its capacity as Master Servicer for the Option One Mortgage Loan Trust 2006-2, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006-2 Certificates,<br><br>Plaintiff,<br><br>-against-<br><br>SAND CANYON CORPORATION, f/k/a Option One Mortgage Corporation,<br><br>Defendant | Index No.<br><br>SUMMONS<br><br><br>Date Index No. Purchased:<br>May 31, 2012 |

To the above named Defendant:

Sand Canyon Corporation, f/k/a Option One Mortgage Corporation
7595 Irvine Center Drive, Suite 100
Irvine, California 92618
c/o New York Secretary of State

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is: CPLR 327(b), 501, 503(a), and General Obligations Law § 5-1402.

Dated: New York, New York
May 31, 2012

HUNTON & WILLIAMS LLP

By: _Brian V. Otero_

Brian V. Otero
Stephen R. Blacklocks
200 Park Avenue
New York, New York 10166
(212) 309-1000

Attorneys for Homeward Residential, Inc.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

HOMEWARD RESIDENTIAL, INC., solely
in its capacity as Master Servicer for the
Option One Mortgage Loan Trust 2006-2, for
the benefit of the Trustee and the holders of
Option One Mortgage Loan Trust 2006-2
Certificates,

             Plaintiff,

    - against -

SAND CANYON CORPORATION, f/k/a
Option One Mortgage Corporation,

          Defendant.

Index No.

COMPLAINT

---

Plaintiff Homeward Residential, Inc. ("Homeward Residential"), solely in its capacity as

Master Servicer for the Option One Mortgage Loan Trust 2006-2 ("the Trust"), brings this

lawsuit for the benefit of the Trustee of the Trust and the holders of certificates issued by the

Trust, and for its complaint against Sand Canyon Corporation ("Sand Canyon") states as follows:

**Nature of the Action**

1.    In 2006, Sand Canyon (then known as Option One Mortgage Corporation) and

certain of its subsidiaries sold a pool of more than 7,500 mortgage loans with a total initial

principal balance of about $1.5 billion to the Trust. In connection with that sale, Sand Canyon

made certain representations and warranties that have now been discovered to have been false.

2.    Sand Canyon made about fifty specific representations and warranties regarding

the mortgage loans it was selling to the Trust. In these representations and warranties -- the

"Specific Representations" -- Sand Canyon represented, among other things, that the loans it was

selling complied with Sand Canyon's stated underwriting guidelines, that the information Sand

Canyon provided about the loans was true and correct, and that there had been no fraud in the origination of the loans. Sand Canyon also made various representations concerning key loan metrics intended to measure whether it was likely that borrowers would be able to repay their loans, and whether it was likely that the Trust would suffer a loss in the event of a borrower default. Sand Canyon agreed that in the event of a material breach of any Specific Representation, it would cure the breach or repurchase the loan in question.

3.     Sand Canyon also represented that it had not made any material false statements or omissions in the loan sale agreement and that no documents it had prepared in connection with the sale contained any material false statements or omissions. Sand Canyon agreed that in the event of a breach of this "No Falsehoods" representation, the Trust could require Sand Canyon to repurchase all the loans it had sold to the Trust.

4.     Despite Sand Canyon's representations to the Trust and its investors that the mortgage loans met defined credit quality standards, the loan pool has been plagued by a high rate of default and foreclosure. To date, the Trust and its investors have realized losses of over $325 million. As of March 2012, approximately 56% of the loans in the pool Sand Canyon sold to the Trust have been liquidated, modified, or are seriously delinquent. Moreover, more than half of the loans now remaining in the Trust are delinquent; these delinquencies will produce many millions of dollars in further losses to the Trust.

5.     The huge losses realized by the Trust, and the very high delinquency and default rates, caused some investors to examine whether Sand Canyon's representations about these loans had been truthful. One review of a sample of 392 loans has shown that Sand Canyon breached its representations and warranties with respect to almost 7 out of every 10 of these loans.

6.     In addition to reviewing loan files, a forensic investigation of 1,600 loans in the

Trust was undertaken. For each of these loans, a retroactive appraisal was conducted using an

automated valuation model and historical data. This investigation showed that:

- **Sand Canyon inflated the true market value of properties.** 760 loans for which retroactive appraisal data was available were studied, and for 580 of these loans, the true market value of the mortgaged property was found to be lower than represented by Sand Canyon. For 347 of these loans, the true market value was overstated by 10% or more and in 88 loans, by 25% or more.

- **Sand Canyon understated LTV and CLTV ratios.** The corrected valuation of these properties was then used to recalculate the loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios -- key risk metrics that represent the amount of the loan (or all loans) on the property as a percentage of the property's value. The analysis found that Sand Canyon had understated the LTV and CLTV ratios for 75% of the mortgage loans studied. For a substantial portion of the loans, LTV and CLTV ratios were understated by more than 10 percentage points.

- **Sand Canyon falsely represented that not a single mortgage had an LTV ratio above 100%.** In fact, the analysis found that almost 20% of the mortgages had LTV ratios above 100%, meaning that the loans exceeded the value of the mortgaged properties and so were "underwater" from the date of origination.

- **Sand Canyon understated the number of properties that were not owner-occupied.** Loan default rates on owner-occupied homes are much lower than on second or third homes or investment properties. The analysis found that Sand Canyon misrepresented owner-occupancy in 14% of the examined loans.

7.     Sand Canyon's misrepresentations with respect to individual loans in the pool of

loans it sold to the Trust were a manifestation of a pattern of deeper misconduct: a pervasive and

systemic disregard of responsible lending practices and standards as Sand Canyon rushed to cash

in on the mortgage securitization boom. Sand Canyon knowingly allowed its lending practices

and standards to deteriorate in order to ensure that it had a constant supply of mortgages that it

could sell at a profit for securitization. Instead of carefully scrutinizing the credit risks from

potential loans to guard against default and loss to the Trust, Sand Canyon generated a large

volume of loans that it could unload onto others in order to further its own financial interests

without regard to the potential harm to investors.

8.      In this lawsuit, Plaintiff will prove that Sand Canyon breached its representations to the Trust and its investors in its headlong rush to originate more and more mortgages to sell to the Trust and others.  The sale agreement provides a remedy for this sort of pervasive and systemic untruthfulness and disregard of underwriting standards:  Sand Canyon should be required to repurchase all the loans it sold to the Trust.

### The Parties

9.      Homeward Residential is a Delaware corporation with its principal place of business in Coppell, Texas.  Homeward Residential was formerly called American Home Mortgage Servicing, Inc.  Homeward Residential is the Master Servicer for the Trust.

10.      Defendant Sand Canyon is a California corporation with its principal place of business in Irvine, California.  Until 2008, Sand Canyon was known as Option One Mortgage Corporation.

### Jurisdiction and Venue

11.      This Court has jurisdiction under General Obligations Law §§ 5-1401 and 5-1402 because (i) the contracts at issue relate to an obligation of more than $1 million, (ii) in those contracts the parties agreed that New York law should govern the contracts, and (iii) the parties have "irrevocably submit[ted] to the exclusive jurisdiction of the Courts of the State of New York and the United States District Court located in the Borough of Manhattan."

