UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3|3|14

HOMEWARD RESIDENTIAL, INC., solely in its
capacity as Master Servicer for the Option One Mortgage
Loan Trust 2006-2, for the benefit of the Trustee and the
holders of Option One Mortgage Loan Trust 2006-2
Certificates,

                Plaintiff,

      -against-

SAND CANYON CORPORATION, f/k/a Option One
Mortgage Corporation,

                Defendant.

12 Civ. 5067 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

In this diversity action, Plaintiff, Homeward Residential, Inc., asserts claims against

Defendant, Sand Canyon Corporation, for breach of contract, anticipatory breach, and

indemnification. Plaintiff also seeks a declaratory judgment. Defendant moves to dismiss the

amended complaint (the "complaint") pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal

Rules of Civil Procedure. For the reasons stated below, Defendant's motion is GRANTED in

part and DENIED in part.

## BACKGROUND

The following facts are taken from the complaint and accepted as true for the purposes of

this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

I.   <u>Overview</u>

In 2006, Defendant, a mortgage originator, sold a pool of over 7,500 mortgage loans with

a total initial principal balance of about $1.5 billion and in connection with that sale, made more

than fifty representations and warranties regarding the loans. Defendant represented, among

other things, that the loans complied with its stated underwriting guidelines, that the information

Defendant had provided about the loans was true and correct, and that, to Defendant's

knowledge, there had been no fraud in the origination of the loans. Am. Compl. ¶¶ 1, 2, ECF No. 24. The complaint alleges that approximately 1,400 of the loans sold breach Defendant's representations and warranties and that Defendant has failed to cure or repurchase the defective loans. *See id.* at ¶¶ 8-12.

## II. RMBS Securitization

Residential mortgage-backed securities ("RMBS") are a type of asset-backed security collateralized by residential mortgages. In a RMBS securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans. This pool of loans is then transferred by the originator or sponsor to an affiliated entity called the "depositor." The depositor then transfers the loans to a mortgage trust. The trust then issues securities – usually referred to as "certificates" – entitling holders to a specified portion of the monthly revenue stream produced by the borrowers' principal and interest payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans. *Id.* at ¶ 18.

## III. The Parties

Defendant is a California corporation with its principal place of business in Irvine, California. Until 2008, Defendant was known as Option One Mortgage Corporation. *Id.* at ¶ 15. Defendant originated the mortgage loans at issue (or purchased them from a correspondent lender), and transferred the loans to Option One Mortgage Acceptance Corporation (the "Depositor"). This transfer was structured as a sale, and the purchase of the loans is documented in the Mortgage Loan Purchase Agreement (the "Purchase Agreement"). *Id.* at ¶ 19. The Purchase Agreement sets forth the representations and warranties at issue. *See id.* at ¶ 22. The Depositor then conveyed "all right, title and interest" in the mortgage loans to a trust (the "Trust") by means of a Pooling and Servicing Agreement (the "PSA"). *See id.* at ¶ 20. The PSA

expressly states that Wells Fargo Bank, N.A. (the "Trustee"), *id.*, may seek redress for "breach by the Originator of any representation, warranty or covenant under the . . . Purchase Agreement." *Id.* at ¶ 30 (internal quotation marks omitted).

Plaintiff is a Delaware corporation with its principal place of business in Coppell, Texas. Plaintiff is the master servicer of the Trust. *Id.* at ¶ 14. The PSA gives Plaintiff, as master servicer, the authority to enforce Defendant's obligations – including its obligation "'to purchase a Mortgage Loan . . . on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant' – 'for the benefit of the Trustee and the Certificateholders.'" *Id.* at ¶ 31 (citation omitted).

IV. Defendant's Representations and Warranties

In the Purchase Agreement, Defendant made over fifty representations concerning the quality of the mortgage loans, including that:

- '[t]he information set forth on each Schedule [of mortgage loans]' – which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information – 'is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule';
- the loans have 'been acquired, serviced, collected and otherwise dealt with by the Originator and any affiliate of the Originator in compliance with all applicable federal, state and local laws and regulations and the terms of the related Mortgage Note and Mortgage';
- '[t]here is no material default, breach, violation or event of acceleration existing under the [related] Mortgage or the related Mortgage Note';
- '[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan';
- the mortgage file 'contains an appraisal of the Mortgaged Property indicating the appraised value at the time of origination . . . . Each appraisal has been performed in accordance with provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989';
- the loans were 'originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the

underwriting criteria set forth in the Prospectus Supplement';

- '[a]s of the Cut-off Date, each Mortgage Loan, including any Mortgage Loan seasoned more than 12 months as of the Cut-off Date, had a loan-to-value-ratio that was less than or equal to 100%';

- and '[e]ach Mortgage Loan conforms, and all Mortgage Loans in the aggregate conform, in all material respects, to the description thereof set forth in the Prospectus Supplement.'

*Id.* at ¶ 22 (citations omitted). Under the Purchase Agreement, breaches "which materially and adversely affect the value of loans or materially and adversely affect the interests of the Trust and its Certificateholders requires [Defendant] to cure the breach within 120 days of discovery or notice of the breach. If [Defendant] cannot cure the breach, it is obliged to repurchase the loan." *Id.* at ¶ 26 (citations omitted).

V. Defendant's Alleged Breaches

Through various letters, notices, loan schedules, and supporting materials (collectively, the "Demand Letters"), the Trustee gave Defendant notice of the alleged breaches of Defendant's representations and warranties with respect to over 1,400 mortgage loans. *Id.* at ¶¶ 8-11. The Demand Letters are attached to the complaint. *Id.*

Broadly, the breaches described in the Demand Letters (all incorporated by the complaint) include allegations that Defendant, in violation of its underwriting guidelines, failed to make reasonable determinations of borrowers' ability to repay the loans. *See id.* at ¶ 33. Under Defendant's underwriting guidelines, borrowers' stated incomes must be reasonable based on their stated income source, employment position, current credit profile, and other factors. *Id.* at ¶ 35. Many borrowers' stated incomes and stated debts were allegedly unreasonable given the circumstances, and Defendant "ignored clear red flags that indicated that the borrower was unlikely to be able to repay the loan." *Id.* at ¶ 36. The failure to ensure reasonable stated incomes and stated debts led to inaccurate debt-to-income ("DTI") ratios (a borrower's monthly

4

debt obligations as a percentage of his or her monthly income). *Id.* Because Defendant's underwriting guidelines set maximum DTI ratios, failure to ensure reasonable stated incomes resulted in Defendant originating loans outside of its underwriting guidelines. *See id.*

Loan-to-value ("LTV")[1] or combined loan-to-value ("CLTV")[2] ratios allegedly exceeded Defendant's underwriting guidelines. *Id.* at ¶ 42. These ratios are an important factor in assessing the likelihood of default on a mortgage loan. The lower the LTV or CLTV ratio, the more equity the borrower has in the property. A borrower with more equity has a stronger incentive to keep payments current, and a higher equity level protects against loss to the lender in the event of default. *See id.* Plaintiff alleges that inflated appraisals artificially reduced the LTV and CLTV ratios used by Defendant and that the actual ratios exceeded guidelines. *See id.* Plaintiff alleges that appraisal fraud was rampant in the mortgage industry and that many appraisers felt pressure to restate, adjust, or change appraisal values. *Id.* at ¶ 43. Citing the complaint filed in a Massachusetts lawsuit, Plaintiff alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. *Id.* at ¶ 44. Plaintiff also alleges that retroactive appraisals of 750 of the loans, conducted using an automated valuation model ("AVM"), reveal that the true market value of the property was lower than represented by Defendant. *Id.* at ¶¶ 49-51.

Defendant also allegedly misrepresented owner-occupancy rates. *Id.* at ¶ 48. Breach of the owner-occupancy representation is material because homeowners who reside in mortgaged properties are less likely to default and abandon the property compared to owners who purchase properties as investments or vacation homes. *Id.* at ¶ 63. Plaintiff's review of public records, tax

---

[1] LTV ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage. For example, an 80% LTV means that the mortgage equals 80% of the property's value, and the borrower's equity is 20%. *Id.* at ¶ 42.
[2] CLTV ratios include all of the liens on the mortgaged property. *Id.*

billing addresses, lien records, and credit records allegedly reveals a systemic misrepresentation of owner-occupancy status, with 14% of the loans falsely representing an owner-occupied property. *Id.* at ¶¶ 57-62.

Plaintiff alleges that Defendant departed from its underwriting guidelines because some loan files are missing key documentation. *Id.* at ¶ 64. Plaintiff contends that to underwrite loans in accordance with applicable guidelines, an underwriter must have access to all of the documents to determine whether to approve the loan application. *Id.* Other alleged breaches are set forth in the Demand Letters attached to the complaint. Am. Compl. Exs. A-E.

Lastly, the Purchase Agreement contains a "No Falsehoods" representation, which provides:

> Except with respect to any statement regarding the intention of the Purchaser, or any other statement contained herein the truth or falsity of which is dependent solely upon the actions of the Purchaser, this Agreement <u>does not contain any untrue statements of material fact or omit to state a material fact</u> necessary to make the statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Originator pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate <u>do not contain any untrue statement of material fact or omit to state a material fact</u> necessary to make the statements contained herein not misleading.

*Id.* at ¶ 24 (underline in original). Plaintiff alleges that Defendant breached the No Falsehoods representation, *id.* at ¶ 25, which requires Defendant to repurchase *all* of the more than 7,500 mortgage loans sold to the Trust (not just the approximately 1,400 loans alleged to have breached a representation and warranty). *Id.* at ¶¶ 26, 73.