12.      Venue is proper in this Court under CPLR §§ 327(b), 501 and 503(a), and General Obligations Law § 5-1402, because, in the contracts at issue, the parties "irrevocably waive[d] any objection" to venue in this Court.

4

## Factual Background

### A. The creation of the Trust

13. In a mortgage-backed securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans. This pool of loans is then typically transferred by the originator or sponsor to an affiliated entity called the "depositor"; the depositor then transfers the loans to a specially-created mortgage trust. This trust then issues securities -- usually referred to as "certificates" -- entitling holders to a certain specified share in the income to the trust as borrowers make their mortgage payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans.

14. In the present case, Option One / Sand Canyon originated the mortgages, and transferred them to Option One Mortgage Acceptance Corporation, as depositor. This transfer was structured as a sale and purchase of the loans, and is documented in a Mortgage Loan Purchase Agreement between Option One (and some special-purpose Option One "seller trusts") and Option One Mortgage Acceptance Corporation, dated as of June 23, 2006. (The Purchase Agreement is Exhibit A to this complaint.)

15. Option One Mortgage Acceptance Corporation then conveyed "all right, title and interest" in the mortgage loans to the Trust by means of a Pooling and Servicing Agreement dated as of June 1, 2006. Wells Fargo Bank, N.A., was a party to this Pooling agreement as Trustee. (The Pooling Agreement is Exhibit B to this complaint.)

16. The Trust subsequently issued and sold certificates in various classes (or "tranches"), with each class having a different claim on the income to the Trust. The Trust was structured to provide the certificates with various forms of credit support, including overcollateralization, pool insurance, and an interest rate swap agreement. Credit support was also provided by Sand Canyon's representations and warranties with respect to the quality of the

5

loans in the pool and its obligation to repurchase some or all of the loans in the event of breach

of these representations and warranties.

**B.      Sand Canyon's representations**

17.      Sand Canyon made over fifty Specific Representations concerning the quality of

the mortgage loans in the Purchase Agreement, including the following:

- That "the information set forth on each Schedule [of mortgage loans]" -- which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information -- "is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule." (Purchase Agreement § 3.01(a)(4).)

- That the loans have "been acquired, serviced, collected and otherwise dealt with by the Originator and any affiliate of the Originator in compliance with all applicable federal, state and local laws and regulations and the terms of the related Mortgage Note and Mortgage." (Id. § 3.01(a)(5).) See also id. § 3.01(a)(50) ("Each Mortgage Loan was originated in compliance with all applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory and anti-abusive lending laws.").

- That "[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan." (Id. § 3.01(a)(24).)

- That the mortgage file "contains an appraisal of the Mortgaged Property indicating the appraisal value at the time of origination . . . . Each appraisal has been performed in accordance with provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989." (Id. § 3.01(a)(25).)

- That the loans were "originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement." (Id. § 3.01(a)(28).)

- That "the Mortgage Loans were not intentionally selected by the … Seller in a manner intended to adversely affect the Purchaser or the Trust." (Id. § 3.01(a)(40).)

- That "[a]s of the Cut-off Date, each Mortgage Loan, including any Mortgage Loan seasoned more than 12 months as of the Cut-off Date, had a loan-to-value-ratio that was less than or equal to 100%." (Id. § 3.01(a)(43).)

- That "[e]ach Mortgage Loan conforms, and all Mortgage Loans in the aggregate conform, in all material respects, to the description thereof set forth in the Prospectus Supplement." (Id. § 3.01(a)(46).)

18. Sand Canyon's Specific Representations were material to the Trust and the

Certificateholders because they represented that the loans met certain credit quality standards

that indicated that borrowers would be able to repay their loans. Breaches of these

representations therefore have a material effect on the value of the loans and the interests of the

Certificateholders in the loans.

19. In § 3.02(xi) of the Purchase Agreement, Sand Canyon gave its No Falsehoods

representation:

> Except with respect to any statement regarding the intention of the Purchaser, or any other statement contained herein the truth or falsity of which is dependent solely upon the actions of the Purchaser, this Agreement does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Originator pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading.

20. Sand Canyon's No Falsehoods representation was material to the Trust and the

Certificateholders. By this representation, Sand Canyon promised that the written information it

provided in connection with the sale of mortgages -- including key credit metrics such as loan-to-

value ratios -- was not false or misleading. A breach of this No Falsehoods representation

materially and adversely affected the value of the mortgage loans and the interests of the Trust

and its Certificateholders because untrue statements of material fact that misrepresent the risk

profile of the mortgage pool expose the Trust and its Certificateholders to a greater risk of losses

on the Certificates.

7

### C.    Sand Canyon's obligation to cure or repurchase

21.    Sand Canyon's breaches of its Specific Representations which materially and adversely affect the value of loans or materially and adversely affect the interests of the Trust and its Certificateholders require Sand Canyon to cure the breach within 120 days of discovery or notice of the breach. (Purchase Agreement § 3.04.)  If Sand Canyon cannot cure the breach, it shall repurchase the loan if required to do so.  (Id.[1])  The Pooling Agreement defines the "Purchase Price" at which Sand Canyon must repurchase the loan.

22.    In the event that Sand Canyon breached a representation or warranty it gave in § 3.02 of the Purchase Agreement -- including the No Falsehoods representation -- Sand Canyon can be required to repurchase "all of the Mortgage Loans . . . at the Purchase Price." This pool-wide remedy is apt here because Sand Canyon's misrepresentations and faulty underwriting practices affected the mortgage loan pool as a whole, and the injury caused by such pervasive and systemic misconduct cannot be fully and efficiently compensated by the loan-by-loan repurchase remedy provided for breach of the Specific Representations.

23.    For breaches related to a mortgage loan or acquired property already sold from the trust (typically as a result of foreclosure), Sand Canyon must pay the difference between the Purchase Price immediately prior to the liquidation and any liquidation proceeds.

24.    Sand Canyon also agreed to indemnify the Trust and the Certificateholders and hold them harmless against any "costs, fees, and expenses," including "legal fees and related costs," arising out of any untrue statement made by Sand Canyon in connection with the sale of the loans or related in any way to the origination of the loans. (Purchase Agreement § 5.01(e).)

---

[1]    Until June 29, 2008, the repurchase obligation could also have been satisfied by Sand Canyon substituting a conforming mortgage loan for a defective mortgage loan.

8

**D.    The Master Servicer is authorized to enforce Sand Canyon's loan repurchase obligations for the benefit of the Trustee and the Certificateholders.**

25.    In the Purchase Agreement, Sand Canyon "acknowledge[d] and consent[ed] to the assignment by the Purchaser [Option One Mortgage Acceptance Corporation] to the Trustee of all of the Purchaser's rights against each Seller and the Originator [Sand Canyon] pursuant to this Agreement insofar as such rights relate to Mortgage Loans transferred to the Trustee and to the enforcement or exercise of any right or remedy against such Seller or Originator pursuant to this Agreement by the Trustee." (Purchase Agreement § 7.08.)