To date, Defendant has not cured or repurchased any of the loans sold from the loan pool. *See id.* at ¶ 12.

## DISCUSSION

To prevail on any breach of contract claim under New York law, a plaintiff must plead: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages attributable to the breach. *See Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011). The first two elements are not in dispute, and the Court finds that the fourth element has been established.[3] In support of its motion, Defendant propounds two main arguments: (1) Plaintiff's pleadings are inadequate (attacking the complaint's lengthy exhibits, its alleged failure to satisfy the heightened pleading standard for fraud-related claims, and its incorporation of a complaint from another lawsuit); and (2) Plaintiff has failed to establish the third element, breach (arguing that Plaintiff's allegations regarding the loans do not violate the representations and warranties). The Court will address each argument in turn.

## I. Pleading Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

---

[3] The complaint alleges that "[d]espite [Defendant's] representations to the Trust and its investors that the mortgage loans met defined credit quality standards, the loan pool has been plagued by a high rate of default and foreclosure. To date, the Trust and its investors have realized losses of over $325 million. Over half of the loans in the pool [Defendant] sold to the Trust have been liquidated, modified, or are seriously delinquent. Moreover, more than half of the loans now remaining in the Trust are delinquent; these delinquencies will produce many millions of dollars in further losses to the Trust." Am. Compl. ¶ 4. "The huge losses realized by the Trust, and the very high delinquency and default rates, caused some investors to examine whether [Defendant's] representations about these loans had been truthful. One review of a sample of 392 loans showed that [Defendant] breached its representations and warranties with respect to almost 7 out of every 10 of these loans." *Id.* at ¶ 5. "[Defendant] breached its representations and warranties with respect to many of the 5,000 plus loans that are no longer in the Trust, of which many were liquidated with heavy losses to the Trust when borrowers were unable to make their mortgage payments. These losses would have been avoided in many cases had [Defendant] adhered to the underwriting guidelines it represented that it had followed, or truthfully described the nature of these loans to the Trust in advance of its sale of the loans." *Id.* at ¶ 74.

U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555.  In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level."  *Id.*  On a 12(b)(6) motion to dismiss, a district court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  A district court considering a Rule 12(b)(6) motion must accept all factual allegations in the complaint as true, while also drawing all reasonable inferences in favor of the nonmoving party.  *ATSI Commc'ns, Inc.*, 493 F.3d at 98.  For fraud claims to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

For a fraud claim "to comply with Rule 9(b), the complaint must:  (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation and internal quotation marks omitted).  A complaint alleging fraud, moreover, must plead facts that give rise to a strong inference of scienter.  *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996).

A. Lengthy Attachments

Rule 8 of the Federal Rules of Civil Procedure requires plaintiffs to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 10 of the Federal Rules of Civil Procedure provides:  "A statement in a pleading

may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Thus, when assessing the legal sufficiency of a claim, the Court may consider "the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference." *Miotto v. Yonkers Public Schs.*, 534 F. Supp. 2d 422, 425 (S.D.N.Y. 2008) (citations omitted).

Defendant argues that courts dismiss complaints where the "plaintiff sets forth the bulk of its allegations in attachments to the complaint and forces the defendant (and the court) to sift through the attachments to divine the claims and the supporting facts." Def. Mem. 30-31 (citing *United States v. Erie Cnty.*, 724 F. Supp. 2d 357, 367 (W.D.N.Y. 2010); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003); *Taurus IP, LLC v. Ford Motor Co.*, 539 F. Supp. 2d 1122, 1127 (W.D. Wis. 2008)). In all three cases, the attachments or items incorporated by reference failed to link or specify the claims at issue, and instead worked to confuse the courts and the litigants. *See Erie Cnty.*, 724 F. Supp. 2d at 367 (the attachment "makes it unnecessarily difficult for [the] [d]efendants to decipher the scope of the allegations underlying each claim"); *Lockheed-Martin*, 328 F.3d at 378 ("[The attached] documents [were] so long, so disorganized, so laden with cross-references and baffling acronyms, that they could not alert either the district judge or the defendants to the principal contested matters.").

Exhibits A through E of the complaint contain the Demand Letters (which include letters and loan schedules). The letters identify the loan at issue and cite to the specific representation from the Purchase Agreement that has allegedly been breached. Many of the letters contain evidence documenting the breach. *See, e.g.*, Am. Compl. Exs. A, B. The schedules, by means of well-organized columns and rows, identify for each loan which of the representations Defendant

allegedly breached (some cite to the specific provision of the Purchase Agreement) and the grounds for alleging breach (in thorough yet succinct paragraphs). *See* Am. Compl. Exs. C, D. The allegations of breach in the attachments are specific enough to satisfy the requirements of Rule 8 of the Federal Rules of Civil Procedure. Unlike the attachments or materials incorporated by reference in *Erie Cnty.*, *Lockheed-Martin*, and *Taurus*, the letters and schedules here typically tie the allegations of breach to the clauses of the contract, giving Defendant sufficient notice of Plaintiff's claims and the grounds upon which they rest. Although the attachments to the complaint here are less well organized compared to the prior motion to dismiss before this Court brought by Defendant against Plaintiff, *see Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12 Civ. 7319, 2014 WL 572722, at *5 (S.D.N.Y. Feb. 14, 2014), they are not so disorganized as to violate Rule 8.

Indeed, even if the Court did not consider the attachments to the complaint, the allegations in the complaint would likely be sufficient to support Plaintiff's claims with respect to all of the loans allegedly in breach. Defendant argues that Plaintiff (in the event that the Court refuses to consider the attachments), should "not be permitted to use 11 example loans [from the body of the complaint] to plead its claim for repurchase of more than 1,400 other loans" because "[a]bsent specific allegations as to each of the loans that allegedly breach . . . the loan representations, Defendant cannot formulate an adequate responsive pleading." Def. Mem. 32. Defendant is incorrect. "At the pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual loans in the specific trusts – such information is, at this stage, is [sic] uniquely in the possession of defendants." *Policemen's Annuity & Ben. Fund of City of Chicago v. Bank of Am., NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013).

B. Fraud Pleading

Plaintiff asserts breach of contract claims, which typically only need to meet the pleading requirements of Fed. R. Civ. P. 8(a). However, Defendant argues that because many of the complaint's allegations sound in fraud, they are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b). Plaintiff argues that the underlying allegations of fraud in the complaint (by borrowers when reporting income, debt, and employment and by appraisers when performing appraisals) are not subject to Rule 9(b). Plaintiff states that Defendant has failed to point to any cases where "Rule 9(b) applies 'at one remove' -- i.e., when (as here) the fraud alleged is not by the defendant but by a third-party." Pl. Mem. 43.

Rule 9(b) applies to "claims insofar as the claims are premised on allegations of fraud. By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (citation omitted).[4] Thus, it is hardly Defendant's burden to prove that "all" does not mean all. *See id.* (emphasis added) ("Rule 9(b) applies to '*all* averments of fraud.'"). Indeed, other courts in this district have applied Rule 9(b) at one remove to allegations of fraud committed by third parties. *See, e.g., JSC Foreign Econ. Ass'n Technostroyexport v. Weiss*, No. 06 Civ. 6095, 2007 WL 1159637, at *11 (S.D.N.Y. Apr. 18, 2007). Thus, Rule 9(b) applies to the allegations of fraud here, even if they are directed at third parties.

Plaintiff argues that even if Rule 9(b) applies (which it does), the complaint satisfies the Rule's requirements. With respect to borrower fraud, Plaintiff states that, "the complaint and its

---

[4] In its current form, Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The language, "all averments of fraud," was dropped by the 2007 amendment; however, the change was "intended to be stylistic only." Fed. R. Civ. P. 9(b), Advisory Committee Notes, 2007 Amendment.

exhibits identify the speaker (i.e., the borrower), the false statement (e.g., misstatement of income or debt), where the statement was made (the loan application), and the grounds for saying that the statement was false (e.g., a subsequent bankruptcy filing revealing the borrower's true income at the time of his loan application)." Pl. Mem. 43. In response, Defendant argues that "Plaintiff cannot rely on the exhibits attached to its Amended Complaint to establish the particularized facts necessary to plead a fraud claim for each of the loans as to which it alleges some type of fraud," citing *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.*, 287 F. App'x 81, 87 (11th Cir. 2008). Def. Reply Mem. 32. In *W. Coast Roofing*, the court held that generalized allegations in voluminous documents attached to the complaint that allegedly contained examples of false statements failed to satisfy Rule 9(b). *Id.* Defendant's citation to *W. Coast Roofing* is nothing more than a rehashing of its 'lengthy attachment' argument, which was rejected above. The allegations of borrower fraud cite the specific representation breached and detail the four items required to be specified by Rule 9(b). *See Lerner*, 459 F.3d at 290. Thus, unlike the fraudulent allegations in *W. Coast Roofing*, the exhibits to the complaint affords Defendant more than enough particularized notice of the allegations against it. *Cf.* 287 F. App'x at 87.