26.    In the Pooling Agreement, Option One Mortgage Acceptance Corporation transferred to the Trustee "all right, title and interest" it had in the loans. (Pooling Agreement § 2.01.) And in § 2.03, the Pooling Agreement expressly states that the Trustee can seek redress for "breach by the Originator of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement."

27.    The Pooling Agreement gives Homeward Residential, as Master Servicer of the Trust, the authority to enforce Sand Canyon's obligations -- including Sand Canyon's obligation "to purchase a Mortgage Loan . . . on account of a breach of a misrepresentation, warranty or covenant" -- "for the benefit of the Trustee and the Certificateholders." (Id. § 3.02(b).) "Such enforcement . . . shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans." (Id.)

**E.    Sand Canyon's breaches of its representations**

28.    Since the sale of the loans to the Trust, the loans have experienced a very high rate of defaults and delinquencies. As of March 2012, the Trust had realized losses of about $325 million, or 22% of the original value of the Trust. Ninety percent of these losses originated

from Group II loans, which collateralize the Certificates purchased by private investors. Of these Group II loans, nearly half of the losses came from loans on which borrowers made fewer than 12 payments since the securitization closed; 18% of the losses came from loans on which borrowers made fewer than 3 payments since the securitization closed; and 7% of the losses came from loans on which borrowers made no payment at all after the securitization closed. Given the closeness in time between underwriting and default, market changes cannot explain this high rate of failure. Instead this record indicates deep irregularities with Sand Canyon's underwriting and widespread breaches of its representations and warranties.

29.    The severe losses realized by the Trust caused certain Certificateholders and the Certificate Insurer to examine loan files to determine if the loans complied with Sand Canyon's Specific Representations. In addition, a forensic investigation of the mortgage loans was carried out that used an automated valuation model, publicly available data concerning comparable property values at the time of origination, and public records indicating owner occupancy, to determine whether the loans had the characteristics that Sand Canyon represented that they had. Both reviews revealed pervasive and systemic breaches of Sand Canyon's representations and warranties.

30.    Sand Canyon has been informed of these breaches, and has been asked to cure them or repurchase the non-conforming loans.

a.    Between October 2009 and October 2011, the Trustee gave notice to Sand Canyon on almost 200 separate occasions concerning breaches of its representations and warranties with respect to a number of loans. To date, Sand Canyon has neither cured the defects in over 200 of these loans, nor repurchased the loans.[2]

b.    On April 20, 2011, a letter from Homeward Residential gave Sand Canyon notice of breaches of its representations with respect to 206 loans. Sand Canyon

---

[2]    The Trustee's notices are collected as Exhibit C to this Complaint. This exhibit (like the exhibits referred to in subparagraphs b and c below) does not include certain attachments which contain confidential information concerning the borrowers.

responded to this notice asking for further information concerning the defects with these loans. Homeward Residential responded to Sand Canyon's request with documents containing the further information Sand Canyon requested. (This correspondence is attached as Exhibit D.) Sand Canyon has not responded, and has neither cured the defects nor repurchased the loans.

c.     On January 24, 2012, the Trustee wrote to Sand Canon to give notice of breaches of its representations with respect to 267 loans. (This letter is Exhibit E hereto.) The Trustee's communication included a document identifying the defects with each loan. The 120-day cure period with respect to this notice expired on May 23, 2012, without a response from Sand Canyon.

d.     On May 25, 2012, the Trustee wrote to Sand Canyon to give notice of its breaches of its representations and warranties with respect to 725 loans. The Trustee's communication identified the defects with each of these loans, and instructed Sand Canyon to cure these defects or repurchase the loans. The Trustee also notified Sand Canyon that, if it did not cure these defects, the Trustee could require it to repurchase all the loans in the pool. (This letter is Exhibit F hereto.)

**F.     A review of 392 loan files revealed widespread breaches of Sand Canyon's Specific Representations.**

31.     A review of a sample of 392 loans where the borrower was delinquent in his or her mortgage payments or had already defaulted on his or her mortgage found widespread breaches of Sand Canyon's Specific Representations.

32.     Review of loan files is often useful in identifying deviations from underwriting standards and breaches of representations because a loan file should contain information concerning the credit quality of a loan. A file for a residential mortgage loan should contain the borrower's application for the loan; verification of the borrower's income, assets and employment; references; a credit report; a property appraisal; and a statement of occupancy. The loan file should also contain the record of the investigation performed by the loan originator to ensure that the documents and information support making a loan to the borrower. Investors in mortgage securitizations are not given access to the loan files prior to purchasing the certificates, and so rely on the representations and warranties of the originator or sponsor.

11

33.    Review of the loan files found that of the 392 loans in the sample, nearly 70%

manifested material breaches of Sand Canyon's representations and warranties. Of the breaches

identified, 80% involved disregard of Sand Canyon's underwriting guidelines, 58% showed

fraud, 27% revealed an inflated appraisal of the property's value, and another 15% failed to

comply with applicable laws.

34.    Sand Canyon represented that each loan in the Trust was "originated substantially

in accordance with the Originator's underwriting criteria, which are at least as stringent as the

underwriting criteria set forth in the Prospectus Supplement." (Purchase Agreement

§ 3.01(a)(28).) The Prospectus Supplement stated that Sand Canyon's underwriting guidelines

"are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy

of such property as collateral for the mortgage loan and to assess the applicant's ability to repay

the mortgage loan." The Prospectus Supplement also states that:

> Each mortgage loan applicant completes an application that includes information
> with respect to the applicant's liabilities, income, credit history, employment
> history and personal information. . . . Option One Underwriting Guidelines
> require a reasonable determination of an applicant's ability to repay the loan.
> Such determination is based on a review of the applicant's source of income,
> calculation of a debt service-to-income ratio based on the amount of income from
> sources indicated on the loan application or similar documentation, a review of
> the applicant's credit history and the type and intended use of the property being
> financed.

35.    A summary of Sand Canyon's June 20, 2006 underwriting guidelines was filed

with the Securities and Exchange Commission as an attachment to the Trust's mortgage pool

insurance policy. The summary describes the applicable underwriting guidelines as follows:

- The Option One Underwriting Guidelines are primarily intended to assess the
  value of the mortgaged property, to evaluate the adequacy of such property as
  collateral for the mortgage loan and to assess the applicant's ability to repay the
  mortgage loan.

- Mortgaged properties that are to secure mortgage loans generally are appraised by
  qualified independent appraisers. Such appraisers inspect and appraise the subject

12

property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

- The Option One Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations, and require Option One's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal, supports the loan balance.

- Except with respect to the No Documentation program that is described below, the Option One Underwriting Guidelines require verification or evaluation of the income of each applicant and, for purchase transactions, verification of the seasoning or source of funds (in excess of $2,500) required to be deposited by the applicant into escrow.

36. As these statements make clear, an originator's underwriting standards are intended to provide reasonable assurance that a borrower will be able to repay a loan. To the extent the originator deviates from its underwriting standards, the more likely it is that there will be a loss on the loan.