C. Incorporation of Allegations from Another Complaint

Plaintiff must also satisfy the requirements of Rule 9(b) with respect to its allegations of fraud by appraisers. In support of its allegations, Plaintiff alleges that appraisal fraud was rampant in the mortgage industry and that many appraisers felt pressure to restate, adjust, or change appraisal values. Am. Compl. ¶ 43. Citing the complaint of a different lawsuit, Plaintiff also alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. *Id.* at ¶ 44. In support of Plaintiff's claim of appraisal

fraud, the complaint also cites retroactive appraisals conducted using an AVM on 750 of the loans in question. *Id.* at ¶ 49. An AVM produces statistically-derived property valuations using sales data for comparable properties in the same geographic area as the property being evaluated and AVMs have been widely used by originators and servicers to support valuation conclusions and to detect fraud. *Id.* Analysis found that for 580 of the 750 loans for which appraisal data were available, the true market value of the property was lower than represented by Defendant. *Id.* at ¶ 51. For 347 of these loans, Defendant allegedly overstated the true market value by 10% or more, and for 88 loans, by 25% or more. *Id.* The complaint also alleges that some of the original appraisals were faulty because appraisers did not follow required standards: "[T]wo of the comparable properties used in the appraisal were located more than a mile from the subject property in an urban market. A review of the property with proper underwriting appraised the property at $200,000 [instead of $265,000]." *Id.* at ¶ 52.

The allegations of inaccurate appraisals and failure to follow proper protocol are, standing alone, insufficient to support a strong inference of fraudulent intent by the appraisers, as required by Rule 9(b). *See Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 493 (S.D.N.Y. 2012) (although many inaccurate appraisals can provide circumstantial evidence of fraudulent intent, such evidence must be supported by additional circumstantial evidence in order for the plaintiff to carry her pleading burden). Allegations of industry-wide appraisal fraud offer little support – certainly not enough to lift the inaccurate appraisal allegations above Rule 9(b)'s hurdle. *See In Re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (industry-wide allegations of appraisal fraud do not create an inference "that the appraisers of the properties underlying the [c]ertificates . . . succumbed to [pressure] in a way that violated USPAP").

Citing the complaint of *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc.*, Case No. 10-2741-BLS1 (Mass. Sup. Ct. Suffolk Co. Oct. 14, 2011), Plaintiff also alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. Am. Compl. ¶ 44. One confidential witness, a former underwriter of Defendant, allegedly averred that "'[o]f course [appraisers] inflated values,' and . . . if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file." *Id.* Similarly, another confidential witness, a staff review appraiser of Defendant from January 2004 to May 2007, "stated that the appraisals 'were all bad.' He considered the appraisals borderline fraudulent, not merely, incompetent, but was unable to prevent loans based on the flawed appraisals." *Id.* When he objected to the bad appraisals, "the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department said to go forward with the loan." *Id.* An Assistant Vice President of Defendant from 2005 to 2007 who worked in the Correspondent Lending department stated that when he raised concerns about loan quality, he was essentially told, "'Shut up, Wall Street will buy it; don't worry about it.'" *Id.*

The Second Circuit has not ruled on whether plaintiffs can rely on confidential witnesses cited in another complaint to meet their pleading burden. *In re Lehman Bros. Sec. & Erisa Litig.*, No. 10 Civ. 6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("the Second Circuit does not appear to have ruled on this exact issue"). In this district, utilizing allegations drawn from other complaints has been accepted in some cases, *see In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012); *380544 Canada,*

14

*Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 224-25 (S.D.N.Y. 2008), but rejected in others, *see VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11 Civ. 6805, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013); *Lehman Bros.*, 2013 WL 3989066, at *4.

This Court will consider the allegations incorporated from the *Cambridge Place* complaint. "It is not the burden of the [P]lantiff[] to show that it is permissible for [it] to quote accounts of confidential sources from a separate proceeding; rather, it is [Defendant's] burden to show that Plaintiff[] may *not* do so." *380544 Canada, Inc.*, 544 F. Supp. 2d at 224 (emphasis in original). Defendant argues that Rule 11 of the Federal Rules of Civil Procedure prohibits the use of confidential witness statements from a different complaint because the Rule requires counsel to certify that he has spoken with the confidential witnesses and knows who they are. However, Rule 11 only requires that counsel certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, *if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery*." Fed. R. Civ. P. 11(b)(3) (emphasis added). Thus, Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lends credence to the borrowed allegations. *See, e.g.*, *In re Connetics Corp. Secs. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (citation omitted) (noting that "an attorney may rely in part on other sources . . . as part of his or her investigation into the facts"); *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1080 (N.D. Cal. 2001) (holding that a complaint can combine the plaintiff's own allegations with allegations from a SEC complaint).

The complaint here states that the confidential witness statements were included "on information and belief in their truth and on reasonable belief that further inquiry and discovery

15

from [D]efendant and others will provide evidence of [their] truth." Am. Compl. ¶ 44. And, the confidential witness statements are buttressed by allegations of bad appraisals in the specific loans at issue. *See id.* at ¶¶ 51, 52. Additionally, the statements contain their own indicia of reliability. The quotes are from a number of different employees (not from one possibly disgruntled or vindictive employee), who worked in different geographic areas and in different positions throughout the company.[5] Because they report a consistent pattern of behavior, the Court has more faith in their accuracy. *See Bear Stearns*, 851 F. Supp. 2d at 768 n.24 (complaints replete with detailed factual information are better for borrowing than others). Coupled with the confidential witness statements from the *Cambridge Place* action, the Court finds that the allegations of appraisal fraud in the complaint satisfy Rule 9(b).

Because the complaint's pleadings are adequate, the Court will turn to the issue of whether the allegations in the complaint constitute breach under the Purchase Agreement.

## II. First Cause of Action – Breach of Representations and Warranties

Because the Court has already decided to consider Exhibits A through E attached to the complaint, Defendant's motion to dismiss the complaint in its *entirety* is impracticable. In the complaint, Plaintiff addressed only eleven of the approximately 1,400 loans at issue, leading Defendant to argue that "Plaintiff attempts to impute to the entire pool of loans alleged breaches of representations for 11 loans identified in the Amended Complaint." Def. Mem. 17. Defendant proceeds to attack the eleven loans referenced in the complaint, ignoring most of the loans from the exhibits. However, many of the loans in the exhibits plead textbook breach. For example, Exhibit C states for Loan No. [redacted]3264: "The applicable underwriting guidelines

---

[5] The confidential sources have been "described in the complaint with sufficient particularity to support the probability that a person in that position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Underwriters, review appraisers, and executives would have all been privy to the information alleged by the confidential witnesses in the complaint.

permitted a maximum CLTV of 85% for a Full Doc loan with a mid FICO of 552. The

Borrower's CLTV of 100% exceeds this maximum by 15%."[6] Am. Compl. Ex. C, at 19. *See*

*also id.* at 25, Loan No. [redacted]3909 ("The applicable underwriting guidelines permitted a

maximum LTV of 90% for a Full Doc non owner occupied Loan. The Borrower's LTV of 95%

exceeds this maximum by 5%.").[7] The only way these allegations – if verified – do not

constitute breach of § 3.01(a)(28) is that the prospectus supplement "allows for variances to the

appraisal based on a review of such appraisal, the loan-to-value ratio ("LTV") and other risk

factors." Stern Decl. Ex. 6. However, whether such reviews took place is an issue of fact that

cannot be decided on a motion to dismiss.

The Court will address the issues raised by Defendant in turn.

A. <u>Verification Guidelines</u>

Plaintiff alleges that Defendant breached guidelines requiring Defendant to verify the

accuracy of the borrower's income, employment, and existing debt obligations. Defendant's

underwriting guidelines require "a reasonable determination of an applicant's ability to repay the

loan." Am. Compl. ¶ 33 (emphasis omitted). "Such determination is based on a review of the

applicant's source of income, calculation of a debt service-to-income ratio based on the amount

of income from sources indicated on the loan application or similar documentation, a review of

the applicant's credit history and the type and intended use of the property being financed." *Id.*

For stated income loans, the underwriting guidelines require the underwriter to ensure that the

stated income is "reasonably based on factors including . . . stated income source, employment

---

[6] FICO scores are a widely used metric of creditworthiness, created by Fair, Isaac, and Company, that assess the likelihood that a person will pay his or her debts. FICO scores range from 300 to 850. Higher scores indicate lower credit risk.
[7] Note: This is not an instance where Plaintiff is arguing that the LTV ratio is above guidelines because the appraisal was inflated. Plaintiff is simply taking the LTV ratio as is (95%) and demonstrating that it does not comport with the guidelines (regardless of whether the appraisal was accurate).

position, and/or . . . credit profile." *Id.* at ¶ 35 (emphasis omitted). Defendant argues that Plaintiff's claims fail because Plaintiff applies the wrong or non-existent guidelines. Resorting to sophistry, Defendant contends that because the guidelines say nothing about the specific allegations which support Plaintiff's claims, no guidelines have been breached. For example, Defendant argues that there are no guidelines which require loan files to contain employment verification or income documentation (thus, loans missing those documents are not in breach). However, in so arguing, Defendant ignores the guidelines' umbrella mandate of reasonableness under which Plaintiff's allegations fall. The absence of such documentation from the loan file supports a plausible inference that the underwriter failed to reasonably determine the applicant's ability to repay the loan. Although it may be possible that the underwriter, for example, verified income by telephone or possessed and considered a borrower's tax return but misplaced it in the wrong file, such hypotheticals can only be confirmed or dismissed after discovery. Defendant's other arguments along the same lines are similarly unavailing. *See Homeward*, 2014 WL 572722, at *10.

Defendant's motion to dismiss Plaintiff's verification-related breach of contract claims is DENIED.

B.  Appraisals/LTV Ratios

Defendant advances several theories why Plaintiff is unable to demonstrate breach regarding appraisals and/or LTV ratios. The Court will address each in turn.