37. The review of loan files identified numerous breaches of Sand Canyon's Specific Representations. The report of this review, describing the details of each breach, was sent to Sand Canyon on January 24, 2012. The following paragraphs describe some of the breaches found in this and other reviews of loan files.

38. Overstatement of Income: A borrower's ability to repay a mortgage depends in very large measure on his or her income. A key measure of a borrower's ability to repay is the borrower's debt-to-income ratio ("DTI"): the borrower's monthly debt obligations as a percentage of his or her monthly income. The higher the DTI -- i.e., the greater the percentage of monthly income a borrower must devote to his or her debt payments -- the greater the borrower's

13

risk of default on a mortgage. Sand Canyon's underwriting guidelines set maximum DTIs for

borrowers to qualify for particular loan products. Failure to verify the accuracy of a borrower's

income makes a loan riskier and thus materially less valuable to the Trust and Certificateholders.

The following are a few of many examples of misrepresented income that would have been

apparent if Sand Canyon had engaged in proper underwriting procedures:

- An April 2006 loan application stated that the borrower's income was $12,000 per month as an employee of a sandwich shop. The loan was approved under the Stated Income program, which required the originating underwriter to consider the reasonableness of the borrower's stated income in relation to the borrower's occupation and credit profile. This applicant's stated income was not reasonable given his occupation, the fact that he had no verified assets, and the fact that his depth of credit was not consistent with that of a person earning $144,000 per year. There is no indication that the originating underwriter paid any attention to these red flags.

- A borrower's January 2006 loan application stated that the borrower's income as a self-employed seamstress was $7,650 per month. The loan was approved under the Stated Income program, but the applicant's stated income is not reasonable given her employment. There is nothing in the loan file indicating that the underwriter questioned the reasonableness of the borrower's stated income. The borrower's later bankruptcy filing revealed that her actual income was only $365 per month in 2006. The DTI using her actual income is 961%, far exceeding the guideline maximum of 50%, and so the loan should not have been approved.

- A February 2006 loan application stated that the borrower's income as the owner of a construction company was $54,751 per month. The loan was approved under the Full Documentation program, which required the lender to determine the reasonableness of the income stated on the application in relation to the borrower's occupation and credit information. In this case, the file gave no indication that the underwriter assessed the reasonableness of the income listed by the borrower. The only evidence of the borrower's income in the file was statements showing deposits into the borrower's business account, which is not an acceptable substitute for the borrower's income, particularly since the file did not include a review of business expenses. The borrower's subsequent bankruptcy filing revealed that his 2005 income was only $1,706 per month, and listed his 2006 income as "unknown." Using the borrower's actual 2005 income, the DTI is 332%, more than seven times greater than the guideline maximum of 45%, rending the loan ineligible for approval.

- A borrower's May 2006 loan application stated that the borrower's income as a self-employed dog breeder was $9,650 per month. The lender's responsibility for assessing the reasonableness of the borrower's income is enhanced when, as in

14

this case, the borrower's mortgage payment results in a payment shock of 96.30%. The fact that this borrower had no verified assets and only one open revolving credit line with a balance under $100 should have indicated to the originating underwriter that the stated income was unreasonable. Nothing in the file, however, indicates that the underwriter questioned the reasonableness of the applicant's stated income. The borrower's subsequent bankruptcy filing revealed that she had misrepresented her employment in her mortgage application by saying she had been a self-employed dog breeder for seven years, rather than just 18 months, and that her 2006 income was actually only $1,424 per month. The DTI at the actual income level is 331%, rendering the loan ineligible for approval.

- A borrower stated in her March 2006 loan application that she was the owner of a flower shop with a monthly income of $17,500. The loan was approved under the Stated Income program, but the borrower's stated income and position should have put the originating underwriter on notice for potential fraud; however, there is nothing in the origination file indicating that the underwriter addressed that red flag. The borrower's 2008 bankruptcy filings stated that her 2006 income was $1,598 per month. The DTI at the borrower's actual income level was 511%, exceeding the 50% maximum permitted under the applicable underwriting guidelines.

- A borrower stated in his September 2005 loan application that he had a monthly income of $9,500 as the owner of a maintenance company. The loan was approved under the Stated Income program, but the originating underwriter failed to address whether the stated income was reasonable, even though the borrower's reported depth of credit was not consistent with his stated income. A subsequent review revealed that the borrower was an employee of the maintenance company, not the owner, and that his monthly income in 2005 was $2,743.83. Using his verified income for 2005, the borrower's DTI was 149%, exceeding the 50% maximum permitted under the applicable underwriting guidelines.

- A borrower's November 2005 loan application stated that he was employed by the U.S. Army as a recruiting consultant with an income of $15,000 per month. The loan was approved under the Stated Income program, but the borrower's high stated income should have been a red flag to the originating underwriter. In addition, the borrower had been employed in that position for less than two months. An audit of the loan origination revealed that the borrower's income in fact was $3,350 per month, and the actual DTI was 146%, exceeding the maximum allowed for that loan.

- A February 2006 loan application stated that the borrower was an artist/performer earning $8,000 per month. The loan was approved under the Stated Income program, but the borrower's stated income was not reasonable given his occupation and the fact that he had no verified assets. There is no indication that the originating underwriter reviewed these factors when approving the loan. Tax returns and income documents submitted when the borrower later sought a modification show a total monthly income much less than reported by the

borrower. The DTI using the borrower's actual income is over 200%, rendering the loan ineligible for approval.

39. <u>Understatement of Debt Obligations</u>: Proper review of a borrower's existing debt obligations is similarly a key component of loan underwriting. Like income, a borrower's existing debt impacts DTI. Misrepresentations of borrowers' debt loads have material and adverse effects on the value of a loan to the Trust and Certificateholders by disguising the credit risk of the loan, and failure to disclose additional debt is a material default, and so a material and adverse breach of § 3.01(a)(16) of the Purchase Agreement. Finally, the borrower's failure to disclose this debt and/or Sand Canyon's failure to disclose its awareness of this debt breaches the no-fraud representation in §3.01(a)(24) of the Purchase Agreement. The following are a few of many examples of breaches relating to misrepresentations of debt obligations:

- In his April 2006 loan application, the borrower did not disclose a $27,555 auto loan obtained two months prior to closing on the mortgage. The originating underwriter did not address the 37 credit inquiries appearing on the origination credit report within the previous 90 days, including several from auto companies, which should have alerted him to the likelihood of such undisclosed debts. The borrower's recalculated DTI based on the auto loan was 60%, rather than 50% as approved, and exceeded the guideline maximum for the loan.

- A borrower's May 2006 loan application did not disclose all the properties he owned or was in the process of acquiring at the time of origination. Two months prior to the loan's closing, the borrower took out mortgages of $366,400, $292,800, and $140,000 to purchase three properties. None of those mortgages were disclosed on the borrower's loan application, and the mortgage file shows no steps taken by the originating underwriter to check for undisclosed debts. The borrower's DTI using his actual debt obligations is 110%, exceeding the 55% maximum and rendering the loan ineligible for approval.