1.  Did Defendant Represent the Accuracy of Appraisal Values?

The Purchase Agreement represents that "[t]he information set forth on each Schedule is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule." Purchase Agreement § 3.01(a)(4), Stern Decl. Ex. 2, at 7. Plaintiff

argues that "Schedule" refers to the Mortgage Loan Schedule, which contains appraisal values and LTV ratios, and thus the provision represents that "the mortgaged property's appraised value, and loan-to-value ratios, among other information" are true and correct. Am. Compl. ¶ 22. Defendant, on the other hand, contends that "Schedule" refers to the schedules attached to the PSA in Exhibit D, which contain no appraisal values or LTV ratios. Def. Reply Mem. 19. Thus, allegations of inaccurate appraisals or incorrect LTV ratios do not constitute breach.

A written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, 478 B.R. 570, 586 (S.D.N.Y. 2012) (citation and internal quotation marks omitted). In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, *see, e.g., Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000), which is a question of law for the Court to decide on a claim-by-claim basis. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005). A contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation and internal quotation marks omitted). By contrast, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) (citation and internal quotation marks omitted). Ambiguity "can arise either from the language itself or from inferences that can be drawn from th[e] language." *Alexander &*

19

*Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). The language of a contract, however, "is not made ambiguous simply because the parties urge different interpretations." *O.D.F. Optronics Ltd. v. Remington Arms Co.*, No. 08 Civ. 4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (citation and internal quotation marks omitted). Further, a court must avoid any interpretation that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Landmark Ventures, Inc. v. Wave Sys. Corp.*, No. 11 Civ. 8440, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (citation and internal quotation marks omitted).

Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See Rounds v. Beacon Assoc. Mgmt. Corp.*, No. 09 Civ. 6910, 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) (citation and internal quotation marks omitted) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss."). But, "when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007) (citation and internal quotation marks omitted).

Here, the contract is ambiguous as to whether the word "Schedule" in § 3.01(a)(4) refers to the Mortgage Loan Schedule, which contains appraisal and LTV data, or the schedules attached to the PSA in Exhibit D, which do not. Defendant argues that "Schedule" is the schedule referenced in § 2.02 of the Purchase Agreement, a list of mortgage loans containing the loans' account numbers and principal balances.[8] Defendant has not established this. The term

---

[8] Section 2.02 of the Purchase Agreement states: "In connection [with the transfer of loans provided for in the

"Schedule" is not defined in § 2.02. *See* Stern Decl. Ex. 2, at 3-4. Section 1.01 is the Purchase Agreement's definitions section, and it contains no definition of "Schedule." *Id.* at 3. Section 1.01 states, "[a]ll capitalized terms used but not defined herein and below shall have the meanings assigned thereto in the Pooling and Servicing Agreement." *Id.* The PSA also fails to define "Schedule." *See* PSA § 1.01, Stern Decl. Ex. 3.

Section 2.02 sets forth Defendant's obligation to deliver information, and delineates where the information will appear and how the information will be labeled (as "Schedules I-XI"). Stern Decl. Ex. 2, at 3-4. However, the mere fact that a different set of information is labeled "Schedules" creates the possibility that ambiguity could exist (because "Schedule" can plausibly mean more than one thing). And, Defendant's second argument establishes that ambiguity exists regarding which "Schedule" § 3.01(a)(4) refers to. Other representations listed in § 3.01(a) refer specifically to the "Mortgage Loan Schedule," not just "Schedule." *See, e.g.,* Purchase Agreement § 3.01(a)(12), Stern Decl. Ex. 2, at 9 ("as set forth in the Schedule of Mortgage Loans"); Purchase Agreement § 3.01(a)(55), Stern Decl. Ex. 2, at 14 ("unless otherwise specifically disclosed in the Mortgage Loan Schedule"). Defendant argues that the reference to "Schedule," and not "Mortgage Loan Schedule" in § 3.01(a)(4) is deliberate, because when the contracting parties wanted to refer to the Mortgage Loan Schedule, they did so expressly. Although it is true that use of two different terms in the same provision can give rise to an inference that different meanings should be assigned to each term, *see Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996), the inference is not

---

Purchase Agreement], the Originator further agrees . . . to deliver to the Purchaser and the Trustee a computer file containing a true and complete list of all such Mortgage Loans specifying for each such Mortgage Loan, as of the Cut-off Date (i) its account number and (ii) the Cut-off Date Principal Balance. Such files, which form a part of Exhibit D to the Pooling and Servicing Agreement, shall also be marked as Schedules I-XI to this Agreement and are hereby incorporated into and made a part of this Agreement." Stern Decl. Ex. 2, at 3-4.

conclusive: "[I]t is not unknown for different words to be used to express similar concepts, even though it may be poor drafting practice." *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004). And, common sense may tilt in favor of Plaintiff's interpretation. Assuming the point of the representations and warranties is to guard the purchaser against the credit risks associated with bad loans, it is unclear how a representation guaranteeing the accuracy of the account numbers would serve that purpose. Would the parties really bargain for typo-protection? However, a provision ensuring the accuracy of the loans' principal balances is understandable. All this to say, the meaning of "Schedule" in § 3.01(a)(4) is ambiguous, which precludes the Court from dismissing at this time Plaintiff's breach of contract claims for inaccurate appraisals and LTV ratios.

### 2. Are the Appraisals Non-Actionable Opinions?

In the alternative, Defendant argues that assertions of inflated appraisals do not render false Defendant's representations concerning the original appraisal values of the loans at issue because appraisals are non-actionable opinions. Appraisals are indeed statements of opinion. *Employees' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 153 (S.D.N.Y. 2011) (citations and internal quotation marks omitted) ("An appraisal is a subjective opinion based on the particular methods and assumptions the appraiser uses"). "But although . . . appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property." *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 326 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013). In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092-96 (1991), the Supreme Court held that a statement of opinion is false and actionable only if the opinion is both (1) objectively untrue and (2) not believed by the speaker.

22

*See also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). To establish objective falsity in other RMBS cases, plaintiffs have run sampled mortgage loans through an AVM to estimate the true property value at the time of origination and then compared those values to the appraised values. *See Fed. Deposit Ins. Corp. v. Chase Mortgage Fin. Corp.*, No. 12 Civ. 6166, 2013 WL 5434633, at *8 (S.D.N.Y. Sept. 27, 2013) (rejecting the defendants' argument that FDIC had not pleaded objective falsity when the plaintiff alleged inflated appraisal on the basis of an AVM analysis); *UBS*, 858 F. Supp. 2d at 328 ("The loan-sampling results reported in the [complaint] are sufficiently suggestive of widespread inaccuracies in appraisal value to render plausible the Agency's claim that the LTV information reported in the offering materials was 'objectively false.'"). Subjective falsity is established where either the appraiser or the person who reported the appraiser's opinion did not honestly believe the appraisal value. *See In re Bear Stearns Mortgage Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012); *UBS*, 858 F. Supp. 2d at 326.

Here, Plaintiff performed retroactive appraisals using an AVM on 750 of the approximately 7,500 loans in question. Am. Compl. ¶ 49. Plaintiff's analysis found that for 580 of the 750 loans for which appraisal data were available, the true market value of the property was lower than represented by Defendant. *Id.* at ¶ 51. For 347 of these loans, Defendant allegedly overstated the true market value by 10% or more, and for 88 loans, by 25% or more. *Id.* As in *Chase* and *UBS*, the disparity between the actual purchase price and the appraised value makes plausible Plaintiff's claim that appraised values were "objectively false." Plaintiff has also sufficiently pleaded subjective falsity. *See* Am. Compl. ¶ 44 ("With respect to artificially inflated appraisals, [Confidential Witness # 52] stated that '[o]f course they inflated values' and that if an underwriter questioned the appraised value, the account executive and

branch manager would override the underwriter's objection, as with any other red flag in a loan file"); *id.* ("[A] staff review appraiser for [Defendant] . . . stated that the appraisals 'were all bad.' He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to prevent loans based on the flawed appraisals.").

### 3. Did Plaintiff State a Claim Regarding Purchase Money Mortgage Loans?

Lastly, Defendant argues, in its reply brief, that Plaintiff fails to state a claim that the LTV ratios for 'purchase money mortgage loans' were misstated. The Court will not address Defendant's argument. *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."). *See also Fisher v. Kanas*, 487 F. Supp. 2d 270, 278 (E.D.N.Y. 2007), *aff'd*, 288 F. App'x 721 (2d Cir. 2008).

Accordingly, Defendant's motion to dismiss Plaintiff's appraisal-related breach of contract claims is DENIED.

### C. Owner-Occupancy Representation

Plaintiff alleges that Defendant misrepresented owner-occupancy rates. Am. Compl. ¶ 56 ("[Defendant] represented in §§ 3.01(a)(4) and (46) of the Purchase Agreement that the information included in the loan schedule and Prospectus Supplement was correct. The loan schedule gives the owner-occupancy status for each loan and the Prospectus Supplement aggregates owner-occupancy data across the mortgage pool.").