- In his April 2006 loan application, the borrower failed to disclose that five months prior to closing on the loan he took out a mortgage for $185,250. Very soon after the loan closed, the borrower closed on a $255,000 mortgage on another property. A prudent underwriter would have identified the earlier mortgage and would likely also have uncovered the applicant's application for the subsequently-closed mortgage. When those undisclosed mortgages are included, the borrower's recalculated DTI is 159%, exceeding the 45% maximum permitted under the applicable underwriting guidelines.

16

- In her March 2005 loan application, the borrower did not disclose that in the two months prior to the loan closing she had purchased a property with a mortgage of over $200,000, and then refinanced that property with another mortgage of $346,000. When those undisclosed mortgages are included, the borrower's DTI is 462%, exceeding the 50% maximum permitted under the applicable underwriting guidelines. There is no evidence of any investigation by the underwriter directed at uncovering such fraud.

- In his May 2006 loan application, the borrower did not disclose that 45 days prior to the loan closing he had taken out a $172,000 mortgage on another property. When the undisclosed debt is included in the borrower's DTI, the recalculated DTI is 54%, exceeding the 45% maximum allowed and rendering the loan ineligible for approval. Again, there is no indication that Sand Canyon engaged in the proper underwriting practices that would have identified this misrepresentation.

40.  Misrepresentation of Employment:  A borrower's employment is of great importance in deciding whether to make a loan because employment status is a key determinant of whether a borrower is likely to be able to repay the loan. Proper underwriting practices thus require verification of the truth of borrowers' statements concerning their employment. The following are a few of many examples of breaches relating to misrepresentation of employment:

- In his January 2006 loan application, the borrower stated he had been employed as a carpenter for three years and earned $5,000 per month. The loan was approved under the Stated Income program. The originating underwriter ignored a report in the file showing that the company at which the borrower claimed to work had no employees. A post-closing phone call to the company confirmed that the borrower had never been an employee of that company.

- In his January 2006 loan application, the borrower stated he was the owner of a company in Florida. In approving the loan under the Stated Income program, the originating underwriter ignored a document in the origination file from the Florida Department of State Division of Corporations indicating that the borrower's company had been dissolved nearly two decades earlier. A subsequent review was also unable to identify a person who had written a letter included in the origination file stating the borrower was the owner of the company.

- A borrower stated in his application for a February 2006 loan that he was the owner of a real estate company. The loan was approved under the Stated Income program, but the originating underwriter failed to obtain third-party verification of the borrower's status as owner required by the underwriting guidelines. A subsequent audit revealed that the borrower was not the owner of the business,

and that the business was actually owned by the loan appraiser. The borrower later confirmed that he was an employee of the real estate company listed on his application, and had no ownership in the company.

- A borrower stated in his May 2006 loan application that he had been self-employed in a real estate business for eight years. However, the loan origination file does not include the employment verification required by the guidelines. In addition, the originating underwriter overlooked other signs that the borrower's employment was misstated, including the fact that the bank statements used to support the borrower's stated employment were for an account held by a different business bearing the borrower's name. A subsequent review found no indication that the borrower was actually self-employed in any capacity relating to real estate.

- According to his April 2006 loan application, the borrower was employed as a finance manager at an auto sales company. The loan was approved under the Full Documentation program. The originating underwriter ignored red flags regarding the borrower's stated income and employment that should also have alerted the underwriter to potential misstatements. For example, the employment verification in the origination file stated that the borrower was paid "commission only," but the applicant submitted a paystub purporting to show that he was an employee with a fixed monthly salary of $6,000. A subsequent review found that the borrower had left this job before the loan closed.

- In a May 2006 loan application, the borrower stated that she was a real estate sales agent from November 2004 through February 2005. A verification of employment at that job was required to provide a two-year employment history, but the origination file contained no evidence that the underwriter verified the employment information provided by the borrower. When contacted later, the company verified that it had never employed the borrower.

41.    LTV or CLTV Ratios Exceeding Program Guidelines: Loan-to-value ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage. For example, an 80% LTV means that the mortgage equals 80% of the property's value, and the borrower's equity is 20%. That 20% equity provides the borrower with an important incentive not to default (and potentially lose the equity in the property), and also acts as a cushion against loss to the lender in the event a default occurs. Combined loan-to-value ratios also take into account all of the liens on the mortgaged property. Sand Canyon's underwriting guidelines set out maximum limits on the LTV and CLTV ratios for particular loan

18

products. But when a loan is based on an inflated appraisal of the value of a property, the equity

cushion that specified loan-to-value ratios are intended to provide is removed or reduced. For

the loans in this Trust, it appears that the appraised values of the properties used by Sand Canyon

in calculating these critical ratios were routinely inflated. The following are a few of many

examples where an inflated appraisal undermined the represented LTV and CLTV ratios, and so

undermined the usefulness of these metrics in reflecting the risk of a default:

- A loan originated in May 2006 was for a property appraised at $265,000.
  However, the originating underwriter ignored several red flags that indicated that
  the original appraisal was faulty, including the fact that two of the comparable
  properties used in the appraisal were located more than a mile from the subject
  property in an urban market. A review of the property with proper underwriting
  appraised the property at $200,000. Without the inflated appraisal value, the LTV
  originally presented as 90% would have been 119%, and the loan should not have
  been approved.

- The property for a loan that closed in May 2006 was initially appraised at $1.82
  million. That appraisal was then reduced to $1.65 million by a field review
  performed before the loan was approved. Despite having access to the reports
  lowering the initial appraisal, the originating underwriter chose to rely on the
  higher $1.82 million appraisal in approving the loan. In fact, a post-closing field
  review valued the property at only $835,000. Without use of the inflated value,
  the original LTV of 65% would have been 142%, and the loan should have been
  ineligible for approval.

- A loan originated in April 2006 was based on an appraisal of $155,000. A
  subsequent review of the property showed that a reasonable appraisal was
  $128,000. Using the more accurate appraisal value, the LTV would have been
  121%, and the loan would have been ineligible for approval. The substantial
  difference in the appraised values also calls into question the reasonableness of
  the original appraisal.

- The property for a loan originated in May 2006 was appraised at $118,000. A
  June 2011 field review showed that the value used to calculate the LTV
  overstated the value of the property by $33,000, or 41%. Using the more accurate
  appraisal value the LTV would have been 141%, rendering the loan ineligible for
  approval.

- The property for a loan that closed in May 2006 was appraised at $85,000. A
  field review later yielded an appraised value of $62,000. Without the use of the
  inflated value, the LTV that was originally presented as 80% would have more
  accurately been 109%, and the loan should have been ineligible for approval.

- The property for a loan that closed in February 2006 was appraised at $398,000. A retrospective field review provided a value of $275,000. Using this appraisal, the LTV that was originally presented as 80% would have been 116%, rendering the loan ineligible for approval.

- A loan that closed in February 2006 was approved as a full documentation loan. The applicable underwriting guidelines permitted a maximum CLTV of 85% for a full documentation loan, but as reported on the schedule of loans attached to the Pooling Agreement, the loan's actual CLTV was 100%. In addition, the file contains no proof of housing payment history, as required by guidelines.