### 1. Alleged Breach of § 3.01(a)(46)

Section 3.01(a)(46) of the Purchase Agreement warrants: "Each Mortgage Loan conforms, and all Mortgage Loans in the aggregate conform, in all material respects, to the description thereof set forth in the Prospectus Supplement." Stern Decl. Ex. 2, at 13. The Prospectus Supplement provides charts of aggregated owner-occupancy statistics, where it

indicates the percentage of the mortgaged properties that are owner-occupied, non-owner-occupied, and second homes. Stern Decl. Ex. 5. A footnote directly underneath the charts states, "Occupancy as represented by the mortgagor at the time of origination." *Id.* Thus, Defendant argues that absent an allegation that Defendant did not accurately parrot the occupancy data relayed to it by the borrowers in the Prospectus Supplement, Defendant did not breach § 3.01(a)(46). *See* Def. Mem. 18. Defendant is correct. *See In re Countrywide Fin. Corp. Mortgage-backed Sec. Litig.*, 943 F. Supp. 2d 1035, 1056 (C.D. Cal. 2013) (citation omitted) ("The accurate repeating of [owner-occupancy data], especially when [p]laintiffs do not allege that [d]efendants 'passed on information that they knew was false,' cannot amount to fraudulent inducement."); *Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, No. 11 Civ. 2327, 2013 WL 1342529, at *9 (S.D.N.Y. Mar. 29, 2013) ("Because the Offering Materials explicitly stated that all occupancy rates were based only on borrowers' representations and because [p]laintiffs do not allege that [d]efendants falsely reported the borrowers' representations, [p]laintiffs have alleged no misstatements concerning owner-occupancy rates."); *Massachusetts Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 205 (D. Mass. 2012) (emphasis in original) ("The disclosures specifically stated that all owner-occupancy rates were based *only* on borrowers' representations. The disclosures thus put investors on notice that none of the owner-occupancy information had been verified by [d]efendants and that the rates represented only the self-reported data provided by borrowers, which might be inaccurate."). The complaint does not allege that the occupancy data set forth in the Prospectus Supplement did not accurately reflect the information provided by the borrowers. Nor does it allege that Defendant knew the owner-occupancy information provided by the borrowers was false.

Accordingly, Defendant's motion to dismiss Plaintiff's owner-occupancy claims based on

breach of § 3.01(a)(46) of the Purchase Agreement is GRANTED.

### 2. Alleged Breach of § 3.01(a)(4)

Section 3.01(a)(4) of the Purchase Agreement warrants: "The information set forth on each Schedule is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule." Stern Decl. Ex. 2, at 7. As discussed in Section II.B.1 of this opinion, § 3.01(a)(4) is ambiguous as to whether "Schedule" refers to the Mortgage Loan Schedule or the schedules referenced in § 2.02 of the Purchase Agreement. The latter makes no promises regarding owner-occupancy information, and the former sets forth "a code indicating whether the Mortgaged Property was represented by the borrower, at the time of origination, as being owner-occupied." Stern Decl. Ex. 3, at 33. Thus, the PSA, like the Prospectus Supplement, clearly discloses that the occupancy data contained in the Mortgage Loan Schedule was provided by the borrowers. Plaintiff's owner-occupancy claims, therefore, fail regardless of which schedule § 3.01(a)(4) refers to, for the same reasons discussed above.

Accordingly, Defendant's motion to dismiss Plaintiff's owner-occupancy claims based on breach of § 3.01(a)(4) of the Purchase Agreement is GRANTED.

### D. Pool-Wide Remedy

Section 3.02(xi) of the Purchase Agreement contains a "No Falsehoods" representation, which provides:

> Except with respect to any statement regarding the intention[s] of the Purchaser, or any other statement contained herein the truth or falsity of which is dependent solely upon the actions of the Purchaser, this Agreement does not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements contained herein not misleading. The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Originator pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material

<u>fact</u> necessary to make the statements contained herein not misleading.

Am. Compl. ¶ 24 (underline in original); Stern Decl. Ex. 2, at 16. Plaintiff alleges that

Defendant breached the No Falsehoods representation by misrepresenting the risk profile of the

mortgage pool, Am. Compl. ¶ 25, thereby triggering the § 3.04 requirement that Defendant

repurchase *all* of the more than 7,500 mortgage loans sold to the Trust (not just the

approximately 1,400 loans alleged to have breached a representation and warranty).[9] *Id.* at ¶¶

26, 73. Defendant argues that it did not breach § 3.02(xi), advancing two main arguments: (1)

the § 3.02(xi) representation was not transferred to the Trust; and (2) this pool-wide repurchase

obligation is not triggered by a breach of loan-level representations.

### 1. Was the § 3.02(xi) Representation Transferred to the Trust?

Defendant argues that the § 3.02(xi) representation was never transferred to the Trust,

and thus Plaintiff has no contractual right to enforce alleged breaches of § 3.02(xi). Defendant

points out that § 3.04 of the Purchase Agreement states, "It is understood and agreed that the

representations and warranties set forth in Section 3.01 shall survive delivery of the respective

Mortgage Files to the Trustee on behalf of the Purchaser," whereas no language provides the

same for the representations in § 3.02. Stern Decl. Ex. 2, at 19. Defendant contends, therefore,

that the Purchase Agreement's express transfer of the representations in § 3.01, but omission of

those in § 3.02, reflects the contracting parties' intent to transfer to the Trust the § 3.01

representations only. Defendant also points to language in the PSA, which provides Plaintiff's

duty, as master servicer, to enforce Defendant's repurchase obligation in the event of breach.

Section 3.02(b) of the PSA states that the master servicer (Plaintiff), "shall enforce the

---

[9] Section 3.04 of the Purchase Agreement provides: "In the event that a breach shall involve any representation or warranty set forth in Section 3.02 and such breach cannot be cured within 120 days of the earlier of either discovery by or notice to the Originator of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Originator at the Purchase Price." Stern Decl. Ex. 2, at 18.

obligations . . . of the Originator under the Mortgage Loan Purchase Agreement, including, without limitation, any obligation . . . to purchase a Mortgage Loan on account of . . . a breach of a representation, warranty or covenant, as described in Section 2.03(a)." Stern Decl. Ex. 3, at 75-76. Section 2.03(a) provides: "It is understood and agreed that the obligation of the Originator to cure or to repurchase (or to substitute for) any Mortgage Loan as to which . . . a breach has occurred and is continuing shall constitute the sole remedy against the Originator respecting such . . . breach available to the Trustee on behalf of the Certificateholders." Stern Decl. Ex. 3, at 63-64. Thus, Defendant argues that the § 3.02 representations were not transferred to the Trust because § 2.03(a) does not refer to the pool-wide remedy, but instead states that the cure or repurchase remedy is the sole remedy available against the originator regarding breaches of loan-level representations and warranties.

Plaintiff asks the Court to look at the bigger picture. Defendant's sale of the loans to the Trust had two steps. First, Defendant sold the mortgages to the Depositor by means of the Purchase Agreement. Am. Compl. ¶ 19. Second, the Depositor sold the loans to the Trust by means of the PSA. *Id.* at ¶ 20. The Purchase Agreement specifically contemplated that the Depositor could assign to the Trustee "all of [its] rights against . . . [Defendant] pursuant to this Agreement insofar as such rights related to Mortgage Loans transferred to the Trustee and to the enforcement or exercise of any right or remedy against . . . [Defendant] pursuant to this Agreement by the Trustee." Stern Decl. Ex. 2, at 25. It also stated: "Such enforcement of a right or remedy by the Trustee shall have the same force and effect as if the right or remedy had been enforced or exercised by the [Depositor] directly." *Id.* Then, the Depositor in fact did transfer "all the right, title and interest of the Depositor, including . . . the rights of the Depositor under the Mortgage Loan Purchase Agreement." Stern Decl. Ex. 3, at 59. Thus, Plaintiff argues

that the word "all" in both the Purchase Agreement and the PSA should be taken seriously, and the Court should not read any other language in the Purchase Agreement or PSA to limit this broad transfer of rights. The Court agrees that "all" means all and that the PSA did indeed transfer the § 3.02(xi) representation from the Depositor to the Trust.

First, if Defendant's position were correct, it would mean that the § 3.02 representations and remedies for their breach were given only to the Depositor, an entity created by Defendant for the sole purpose "of serving as a . . . conduit" for the transfer of loans to the Trust and which "does not have, nor is . . . expected in the future to have, any significant assets." Otero Decl. Ex. E, at S-50. Contracts should be construed in accordance with common sense and the economic reason why the parties entered into the contract. *TransAtlantic Lines LLC v. United States*, No. 06 Civ. 354, 2007 WL 735705, at *2 (D. Conn. Mar. 5, 2007) (citation omitted) ("'provisions of a contract must be so construed as to effectuate its spirit and purpose'"); *Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 157 (2nd Dep't 1983) (citations omitted) ("In construing the provisions of a contract, ascertainment of the intention of the parties is paramount and due consideration must be given to the purpose of the parties in entering into the contract."). Here, it would make little sense to read the Purchase Agreement and the PSA to transfer the § 3.02 representations only to the Depositor, "a limited-purpose wholly-owned subsidiary of" Defendant, Otero Decl. Ex. E, at S-49, an entity unlikely to seek relief for breach of those representations, but not to the Trustee and the Certificateholders, the parties with the paramount interest in seeking recourse in the event of breach.

Second, Plaintiff advances a plausible argument as to why § 3.04 of the Purchase Agreement mentions the survivability of the § 3.01 representations and not the § 3.02 representations. Survival clauses are motivated by the doctrine of merger: representations in

29

contracts that are not restated in the deed are enforceable so long as the contract states that the representations survive the transfer of the interest in the property. *See Toys R Us-NYTEX, Inc. v. Rosenshein Dev. Corp.*, 172 A.D.2d 826, 827 (2nd Dep't 1991). However, only representations that are integral to the property are in danger of being extinguished; collateral representations – those not integral to the "'title, possession or quantity of land'" – are not merged and so do not need to be saved by means of a survival clause. *Novelty Crystal Corp. v. PSA Institutional Partners, L.P.*, 49 A.D.3d 113, 116 (2nd Dep't 2008) (citations omitted). Because the parties here could have believed that the § 3.02 representations were collateral, but the § 3.01 representations were not, the Court does not read the Purchase Agreement's express mention of the survivability of the § 3.01 representations as evidence that the parties intended to transfer only the § 3.01 representations to the Trust.