- A loan that closed in April 2006 was approved under a program that permitted a maximum CLTV of 80%, but the loan's actual CLTV was 96%, and so the loan should not have been approved. In addition, the schedule of loans attached to the Pooling Agreement incorrectly states that the loan's CLTV is 78%.

42. <u>Missing Documents</u>: To underwrite loans in accordance with applicable underwriting standards, an underwriter must have access to all the documents required by the respective loan program to determine whether to approve the loan application. A document missing from a loan file indicates that it was not verified during underwriting or that it was deliberately removed from the loan file by the loan officer or an underwriter because it did not support the information provided in the application. Whatever the reason, a missing document represents a departure from reasonable and customary underwriting practices. The following are a few of many examples relating to missing documents.

- A loan that closed in December 2005 was approved as a full documentation loan, which required asset documentation for the funds used to close. The file contains no asset documentation and there is no evidence that the lender obtained such information. In addition, the file contains no proof of housing payment history, as required by guidelines.

- Sand Canyon represented that a loan that closed in December 2005 complied with applicable laws and regulatory requirements, including federal law requiring that the loan file include a final HUD-1 with the funding documentation. However, there is no final HUD-1 form in the file.

- A loan that closed in May 2006 was approved under the Full/Alt-A Documentation program. The applicable underwriting guidelines required the lender to obtain W-2s for prior years to document the borrower's current employer. However, there are no W-2s in the loan file.

20

43. These breaches of Sand Canyon's Specific Representations have a material and adverse effect on the value of the loans and the interests of the Trust and its Certificateholders. The very high rate of breaches for the loans analyzed indicates that there are severe and pervasive breaches throughout the entire loan portfolio.

### G. A forensic analysis of over 1,600 loans discovered that Sand Canyon had misrepresented key metrics in the great majority of loans.

44. In addition to reviewing the loan files, a thorough investigation of a sample of mortgage loans was conducted to analyze the accuracy of certain quantitative representations that Sand Canyon had made about the loans. In total, over 1,600 loans were analyzed. For each of these loans, public records were reviewed and a retroactive appraisal was made using a state-of-the-art valuation model and historical data. This examination found that Sand Canyon misrepresented property values, and with them LTV and CLTV ratios, for 75% of the loans for which data was available. Sand Canyon also misrepresented owner-occupancy status with respect to at least 14% of the loans.

45. Sand Canyon represented in § 3.01(a)(4) of the Purchase Agreement that the information in the loan schedule -- which included appraised value -- was correct. Sand Canyon also represented in § 3.01(a)(25) of the Purchase Agreement that each loan file contained an appraisal performed in accordance with the requirements of federal law. These requirements are set out in the Uniform Standards of Professional Appraisal Practice ("USPAP"). USPAP requires appraisers to "perform assignments with impartiality, objectivity, and independence," and the corresponding Ethics Rule provides that an appraiser "must not accept an assignment that includes the reporting of predetermined opinions and conclusions." The rule further provides that appraisers "must not advocate the cause or interest of any party or issue" and "must not communicate assignment results with the intent to mislead or to defraud."

46.     Sand Canyon represented in § 3.01(a)(28) of the Purchase Agreement that the

loans it sold to the Trust were originated in accordance with Sand Canyon's underwriting

guidelines. As noted above, these underwriting guidelines state that:

> Mortgaged properties that are to secure mortgage loans generally are appraised by
> qualified independent appraisers. Such appraisers inspect and appraise the subject
> property and verify that such property is in acceptable condition. Following each
> appraisal, the appraiser prepares a report which includes a market value analysis
> based on recent sales of comparable homes in the area and, when deemed
> appropriate, replacement cost analysis based on the current cost of constructing a
> similar home. All appraisals are required to conform to the Uniform Standards of
> Professional Appraisal Practice adopted by the Appraisal Standards Board of the
> Appraisal Foundation and are generally on forms acceptable to Fannie Mae and
> Freddie Mac.

47.     Using public records, a retroactive appraisal was conducted using a state-of-the

art automated valuation model ("AVM") and historical pricing data for over 750 loans for which

AVM data were available. An AVM produces statistically-derived property valuations using

sales data for comparable properties in the same geographic area as the property being evaluated.

AVMs are routinely used in the industry as a way of valuing properties during prequalification,

origination, portfolio review, and servicing. This appraisal method has been widely used for

many years by originators and servicers to support valuation conclusions and to detect fraud.

48.     Independent testing services have determined that the AVM used to test Sand

Canyon's representations is one of the most comprehensive and accurate models available. The

model incorporates a database of more than 500 million mortgage transactions covering zip

codes that represent more than 97% of all properties in the United States, which are occupied by

more than 99.7% of the country's population. A retroactive appraisal for each sampled loan was

conducted using this AVM -- an appraisal of the mortgaged property as of the time the loan was

originated using the comparable sales data that would have been available to mortgage lenders at

the time.

49.     The analysis found that for 580 of the 750 loans for which appraisal data were available, the true market value of the property was lower than represented by Sand Canyon. For 347 of these loans, Sand Canyon had overstated the true market value by 10% or more, and for 88 loans, by 25% or more. Inflated appraised values provided to the Trust and Certificateholders constitute material and adverse breaches of §§ 3.01(a)(4), (25) and (28) of the Purchase Agreement. Exhibit F identifies these false metrics for each of the loans reviewed.

50.     The results of this analysis are in line with independent evidence of rampant appraisal fraud in the mortgage industry at this time. For instance, in testimony before the Financial Crisis Inquiry Commission ("FCIC"), a former wholesale lender stated that appraisers were "often times pressured into coming in 'at value,' i.e., at least the amount needed for the loan to be approved. The appraisers 'fearing' their 'future business and their livelihoods' would choose properties 'that would help support the needed value rather than finding the best comparables to come up with the most accurate value.'" One appraiser testified to the FCIC that appraisers had been pressured to ignore missing kitchens, damaged walls, and inoperable mechanical systems. The president of the industry association, the Appraisal Institute, testified in April 2009 that "in many cases, appraisers [we]re ordered or severely pressured to doctor their reports to convey a particular, higher value for a property, or else never see work from those parties again." A survey of 1,200 appraisers conducted by a market research firm October Research found that in 2007, 90% of appraisers felt pressure to restate, adjust, or change the appraised property values. The survey also found that 75% of appraisers experienced "negative ramifications" when they declined to provide a higher valuation. In some cases, mortgage lenders and brokers refused to pay for an appraisal that did not support the value of the loan. Many appraisers who remained independent were blacklisted.

51.     The forensic analysis shows that the appraisals on properties underlying the loans in this pool were not made in accordance with the required standards and were neither objective nor independent. Sand Canyon's representations concerning appraisals for the loans it sold to the Trust were false in very many instances and amount to a breach of representations and warranties made by Sand Canyon in §§ 3.01(a)(4), (25), and (28) of the Purchase Agreement.