Third, Defendant argues that the § 3.02(xi) representations were not transferred because doing so would create an inconsistency with PSA § 2.03(a), which provides that the "sole remedy" for a material breach affecting a Mortgage Loan is the repurchase or cure of that loan. *See* Stern Decl. Ex. 3, at 63-64. This argument is only persuasive *if* the Court reads § 3.02(xi) to warrant against untrue statements of loan-level representations. If, on the other hand, § 3.02(xi) warrants only against high-level representations concerning Defendant's status as originator (as Defendant contends elsewhere), then there is no conflict between § 3.02(xi) and PSA § 2.03(a). Defendant cannot have it both ways. However, the Court will remain cognizant of the possible inconsistency created if, at a later stage in the litigation, it finds that § 3.02(xi) does warrant against untrue statements of loan-level representations.

Accordingly, the Court finds that the § 3.02 representations were transferred to the Trust.

30

## 2. Do Loan-level Misrepresentations Violate § 3.02(xi)?

Alternatively, Defendant argues that even if the representation in § 3.02(xi) of the

Purchase Agreement was transferred to the Trust, Plaintiff cannot avail itself of the pool-wide

repurchase remedy. Defendant states that the pool-wide remedy is only available for

misrepresentations regarding the originator, not the individual mortgage loans. Defendant points

to the structure of the Purchase Agreement: representations about loan-level characteristics

appear in one section (§ 3.01) and representations about the originator appear in a separate

section (§ 3.02). Indeed, § 3.01 is entitled, "<u>Originator Representations and Warranties Relating</u>

<u>to the Mortgage Loans</u>," and it contains representations concerning loan-level characteristics,

*see, e.g.*, § 3.01(a)(25) ("Each Mortgage File contains an appraisal"), § 3.01(a)(28) ("Each

Mortgage Loan was originated substantially in accordance with the Originator's underwriting

criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus

Supplement."). Stern Decl. Ex. 2, at 11. And, § 3.02 is entitled, "<u>Originator Representations and</u>

<u>Warranties Relating to The Originator</u>," and contains representations concerning the originator as

a business entity, *see, e.g.*, § 3.02(i) ("The Originator is duly organized, validly existing and in

good standing as a corporation"), § 3.02(ii) ("The Originator has the full power and authority to

execute, deliver and perform, and to enter into and consummate, all transactions contemplated by

this Agreement."). Stern Decl. Ex. 2, at 14. Defendant argues that "contractual section headings

inform and limit the statements that appear beneath them." Def. Mem. 13 (citing *Russell-Stanley*

*Holdings, Inc. v. Buonanno*, 327 F. Supp. 2d 252, 255-56 (S.D.N.Y. 2002)).

Defendant also appeals to common sense, stating that it would be commercially

nonsensical for the parties to agree that a breach of a single mortgage loan could trigger the pool-

wide remedy and unwind a $1.5 billion transaction. Furthermore, Defendant argues, Plaintiff's

interpretation that a loan-level breach triggers a pool-wide repurchase remedy renders § 3.01 and its corresponding loan-by-loan repurchase remedy in § 3.04 superfluous.

Plaintiff asks the Court to focus on the plain language of the § 3.02(xi) representation. Section 3.02(xi) states that "this Agreement does not contain *any* untrue statement of material fact or omit to state a material fact necessary to make the statements contained herein not misleading." Stern Decl. Ex. 2, at 16 (emphasis added). Thus, Plaintiff contends that "any untrue statement" means untrue statements not just relating to the originator, but untrue statements also made in individual loans, like LTV ratios, DTI ratios, appraisal values, etc.

Plaintiff also argues that the pool-wide repurchase remedy for individual breaches is not nonsensical or draconian because Defendant can cure the individual loans breached, thus stopping the pool-wide remedy in its tracks. In other words, only if Defendant elected not to cure the individual breach could Plaintiff elect to invoke the pool-wide remedy. Plaintiff also states that the deal makes more commercial sense when considering the time it was entered into – early summer 2006 – before the financial crisis.

Plaintiff counters Defendant's surplusage argument by arguing that individual conduct can often breach several representations in the Purchase Agreement – for example, a loan with greater than 100% LTV breaches both § 3.01(a)(28) and § 3.01(a)(43). Plaintiff argues that the fact that the same conduct can give rise to alternative remedies is hardly unusual in a complex agreement.

Defendant counters Plaintiff's plain language argument in its reply, arguing that the provision should be read to read: "this Agreement does not contain any untrue statement of material fact [*relating to the Originator*] or omit to state a material fact [*relating to the Originator*] necessary to make the statements contained herein not misleading." Def. Reply

32

Mem. 7 (alterations and emphases in original). Defendant also repeats and refines its contract structure, commercial reasonableness, and surplusage arguments.

"[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citation omitted). Although the Court agrees with Defendant that it is unlikely that the parties meant for the § 3.02(xi) representation to apply to loan-level breaches, the Purchase Agreement contains enough ambiguity to survive the motion to dismiss stage. *See Subaru Distributors Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005) (Courts "should resolve any contractual ambiguities in favor of the plaintiff."). The case *U.S. Bank, N.A. v. Greenpoint Mortgage Funding, Inc.*, 26 Misc. 3d 1234(A), 907 N.Y.S.2d 441 (N.Y. Sup. Ct. 2010) is persuasive. There, the plaintiff argued that pervasive breaches of individual loan-level representations triggered the pool-wide repurchase remedy. Although the theory advanced by the plaintiff there is somewhat different than the theory advanced by Plaintiff here (for Plaintiff, the breaches need not be pervasive to trigger a § 3.02(xi) violation and the pool-wide repurchase remedy – in fact, just one will do), the court correctly noted that the language of the agreement created "ambiguities, which cannot be deciphered on a motion to dismiss." *Id.* at *8. *But see U.S. Bank Nat. Ass'n v. Countrywide Home Loans, Inc.*, No. 652388/2011, 2013 WL 2356295, at *4 (N.Y. Sup. Ct. May 29, 2013) (rejecting the plaintiff's pervasive breach theory because neither the term "'pervasive breach' nor any language connoting that concept" were present in the agreement); *U.S. Bank N.A. v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. Feb. 18, 2014) (rejecting repleaded version of the plaintiff's pervasive breach theory and

33

alternatively rejecting plaintiff's pool-wide remedy claim on grounds of surplusage).[10]

Accordingly, the Court will await the outcome of discovery before interpreting this provision as a matter of law.

E. Mortgage Note Representation

Section 3.01(a)(16) of the Purchase Agreement represents that "[t]here is no material default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note . . . other than a payment delinquency." Stern Decl. Ex. 2, at 9. Plaintiff alleges that "[a] borrower's failure to accurately and fully describe his income, debts, and employment are material defaults, breaches and violations under the borrower's mortgage and mortgage note" and that such failure constitutes breach under § 3.01(a)(16).[11] Am. Compl. ¶ 41. Defendant argues that Plaintiff has not alleged breach of § 3.01(a)(16) because the mortgages and mortgage notes do not warrant the accuracy of borrower statements about income, existing debt obligations or employment. Review of a sample mortgage and mortgage note confirms that they do not make such warranties. See Stern Reply Decl. Exs. 1, 2. Instead, they refer to the borrower's rights and obligations under the note, including, for example, the borrower's right to make payments of principal at any time, his obligation to pay a specified amount plus interest in return for the loan, and his obligation to insure the property. The only plausible counterargument

---

[10] In *Morgan Stanley Mortgage Loan Trust 2006-14SL v. Morgan Stanley Mortgage Capital Holdings LLC*, No. 652763/2012, 2013 WL 4488367 (N.Y. Sup. Ct. Aug. 16, 2013), the court held that an originator's breach of its loan-level representations did not trigger a pool-wide remedy for breach of the agreement's no falsehoods representation. However, the case is not on point. The decision turned on the fact that § 3.01 of the purchase agreement in that case stated that loan-by-loan repurchase was the sole remedy for breach of a § 3.01 representation. *Id.* at *7. Here, the "sole remedies" provision bunches breaches of § 3.01 together with breaches of § 3.02 and § 3.03. *See* Stern Decl. Ex. 2, at 19 ("It is understood and agreed that the obligations of the Originator set forth in Section 3.04 to cure, repurchase and substitute for a defective Mortgage Loan and to indemnify the Purchaser as provided in Section 5.01 constitute the sole remedies of the Purchaser respecting a missing or defective document or a breach of the representations and warranties contained in Section 3.01, 3.02 or 3.03."). Thus, the remedies provision does not foreclose the possibility that a breach of a § 3.01 representation can also breach the No Falsehoods representation of § 3.02, unlike the purchase agreement in *Morgan Stanley*.

[11] Plaintiff actually cites § 3.01(a)(6), *see* Am. Compl. ¶ 41, but appears to have intended to cite § 3.01(a)(16).

34

is that "Mortgage" refers not just to the instrument creating the lien on the property, but also to the mortgage loan and files (which would contain borrower descriptions of income, debt, and employment). However, Plaintiff does not advance this argument, and the definition section of the PSA contains separate definitions for "Mortgage," "Mortgage Loan," and "Mortgage File," which confirms "Mortgage" in § 3.01(a)(16) simply refers to the debt instrument. PSA § 1.01, Stern Decl. Ex. 3, at 32.