52.     An inflated appraisal also skews the loan-to-value and combined loan-to-value ratios for a loan. The corrected appraisals were used to recalculate LTV and CLTV rates for the loans in this pool. The new calculation showed that Sand Canyon consistently understated LTV and CLTV ratios in the loan schedule and in the Prospectus Supplement (which aggregates pool-wide LTV and CLTV data in the Mortgage Pool section), contrary to Sand Canyon's representations in §§ 3.01(a)(4) and (46) of the Purchase Agreement. In addition, Sand Canyon's underwriting guidelines required loans to be within certain LTV and CLTV thresholds. For loans whose recalculated LTV and CLTV ratios are greater than the thresholds permitted under the guidelines, Sand Canyon also breached § 3.01(a)(28) of the Purchase Agreement.

53.     The recalculation found that for 75% of the loans, Sand Canyon inflated the LTV and CLTV ratios; in 30% of the cases, this inflation exceeded 10%. Exhibit F identifies these false metrics for each of the loans reviewed.

54.     Sand Canyon represented in § 3.01(a)(43) of the Purchase Agreement that no loan had an LTV ratio greater than 100%. A loan with an LTV ratio that exceeds 100% is by definition "underwater": the bank has lent the borrower more money than the bank can expect to recoup through foreclosure. In addition, an underwater loan has a greater risk of default because the borrower has no equity in the property. The forensic review found that nearly a fifth of the reviewed loans had an LTV that exceeded 100%.

24

55.     The review also examined whether Sand Canyon misrepresented the borrower's occupancy status.  As discussed above, Sand Canyon represented in §§ 3.01(a)(4) and (46) of the Purchase Agreement that the information included in the loan schedule and Prospectus Supplement was correct.  The loan schedule gives the owner-occupancy status for each loan and the Prospectus Supplement aggregates owner-occupancy data across the mortgage pool.  Section 3.01(a)(28) of the Purchase Agreement also represents that the loans were originated in accordance with stated underwriting guidelines, which often limit particular loan product and terms to owner-occupied properties.  The forensic investigation demonstrates that Sand Canyon's representations concerning owner occupancy were false with respect to a significant number of the loans at issue.

56.     To confirm the borrower's owner-occupancy status, public records were analyzed to determine if the borrower owned any other properties at the time he or she owned the mortgaged property.  The analysis also examined whether the borrower consistently identified the mortgaged property as his or her mailing address for property tax bills on each concurrently owned property.  Inconsistencies in tax bill mailing addresses for concurrently-owned properties strongly suggest that the mortgaged property was not, in fact, owner-occupied.

57.     In addition, the lien records on concurrently-owned properties were reviewed to determine whether the borrower indicated that any property other than the mortgaged property was owner-occupied.  The test examines all liens originated after the mortgage was issued and compares owner-occupancy representations with those in the deal documents.  It is strong evidence that the borrower does not reside at the mortgaged property if liens on concurrently-owned properties indicate that those properties are owner-occupied.

58. Mailing addresses identified for liens on concurrently-owned properties were also examined to determine whether the address of the mortgaged property was listed as the mailing address for bills and other correspondence between the borrower and the lienholders. If the property address is not identified, that is also a clear indication that the property is not owner-occupied.

59. Finally, credit records were reviewed to help determine whether a given borrower occupied the mortgaged property. Specifically, it was determined whether creditors were reporting the mortgaged property's address as the borrower's mailing address six months after the origination of the loan. Within six months of closing on a purchase money mortgage loan, the borrower should be expected to have changed his or her billing address with each of his or her creditors. If the borrower was telling creditors to send bills to another address even six months after buying the property, it is likely the borrower was living at a different location.

60. In assessing the accuracy of Sand Canyon's representations, the review only considered instances in which a mortgage loan failed multiple owner-occupancy tests. Despite this high threshold, the forensic investigation revealed systemic misrepresentations of owner occupancy status.

61. The analysis shows that Sand Canyon misrepresented owner-occupancy status with respect to 14% of the loans. The results of this loan-level analysis of actual owner-occupancy rates are set forth in Exhibit F.

62. Breach of the owner-occupancy representation is material and adverse because homeowners who reside in mortgaged properties are less likely to default and abandon the property than owners who purchase properties as investments or vacation homes. As with Sand Canyon's breaches of its other Specific Representations, its misrepresentation about owner

26

occupancy hid from the Trust and the Certificateholders the true nature of the risk of default with the pool of loans that it sold to the Trust.

63.     The breaches of Sand Canyon's Specific Representations materially and adversely affected the value of the loans and the interests of the Trust and its Certificateholders because they concealed the true quality of the loans. These breaches are evidence of Sand Canyon's pervasive and systemic disregard of its own stated underwriting guidelines and its concealment from the Trust and its Certificateholders of the risks of loss in the pool of loans it sold to the Trust.

**H.     Sand Canyon has notice of its breaches of representations and warranties.**

64.     As described above, Sand Canyon has received notice of its breaches of its representations and warranties about the mortgage loans. In each case, Sand Canyon was informed of the facts supporting the conclusion that it had breached its representation and warranties. Section 3.04 of the Purchase Agreement and § 2.03 of the Pooling Agreement require Sand Canyon to cure any such breach or repurchase the defective mortgage loan within 120 days of the discovery. Despite having notice of the breaches, Sand Canyon has to date failed to repurchase any loans.

65.     Sand Canyon's obligation to repurchase does not await notice, but arises upon "discovery of a breach of any representation or warranty." Sand Canyon must therefore repurchase mortgage loans it knows to contain breaches regardless of whether it first receives a demand from the Trustee or Certificateholders to do so, and irrespective of whether such demand identifies specific loans to be repurchased or merely refers to Trust-wide breaches. As the originator of the loans, Sand Canyon must have known of its breaches of its representations and warranties.

27

66.     Section 3.04 of the Purchase Agreement further provides that "[i]n the event that a breach shall involve any representation or warranty set forth in §3.02 [which includes the No Falsehoods representation] and such breach cannot be cured within 120 days of the earlier of either discovery by or notice to the Originator of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Originator at the Purchase Price." Sand Canyon is not able to cure its breach of its No Falsehoods representation within 120 days of the Trustee's notice of breach of this representation, and so is obliged to repurchase all of the loans.

## CAUSES OF ACTION

### First Cause of Action: Breach of Contract / Specific Performance

67.     Plaintiff incorporates all previous allegations as though fully set forth here.

68.     The Purchase Agreement and Pooling Agreement are valid and enforceable contracts. In these contracts, Sand Canyon represented that statements it made in and pursuant to the Purchase Agreement or in connection with the contemplated transactions did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement contained therein not misleading.

69.     Sand Canyon materially breached this No Falsehoods representation by making untrue and misleading statements in the Purchase Agreement, Pooling Agreement, and Prospectus Supplement, as described in detail above and in the notices of breach sent to Sand Canyon. These untrue statements were material and adverse.

70.     Sand Canyon has also materially breached many of the Specific Representations it made in these contracts by its false statements with respect to individual mortgage loans it sold to the Trust, with adverse consequences to the Trust and its Certificateholders.