Thus, Defendant's motion to dismiss Plaintiff's breach of contract claims under § 3.01(a)(16) is GRANTED.

F. Loans Not Identified in the Demand Letters

The Trustee provided Demand Letters, seeking repurchase of mortgage loans, of some, but not all, of the loans in the Trust. *See* Am. Compl. ¶¶ 7-11, Exs. A-E (identifying approximately 1,400 of the approximately 7,500 loans in the Trust). Defendant argues that Plaintiff's first cause of action for repurchase must be limited to only those loans for which Defendant has been given notice of an alleged breach. Defendant is incorrect. Section 3.04 of the Purchase Agreement provides that Defendant's obligation to repurchase arises either when it has been given notice of breach, or by its own discovery of breach:

> Within 120 days of the earlier of *either discovery by or notice to* the Originator of any breach of a representation or warranty made by the Originator that materially and adversely affects the value of the Mortgage Loan or the Mortgage Loans or the interest therein of the Purchaser, the Originator shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Originator shall, at the Purchaser's option, repurchase such Mortgage Loan at the Purchase Price.

Stern Decl. Ex. 2, at 18 (emphasis added). Thus, Plaintiff need not provide notice to Defendant about breaches Defendant has allegedly discovered. *See Trust for Certificate Holders of Merrill Lynch Mortgage Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ.

35

9890, 2005 WL 2582177, at *7 (S.D.N.Y. Oct. 11, 2005) (The defendant's "obligation [to repurchase] is independent of its receipt of prompt written notice because, under the terms of the contract, the obligation can also arise upon its own discovery of a breach."). Courts have held that a pleading sufficiently alleges that a defendant discovered its own breaches – triggering its remedial obligations – when the complaint alleges facts indicating the seller's widespread and systemic disregard of its representations. *See Deutsche Alt-A Sec. Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc.*, 958 F. Supp. 2d 488, 494-95 (S.D.N.Y. 2013). Like the complaint in *Deutsche Alt A. Sec. Mortg. Loan Trust*, the complaint here alleges "patently unreasonable stated borrower incomes and violations of applicable underwriting requirements." *Id.* at 494. *See, e.g.*, Am. Compl. ¶¶ 37-40. Plaintiff also alleges specific facts that show Defendant likely had knowledge of its breaches. *See id.* at ¶ 44 ("[Defendant] approved stated income loans 'knowing good and well that those people did not make that much money in the position they were in.'") (quoting an employee of Defendant). Defendant argues that Plaintiff cannot allege unspecified breaches on thousands of unspecified loans. However, at the pleading stage, Plaintiff cannot be required to identify individual loans that Defendant had discovered were in breach, as such information is uniquely in the possession of Defendant. *See Policemen's Annuity & Ben. Fund of City of Chicago*, 943 F. Supp. 2d at 442. *See also Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted) (Allegations "upon information and belief" are sufficient where "the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."). Defendant's attempt to distinguish *Deutsche Alt-A Securities Mortgage Loan Trust* on the ground that the governing agreement there contained a provision allowing the plaintiff to "'take whatever action at law or in equity that may appear necessary'" to enforce the

36

defendant's obligations is unavailing. *Deutsche Alt-A Sec. Mortgage Loan Trust*, 958 F. Supp. 2d at 499 (S.D.N.Y. 2013). Indeed, the court only discusses that provision in the context of the defendant's "sole remedy" argument – not in its analysis of the "discovery or notice" provision. *See id.*

Accordingly, Defendant's motion to dismiss Plaintiff's breach of contract claim for loans not identified in the Demand Letters is DENIED.

G. Compensatory Damages

The complaint states:

> Under § 3.04 of the Purchase Agreement and § 2.03(a) of the Pooling Agreement, [Defendant] must repurchase non-compliant loans identified in all of the repurchase requests. For liquidated loans, [Defendant] must pay the difference between the Purchase Price immediately prior to liquidation and any liquidation proceeds. Alternatively, [Defendant] should be required to pay damages for the losses caused to the Trust and its Certificateholders by [Defendant's] breaches of representations with respect to the liquidated loans.

Am. Compl. ¶ 83. Defendant argues that Plaintiff's request for compensatory damages should be dismissed because § 3.04 unequivocally limits Plaintiff's remedies to a "cure, repurchase and substitution" of the loan at issue by Defendant.

Because a determination about remedies is premature at the motion to dismiss stage, the Court declines to entertain Defendant's argument at this time. *See Deutsche Alt-A Sec. Mortgage Loan Trust*, 958 F. Supp. 2d at 500-01 (S.D.N.Y. 2013). In *Deutsche Alt-A Sec. Mortgage Loan Trust*, the court held that dismissing the plaintiff's claim of compensatory damages at the pleadings stage would be premature, despite the existence of a "sole remedy" provision, where the breaching party was grossly negligent or willfully knew of breaches of loans and failed to repurchase them, "rendering the entire purpose of the cure-or-repurchase obligation meaningless." *Id.* at 501. Plaintiff has sufficiently alleged facts indicating that Defendant was

37

either grossly negligent or willful in its knowledge of the alleged breaches. *See* Am. Compl. ¶ 44. Because "a motion for failure to state a claim properly addresses the cause of action alleged, not the remedy sought," *City of New York v. A-1 Jewelry & Pawn, Inc.*, 247 F.R.D. 296, 353 (E.D.N.Y. 2007), Defendant may "advance [its] argument at an appropriate time," Def. Reply Mem. 44, *i.e.*, at summary judgment.

III. Second Cause of Action – Breach of the Duty to Cure or Repurchase

Plaintiff also brings a claim of breach of the duty to cure or repurchase, arguing that Defendant breached an independent obligation to repurchase defective loans under § 3.04 of the Purchase Agreement. Am. Compl. ¶¶ 75-78. Defendant argues that the claim fails as a matter of law because the repurchase provision is merely a remedy for the breach of a § 3.01 representation, not a separate promise that can give rise to an independent cause of action. *See Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005-S4 ex rel. HSBC Bank USA, Nat. Ass'n v. Nomura Credit & Capital, Inc.*, No. 653541/2011, 2013 WL 2072817, at *8 (N.Y. Sup. Ct. May 10, 2013). In *Nomura*, the court rejected the plaintiff's independent breach argument and stated that "[t]he repurchase obligation in this case is merely a remedy. It is not a duty independent of the Mortgage Representation breach of contract claims." *Id.* Plaintiff states that the state courts are split on this issue, citing *ACE Sec. Corp. v. DB Structured Products, Inc.*, 965 N.Y.S.2d 844 (N.Y. Sup. Ct. 2013), where the court held that the plaintiff had a claim for breach of an originator's repurchase obligation. Plaintiff notes that the losing parties in both *Nomura* and *ACE* have noticed appeals to the First Department, and asks that the Court deny Defendant's motion with leave to renew the motion after the First Department clarifies the applicable law. The Court denies Plaintiff's request, as the First Department has reversed *ACE*, *see ACE Sec. Corp. v. DB Structured Products, Inc.*, 112 A.D.3d 522 (1st Dep't 2013), and other case law has

already addressed the issue in Defendant's favor. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 96 A.D.3d 684, 684-85 (1st Dep't 2012) (holding that the repurchase provision in the purchase agreement "merely provides for a remedy in the event of a breach," not independent grounds for suit). *See Deutsche Alt-A Sec. Mortgage Loan Trust*, 958 F. Supp. 2d at 500 (distinguishing *ACE* and holding that a failure to repurchase is "not an independent breach").

Accordingly, Defendant's motion to dismiss Plaintiff's second cause of action is GRANTED.

IV. <u>Third Cause of Action – Anticipatory Breach</u>

Plaintiff claims that Defendant anticipatorily repudiated its repurchase obligations by its failure to repurchase a single loan from the Demand Letters and also by its delay and refusal in answering some of the Demand Letters. Am. Compl. ¶¶ 81, 82.

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted). A party faced with anticipatory repudiation may choose between two "mutually exclusive" options: "He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit." *Id.* at 258 (citations omitted). Thus, plaintiffs who bring claims "for breach of contract . . . cannot simultaneously pursue a claim for anticipatory breach." *Waite v. Schoenbach*, No. 10 Civ. 3439, 2010 WL 4456955, at *7 (S.D.N.Y. Oct. 29, 2010) (citations and internal quotation marks omitted). "The law simply does not permit a party to exercise two alternative or inconsistent remedies." *Lucente*, 310 F.3d at 258 (citations, internal quotation marks, and alterations

39

'

omitted). Here, Plaintiff simultaneously brings claims for breach of contract (its first and second causes of action) and anticipatory breach (its third cause of action).

Accordingly, Defendant's motion to dismiss Plaintiff's third cause of action is GRANTED.

## V. Fourth Cause of Action – Indemnification

In its fourth cause of action, Plaintiff seeks indemnification for its losses, costs, fees, and expenses arising out of and related to the breaches of Defendant's representations and warranties (namely, the costs incurred in bringing the current litigation). Am. Compl. ¶¶ 85, 86. Section 5.01(e) of the Purchase Agreement contains an indemnification provision, which provides that Defendant will indemnify and hold harmless the Purchaser, the Trustee, and the certificate holders for "legal fees and related costs . . . arising from a breach by the Originator of its representations and warranties in Section 3.01 and 3.02 of this Agreement." Stern Decl. Ex. 2, at 23.