28

71.     Sand Canyon has received notice of these breaches and demands for it to cure or repurchase the non-conforming loans, but it has refused to remedy its breach of its contractual obligations.

72.     The Trustee, the Certificateholders, and Homeward Residential have performed all the conditions, covenants, and promises they were required to perform under the operative agreements.

73.     Because of Sand Canyon's pervasive and systemic misconduct and false statements, Homeward Residential, for the benefit of the Trustee and the Certificateholders, is entitled to specific performance of Sand Canyon's obligation to repurchase all the loans in the Trust. Because of this pervasive and systemic misconduct, Sand Canyon's breach of the No Falsehoods representation in § 3.02 of the Purchase Agreement cannot be cured within 120 days of the Trustee's notice to Sand Canyon of that breach. In the alternative, Sand Canyon should be required to repurchase all the loans with respect to which it made false or misleading Specific Representations.

## Second Cause of Action: Breach of Contract / Specific Performance or, in the Alternative, Damages

74.     Plaintiff incorporates all previous allegations as though fully set forth here.

75.     Reviews of the loan files and the forensic analysis described herein demonstrate that Sand Canyon breached its representations with respect to many hundreds of loans it sold to the Trust. This evidence of Sand Canyon's pervasive and systemic misconduct, and the vast losses that the Trust has realized on loans sold to the Trust, indicate that Sand Canyon made false statements with respect to the 5,000 plus loans that are no longer in the Trust. Many of these loans were liquidated with heavy losses to the Trust when borrowers were unable to make their mortgage payments -- losses that would have been avoided in many cases had Sand Canyon

adhered to the underwriting guidelines it represented that it had followed, or truthfully described the nature of these loans to the Trust in advance of its sale of the loans. If a loan is no longer in the Trust (typically as a result of foreclosure), Sand Canyon must pay the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds. Alternatively, Sand Canyon should be required to pay damages for the losses caused to the Trust and its Certificateholders by its breaches of its representations with respect to that loan.

### Third Cause of Action: Anticipatory Breach

76.     Plaintiff here incorporates all previous allegations as though fully set forth here.

77.     The Trustee sent repurchase demands to Sand Canyon between October 2009 and 2011 notifying Sand Canyon of breaches of its representations and warranties with respect to hundreds of loans. The 120-day cure period for the most recent of these demands expired on February 1, 2012. On April 20, 2011, the Master Servicer sent a repurchase demand to Sand Canyon with respect to 206 loans, and supplemented this demand on October 13, 2011. The 120-day cure period for this notice expired at the latest on February 12, 2012.

78.     On January 24, 2012, the Trustee, on behalf of the Trust and at the direction of Certificateholders, notified Sand Canyon that it had materially breached its representations and warranties with respect to 267 loans, and instructed Sand Canyon to either cure these breaches or repurchase the loans. Sand Canyon did neither: in fact, it did not even bother to respond to the Trustee's letter. On May 25, 2012, the Trustee sent a repurchase demand to Sand Canyon with respect to 725 loans and demanded that Sand Canyon cure these breaches or repurchase the loans.

79.     To date, Sand Canyon has not repurchased a single loan from among the many hundreds with respect to which it has breached its representations and warranties. Sand Canyon's refusal to even respond to the Trustee's January 24, 2012 notice within the 120-day

cure period further confirms that it has no intention to honor its contractual obligations. Sand Canyon has thus overtly and unequivocally repudiated its repurchase obligations, by its acts (and failures to act) clearly demonstrating that it will not perform its obligation to repurchase loans concerning which it has breached its representations. In light of this repudiation, Plaintiff has good reason to expect that Sand Canyon will refuse in the future to cure or repurchase non-compliant loans in accordance with its obligations, including its obligation to repurchase the non-compliant loans identified in the May 25, 2012 repurchase demand.

80.     Under § 3.04 of the Purchase Agreement and § 2.03(a) of the Pooling Agreement, Sand Canyon must repurchase non-compliant loans identified in all of the repurchase requests, including the May 25, 2012 repurchase demand. For liquidated loans, Sand Canyon must pay the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds. Alternatively, Sand Canyon should be required to pay damages for the losses caused to the Trust and its Certificateholders by Sand Canyon's breaches of its representations with respect to the liquidated loans.

### Fourth Cause of Action: Indemnity

81.     Plaintiff incorporates all previous allegations as though fully set forth here.

82.     In the Purchase Agreement, Sand Canyon undertook to hold the Trustee and the Certificateholders "harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" the Trustee and the Certificateholders may sustain relating to the origination of the loans and breaches of the originator's representations and warranties.

83.     The Trustee and the Certificateholders have sustained and will continue to sustain losses, costs, fees and expenses arising out of and related to Sand Canyon's origination of the loans it sold to the Trust and its breaches of its representations and warranties.

84.     Sand Canyon should therefore indemnify the Trustee and the Certificateholders for these losses, costs, fees and expenses.

### Fifth Cause of Action: Declaratory Judgment

85.     Plaintiff incorporates all previous allegations as though fully set forth here.

86.     Sand Canyon has thus far failed to repurchase loans when given notice of its breaches of representations.  The Trustee reasonably expects that Sand Canyon will refuse to respond to outstanding and future requests for it to repurchase loans, notwithstanding its repurchase obligation.  Consequently, there exists a real and justiciable controversy as to the rights and legal relations of the parties under the Purchase and Pooling Agreements.

87.     Because there is a justiciable controversy under CPLR § 3001, Plaintiff seeks a declaration that Sand Canyon must honor its obligations to repurchase loans for which it has been given notice, or will be given notice, of its breach of representations.

### Prayer for Relief

WHEREFORE Plaintiff prays for relief as follows:

88.     On the First Cause of Action, specific performance of Sand Canyon's repurchase obligations under the Purchase Agreement and the Pooling Agreement.

89.     On the Second Cause of Action, with respect to Sand Canyon's breach of its representations concerning liquidated loans, specific performance of Sand Canyon's repurchase obligations, including payment of the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds for liquidated loans, or, alternatively, damages sufficient to compensate the Trust and its Certificateholders for their losses.

90.    On the Third Cause of Action, specific performance and/or damages to compensate the Trust and its Certificateholders for Sand Canyon's anticipatory repudiation of its contractual obligations.

91.    On the Fourth Cause of Action, an award sufficient to indemnify the Trustee and the Certificateholders for all losses, costs, fees and expenses sustained as a consequence of Sand Canyon's misconduct.

92.    On the Fifth Cause of Action, a declaratory judgment that Sand Canyon must comply with its contractual obligation to cure its breaches of its representations or repurchase the loans when given notice of such breaches.

93.    Reimbursement of the costs and expenses of maintaining this action, including reasonable attorney and expert fees.

94.    An award of such other and further relief as may be just and proper.

DATED:    New York, New York
             May 31, 2012

                                        HUNTON & WILLIAMS LLP

                                        By: _Brian V. Otero_____
                                        Brian V. Otero
                                        Stephen R. Blacklocks

                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 309-1000

                                        Attorneys for Plaintiff Homeward
                                        Residential, Inc.

33