Because promises in a contract to indemnify the other party's attorney's fees and related costs "run against the grain of the accepted policy that parties are responsible for their own attorneys' fees," *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir. 2003), courts applying New York law do not infer a party's intention to indemnify such costs "unless the intention to do so is unmistakably clear from the language of the promise." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989). In *Hooper*, the New York Court of Appeals refused to read an attorneys' fees provision as including claims between the parties themselves, as opposed to third-party claims, where the provision did not "exclusively or unequivocally" refer to such claims or otherwise "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* Reading the contract as a whole, the

court also observed that its narrow interpretation of the indemnity clause was "supported by other provisions in the contract which unmistakably relate[d] to third-party claims." *Id.* To read the indemnity clause as covering suits between the parties, the court found, would render other provisions "meaningless." *Id.* Following the rule laid down in *Hooper*, courts resolve any ambiguity in favor of excluding first-party coverage. *In re Refco Sec. Litig.*, 890 F. Supp. 2d 332, 350 (S.D.N.Y. 2012) (Rakoff, J.) ("[A]ny ambiguity on the question . . . requires a finding that attorney fees in suits between the contracting parties are not covered.").

Plaintiff argues that the Purchase Agreement unequivocally extends indemnity to claims between the parties because § 3.04, the remedies provision, provides that Defendant's obligation to "cure, repurchase and substitute for a defective Mortgage Loan and to indemnify the Purchaser as provided in Section 5.01 constitute the sole remedies of the Purchaser respecting a missing or defective document or a breach of the representations and warranties contained in Section 3.01, 3.02 or 3.03." Stern Decl. Ex. 2, at 19. However, the indemnification referenced in § 3.04 is available only "as provided in Section 5.01," *id.*, and § 5.01 provides for indemnification in only four circumstances, none of which mention actions to enforce the "cure, repurchase and substitute" remedy for a breach of the representations and warranties.[12] Plaintiff argues that "it is difficult to imagine how" a third party could bring an action for breach of the representations that Defendant made to the Trustee. Pl. Mem. 52. Plaintiff is incorrect. An

---

[12] Section 5.01(a) provides that the originator agrees to indemnify the purchaser for "any and all losses, claims, damages, or liabilities" that "arise out of or are based upon" material misstatements or omissions of the originator in the Prospectus Supplement, on any computer tape furnished to the Trustee, or in any other marketing material. Stern Decl. Ex. 2, at 20. Section 5.01(e) provides that the originator agrees to indemnify the purchaser, the Trustee, and the certificate holders against "any and all claims, losses, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses" that they "may sustain in any way (i) related to the failure of the Originator to perform its duties in compliance with the terms of this Agreement, (ii) arising from a breach by the Originator of its representations and warranties in Section 3.01 and 3.02 of this Agreement or (iii) related to the origination or prior servicing of the Mortgage Loans by reason of any acts, omissions, or alleged acts or omission of the Originator, the related Seller or any servicer." *Id.* at 23.

action where the certificate holders sue the Trustee for failing to enforce the repurchase remedy requires little imagination. *See, e.g.*, Second Am. Compl., *Ret. Bd. Of Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, No. 11 Civ. 5459 (S.D.N.Y. June 17, 2013), ECF No. 89 (action by certificate holders against a trustee alleging that the trustee failed to enforce the mortgage originator's repurchase obligation); Second Am. Compl., *Ok. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, No. 11 Civ. 8066, 291 F.R.D. 47 (S.D.N.Y. Nov. 9, 2011), ECF No. 24 (same).

As in *Hooper*, the indemnification provision contains clauses which unmistakably relate to third-party claims. Section 5.01(c) requires prompt notice and provides the indemnifying party the right to substitute counsel. Stern Decl. Ex. 2, at 21. Defendant argues that these provisions requiring notice of third-party claims and assumption of the defense against third-party claims would make little sense if indemnification was intended for claims between parties to the indemnity. *See Hooper*, 74 N.Y.2d at 492-93 ("[T]he requirement of notice and assumption of the defense has no logical application to a suit between the parties."). Plaintiff argues that *Hooper* is inapposite because § 5.01(e) also addresses notice and assumption of the defense and specifically references third-parties: "The Originator shall immediately notify the Purchaser, the Trustee and each Certificateholder if a claim is made by a third party with respect to this Agreement. The Originator shall assume the defense of any such claim." Stern Decl. Ex. 2, at 23. Plaintiff argues that by specifically carving out third-party claims and making an express provision for notice and assumption of the defense for such claims, § 5.01(e) is acknowledging that there is another class of claims which need no notice or assumption of the defense rules, citing *Promuto v. Waste Mgmt., Inc.*, 44 F. Supp. 2d 628, 651 (S.D.N.Y. 1999). Pl. Mem. 52.

42

In *Promuto*, the court stated that because the notice requirement and assumption of defense provisions expressly mentioned third-party claims, the rationale of *Hooper* did not apply. *Promuto*, 44 F. Supp. 2d at 651. However, the court first found that the indemnification provision applied to both third-party claims and claims between the parties because of other language in the contract, and merely stated that reference to third-party claims in the notice and assumption of the defense clauses "also support this interpretation." *Id.* The language in § 5.01(e) here that refers specifically to third-parties provides some evidence that claims between the parties were contemplated because courts generally avoid interpretations that render contract terms surplusage. *See State-Wide Capital Corp. v. Superior Bank FSB*, No. 98 Civ. 817, 1999 WL 258268, at *4 (S.D.N.Y. Apr. 29, 1999).

However, in a different portion of the contract, the same principle suggests that the indemnification provision excludes claims between the parties. Section 5.01(a) contains a concluding sentence that § 5.01(e) does not: "This indemnity agreement will be in addition to any liability which the Originator may otherwise have." Stern Decl. Ex. 2, at 20. The absence of such language in § 5.01(e) signals that the contracting parties did not intend for indemnification under § 5.01(e) to be in addition to any liability that the originator otherwise might have, such as lawsuits to enforce Defendant's repurchase obligation. Because the same canon of contract construction forges conflicting conclusions, the parties' intention to provide indemnification for claims between the parties is hardly unmistakable, as required. *See Hooper*, 74 N.Y.2d at 492.

Lastly, Plaintiff argues that courts have found that contracts with similar indemnification provisions to the ones at issue here unequivocally cover claims between contracting parties, citing *E*TRADE Fin. Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 119 (2d Cir. 2010) as directly on point. In *E*TRADE*, the court found that the

43

contract unambiguously contemplated indemnification between the contracting parties because the remedy provision, § 9.01, could only be resolved within the framework of § 9.02, the indemnification provision. *Id.* at 391-92. Plaintiff argues that like § 9.01 in *E\*TRADE*, § 3.04 here unambiguously contemplates indemnification between the contracting parties because the § 3.04 remedy may only be resolved within the framework of § 5.01, the indemnification provision. However, Plaintiff's truncated description of *E\*TRADE* omits the distinguishing feature of the case. In *E\*TRADE*, the plaintiff would have had no remedy for the defendant's breach of contract unless the court read the indemnification provision to cover first-party claims: "[The defendant's] reading of § 9.02 to apply only to indemnification claims for third-party actions, read together with the 'sole and exclusive remedy' clause of § 9.01, would require the absurd result that the parties to the [agreement] could not be held liable for breach of contract and indemnification would be limited only to third party claims." *E\*TRADE*, 631 F. Supp. 2d at 392. Here, the Purchase Agreement provides Plaintiff with a separate "cure, repurchase and substitute" remedy under § 3.04. Stern Decl. Ex. 2, at 19. Thus, no absurd result manifests if the indemnification provision covers only third-party claims.

Because the Purchase Agreement is not "unmistakably clear" that the indemnification provision covers claims between the contracting parties, Defendant's motion to dismiss Plaintiff's fourth cause of action is GRANTED.

VI.   Fifth Cause of Action – Declaratory Judgment

Plaintiff's fifth cause of action seeks "a declaration that [Defendant] must honor its obligations to repurchase loans for which it has been given notice, or will be given notice, of its breach of representations." Am. Compl. ¶ 90.

Courts "entertain a declaratory judgment action: (1) when the judgment will serve a

44

useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992). Defendant argues that the determination sought – that Defendant breached its representations and must honor its contractual obligations – will do nothing to further clarify the legal relations or afford relief from uncertainty, as these issues will be addressed in Plaintiff's breach of contract claim. Defendant is correct. Courts deny claims seeking declaratory judgment that are "duplicative of the adjudication of [plaintiffs'] breach of contract claim[s]." *Camofi Master LDC v. Coll. P'ship, Inc.*, 452 F. Supp. 2d 462, 480 (S.D.N.Y. 2006). Plaintiff does not seem to contest this point. Instead, it argues that the Trustee may discover further breaches, so "a declaration about the scope of [Defendant's] obligations going forward" will clarify the legal issues and eliminate uncertainty. Pl. Mem. 56 (underline in original).

In *Apple Records, Inc. v. Capitol Records, Inc.*, 137 A.D.2d 50, 54 (1st Dep't 1988), the plaintiffs conceded that their declaratory judgment "causes of action parallel[ed] the[ir] breach of contract claims," and instead argued that the declaration they sought was "as to their future rights . . . under the agreements." The First Department held that resolution of the plaintiffs' breach of contract claims "will still sufficiently guide the parties on their future performance of the contracts, thereby obviating any need for declaratory judgments." *Id.* The same is the case here.

Accordingly, Defendant's motion to dismiss Plaintiff's fifth cause of action is GRANTED.

**CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is directed to terminate the motions at ECF Nos. 17 and 29.

SO ORDERED.

Dated: March 30, 2014
      New York, New York

                                                   _____
                                                     ANALISA TORRES
                                      United States District Judge