USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/13/2017

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------ X
HOMEWARD RESIDENTIAL, INC.,    :
solely in its capacity as      :
Master Servicer for the Option :
One Mortgage Loan Trust        :
2006-2, for the benefit of the :
Trustee and the holders of     :
Option One Mortgage Loan Trust :
2006-2 Certificates,           :
                               :    No. 12 Civ. 5067 (JFK)
                 Plaintiff,    :    **OPINION & ORDER**
                               :
        -against-             :
                               :
                               :
SAND CANYON CORPORATION,       :
f/k/a Option One Mortgage      :
Corporation,                   :
                               :
                 Defendant.    :
------------------------------ X
APPEARANCES

FOR PLAINTIFF HOMEWARD RESIDENTIAL, INC.:
     Brian V. Otero
     Stephen R. Blacklocks
     Michael B. Kruse
     Kristen Madison
     HUNTON & WILLIAMS LLP

FOR DEFENDANT SAND CANYON CORPORATION:
     Douglas W. Henkin
     Joyce Y. Young
     Michael L. Calhoon
     Richard P. Sobiecki
     Vernon A. Cassin
     Julia B. Rubenstein
     Patrick Marecki
     BAKER BOTTS L.L.P.

     James Goldfarb
     Daniel T. Brown
     Hannah Berkowitz
     MURPHY & McGONIGLE, P.C.

1

**JOHN F. KEENAN, United States District Judge:**

Before the Court is plaintiff Homeward Residential, Inc.'s ("Homeward") motion under Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702 for (1) permission to prove its breach of contract claims against Sand Canyon Corporation ("Sand Canyon") using statistical sampling evidence, and (2) a determination regarding the admissibility of testimony from its statistical expert, Dr. Charles D. Cowan, regarding the sampling exercise and results. As master servicer for a residential mortgage-backed securities ("RMBS") trust, Homeward contends that Sand Canyon damaged the trust by breaching representations and warranties set forth in the governing agreements. According to Homeward, statistical sampling evidence regarding the likelihood of breach is appropriate in this case, especially in light of the large number of loans Homeward contends are potentially at issue. Because the Court concludes that the governing agreements, as relevant here, call for proof of breach on a loan-by-loan basis, Homeward's proposed sampling will not assist the trier of fact and, accordingly, the Court denies Homeward's motion.

## I. Background

### A. Factual Background

In 2006, Sand Canyon—then known as Option One Mortgage Corporation[1]—conveyed a pool of more than 7,500 mortgage loans with a total initial principal balance of approximately $1.5 billion to Option One Mortgage Acceptance Corporation via a Mortgage Loan Purchase Agreement (the "MLPA") dated June 23, 2006. (See Am. Compl. Ex. F, ECF No. 24-2 (filed July 19, 2013) [hereinafter MLPA].) The loans were then transferred to the Option One Mortgage Loan Trust 2006-2 (the "Trust") by means of a Pooling and Servicing Agreement (the "PSA") dated June 1, 2006. (Am. Compl. Ex. G, ECF No. 24-3 (filed July 19, 2013) [hereinafter PSA].) These transactions established an RMBS trust, the likes of which courts within this Circuit have become quite familiar in the past decade. The Second Circuit has offered a helpful summary of the mechanics of an RMBS trust:

> To raise funds for new mortgages, a mortgage lender sells pools of mortgages into trusts created to receive the stream of interest and principal payments from the mortgage borrowers. The right to receive trust income is parceled into certificates and sold to investors, called certificateholders. The trustee hires a mortgage servicer to administer the mortgages by enforcing the mortgage terms and administering the payments. The terms of the securitization trusts

---

[1] For the sake of convenience, the Court will refer to the defendant only as "Sand Canyon" throughout the remainder of this Opinion.

> as well as the rights, duties, and obligations of
> the trustee, seller, and servicer are set forth
> in a Pooling and Servicing Agreement[.]

<u>BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac</u>
<u>Assurance Corp.</u>, 673 F.3d 169, 173 (2d Cir. 2012).

Here, the MLPA designated Sand Canyon as "Originator" and Wells Fargo Bank, N.A. as "Trustee."  The PSA designated Sand Canyon as "Master Servicer," however Homeward subsequently assumed the role of Master Servicer.  As Master Servicer, Homeward has authority under the PSA to enforce Sand Canyon's obligations under the MLPA. (<u>See</u> PSA § 3.02(b) ("[T]he Master Servicer, for the benefit of the Trustee and the Certificateholders, shall enforce the obligations . . . of the Originator under the [MLPA], including, without limitation, any obligation . . . to purchase a Mortgage Loan on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant, as described in Section 2.03(a).").)

Given the importance of the rights and obligations set forth in the MLPA and PSA (collectively, the "Governing Agreements")—and the bearing of the Governing Agreements on the instant motion—it is appropriate to review the relevant contractual provisions in some detail.  As a starting point, Sand Canyon made numerous representations and warranties in connection with conveyance of the loans.  These representations and warranties are contained in §§ 3.01, 3.02, and 3.03 of the

4

MLPA.  Representations and warranties contained in §§ 3.01 and 3.02 only are at issue in this action.[2]

As is customary in complex commercial agreements, each section and subsection of the MLPA contains a title or heading that relates to the provisions found thereunder.  Section 3.01 bears the heading "Originator Representations and Warranties Relating to the Mortgage Loans."  As the heading suggests, § 3.01 contains more than fifty representations and warranties regarding the loans ultimately sold to the Trust. (See, e.g., MLPA §§ 3.01(a)(5) ("The Mortgage Loan has been acquired, serviced, collected and otherwise dealt with by the Originator and any affiliate of the Originator in compliance with all applicable federal, state and local laws and regulations and the terms of the related Mortgage Note and Mortgage[.]"), 3.01(a)(16) ("There is no material default, breach, violation or event of acceleration existing under the related Mortgage or the related Mortgage Note[.]"), 3.01(a)(24) ("To the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any

_____

[2] Section 3.04 of the MLPA provides that "the representations and warranties set forth in Section 3.01 shall survive delivery of the respective Mortgage Files to the Trustee on behalf to the Purchaser."  Ruling on Sand Canyon's motion to dismiss, Judge Torres (then presiding) found that the representations and warranties contained in § 3.02 of the MLPA were also transferred to the Trust. (See Mem. & Order at 30, ECF No. 51 (filed Mar. 31, 2014).)

appraiser or any other party involved in the origination of the Mortgage Loan[.]").)

Section 3.02 bears the heading "Originator Representations And Warranties Relating to The Originator."  Only one provision contained in § 3.02, reproduced below, is relevant here.  The Court will refer to the following provision as the "No Untrue Statement Rep":

> [T]his Agreement does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained herein not misleading.  The written statements, reports and other documents prepared and furnished or to be prepared and furnished by the Originator pursuant to this Agreement or in connection with the transactions contemplated hereby taken in the aggregate do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading[.]

(Id. § 3.02(xi).)

Section 3.04 bears the heading "Remedies For Breach of Representations And Warranties."  It sets forth the circumstances that give rise to Sand Canyon's repurchase obligation and the process by which Sand Canyon is to effect repurchase.

> Within 120 days of the earlier of either discovery by or notice to the Originator of any breach of a representation or warranty made by the Originator that materially and adversely affects the value of a Mortgage Loan or the Mortgage Loans or the interest therein of the Purchaser, the Originator shall use its best

> efforts promptly to cure such breach in all
> material respects and, if such breach cannot be
> cured, the Originator shall, at the Purchaser's
> option, repurchase such Mortgage Loan at the
> Purchase Price.[3]

(Id. § 3.04.)  Alternatively, Sand Canyon has the option to

remove a "deficient" loan from the Trust and substitute a

replacement loan or loans.

> The Originator may, at the request of the
> Purchaser and assuming the Originator has a
> Qualified Substitute Mortgage Loan,[4] rather than
> repurchase a deficient Mortgage Loan as provided
> above, remove such Mortgage Loan and substitute
> in its place a Qualified Substitute Mortgage Loan
> or Loans.  If the Originator does not provide a
> Qualified Substitute Mortgage Loan or Loans, it
> shall repurchase the deficient Mortgage Loan.

(Id.)  Additionally, § 3.04 cross-references the corresponding

section of the PSA and provides:  "Any repurchase or

substitution required by this Section shall be made in a manner

consistent with Section 2.03 of the [PSA]." (Id.)

---

[3] The "Purchase Price" at which a loan is to be repurchased by
Sand Canyon is defined in the PSA. (See PSA § 1.01 "Purchase
Price.")  Five components make up the "Purchase Price," which,
for the sake of simplicity, can be described here as the sum of
the remaining stated principal balance on the loan, accrued
interest at the applicable rate, and expenses reasonably
incurred in connection with the repurchase. (Id.)

[4] "Qualified Substitute Mortgage Loan" is also defined in the PSA
on the basis of various components.  For the sake of simplicity,
and as relevant here, a "Qualified Substitute Mortgage Loan"
must share various characteristics with the "Deleted Mortgage
Loan," i.e., the loan that it will replace.  For example, the
outstanding principal balances, mortgage rates, and terms to
maturity must be similar. (See PSA § 1.01 "Qualified Substitute
Mortgage Loan.")

Under § 3.04, the parties also agreed that a breach of certain § 3.01 representations and warranties—specifically, §§ 3.01(a)(45), (50), (53), and (54)—"will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of the Purchaser." (Id.)  Section 3.04 also contains a provision focused on a breach of a representation or warranty under § 3.02, which contains the No Untrue Statement Rep.  The Court will refer to the following provision as the "All Mortgage Loans Provision":

> In the event that a breach shall involve any representation or warranty set forth in Section 3.02 and such breach cannot be cured within 120 days of the earlier of either discovery by or notice to the Originator of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Originator at the Purchase Price.

(Id.)

Finally, § 3.04 contains a provision limiting the remedies available for a breach of the representations and warranties set forth in the MLPA.  The Court will refer to the following provision as the "Sole Remedies Provision":

> It is understood and agreed that the obligations of the Originator set forth in Section 3.04 to cure, repurchase and substitute for a defective Mortgage Loan and to indemnify the Purchaser as provided in Section 5.01 constitute the sole remedies of the Purchaser respecting a missing or defective document or a breach of the representations and warranties contained in Section 3.01, 3.02 or 3.03.

The PSA, for its part, establishes the same prerequisites for Sand Canyon's repurchase obligation and the process by which Sand Canyon is to effect repurchase as those set forth in § 3.04 of the MLPA. Section 2.03 of the PSA is titled "Repurchase or Substitution of Mortgage Loans by the Originator" and provides:

> Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originator of any representation, warranty or covenant under the [MLPA] in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Originator, . . . and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the Originator's obligation under the [MLPA] and cause the Originator to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price[.]

(PSA § 2.03(a).) Like the MLPA, the PSA also provides that Sand Canyon may, in lieu of repurchasing a defective or breaching loan, "cause such Mortgage Loan to be removed from the Trust Fund . . . and substitute one or more Qualified Substitute Mortgage Loans[.]" (Id.) Additionally, the PSA contains a provision that resembles the MLPA's "Sole Remedies Provision":

> It is understood and agreed that the obligation of the Originator to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall

> constitute the sole remedy against the Originator
> respecting such omission, defect, or breach
> available to the Trustee on behalf of the
> Certificateholders.

(Id.)

These terms having been agreed to, the Trust issued and sold certificates in various classes, with each class having a different claim on the income to the Trust. Ultimately, the loans in the Trust experienced high rates of default and foreclosure, resulting in losses to the Trust allegedly running into the hundreds of millions of dollars. Through various letters and supporting materials furnished between 2009 and 2012, Sand Canyon received notice of alleged breaches of representations and warranties with respect to more than 1,000 loans. According to Homeward, Sand Canyon refused to cure or repurchase the allegedly breaching loans that were the subject of repurchase demands.

## B. Procedural History

Homeward originally filed this action in the Supreme Court of the State of New York, New York County on May 31, 2012, primarily alleging claims for breach of contract. (See Notice of Removal, ECF No. 1 Ex. A (filed June 28, 2012).) The action was subsequently removed to this District and Homeward filed an amended complaint. (Id.; see also Am. Compl., ECF No. 24 (filed July 19, 2013).) On March 30, 2014, Judge Torres—who was presiding over this case at the time—granted in part and denied

in part Sand Canyon's motion to dismiss the amended complaint.
(See Mem. & Order, ECF No. 51 (filed Mar. 31, 2014).) Judge
Torres dismissed various causes of action, but held that the
amended complaint stated claims for breach of contract.
Specifically, Judge Torres found that the amended complaint
stated claims based on Sand Canyon's alleged breaches of
representations and warranties contained in § 3.01 of the MLPA.
(See id. at 22 (refusing to dismiss breach of contract claims
for inaccurate appraisals under § 3.01(a)(4)); see also Order
Amending Mem. & Order Dated March 30, 2014 at 3, ECF No. 64
(filed Sept. 17, 2014) ("Plaintiff has stated a claim for breach
of contract under § 3.01(a)(16).").)

Judge Torres did not dismiss Homeward's claim that Sand
Canyon's alleged breach of the No Untrue Statements Rep in
§ 3.02 triggers Sand Canyon's obligation to repurchase all the
loans in the pool. (See Mem. & Order at 30-34.) She noted,
however, that she considered it "unlikely that the parties meant
for the [No Untrue Statement Rep] to apply to loan-level
breaches." (Id. at 33.)

Finally, Judge Torres denied the motion to dismiss as to
loans that were not identified for repurchase in the demand
letters provided to Sand Canyon before the suit was commenced.
(Id. at 35-37.) Judge Torres focused on the MLPA's language
concerning "discovery by" Sand Canyon "of any breach of a

representation or warranty . . . that materially and adversely affects the value" of the loan. (Id. at 35 (quoting MLPA § 3.04).)  Accordingly, Judge Torres reasoned that notice to Sand Canyon was not necessarily required and that Homeward's allegations were sufficient at the pleading stage. (Id. at 35-36.)

The case was reassigned to this Court on December 2, 2016.

### C. Homeward's Motion Regarding Statistical Sampling

On July 29, 2015, Homeward moved pursuant to Federal Rule of Civil Procedure 26 ("Rule 26") and Federal Rule of Evidence 702 ("Rule 702") for an order:  (1) permitting Homeward to prove its claims against Sand Canyon using statistical sampling evidence, and (2) determining the admissibility of Dr. Cowan's proposed sampling methodology and related analysis. (See Notice of Pl.'s Mot. to Admit Statistical Sampling Testimony, ECF No. 105 (filed July 29, 2015).)  Homeward contends that sampling is relevant to two of its theories of the case, both of which rely on breaches of MLPA § 3.01 representations and warranties as to individual loans. (See Pl.'s Mem. of L. in Supp. of its Mot. to Admit Statistical Sampling Testimony at 5-6, ECF No. 107 (filed July 29, 2015) [hereinafter Pl. Mem.]; see also June 19, 2017 Letter from Stephen R. Blacklocks to the Honorable John F. Keenan at 2, ECF No. 232 (filed June 19, 2017).)  That is, Homeward apparently concedes that sampling is not relevant to

12

its theory of liability involving the No Untrue Statement Rep contained in § 3.02. (See June 19, 2017 Letter from Stephen R. Blacklocks to the Honorable John F. Keenan at 2.)

Briefly and broadly summarized, Homeward proposes a multi-step process whereby it would first select a random sample of representative loans in the Trust. (Pl. Mem at 3.) Next, Homeward would re-underwrite the loans in the sample set to determine whether—and, if so, in what proportion—they breached the representations and warranties Sand Canyon made. (Id.) Finally, Homeward would extrapolate the results derived from the sample loans to the population of loans in the Trust (and any relevant subpopulations). (Id.)

Specifically, Dr. Cowan proposes a methodology known as "disproportionate stratified sampling." (Pl.'s Br. Concerning the Admissibility of Stratified Sampling in Further Supp. of its Mot. to Admit Statistical Sampling Testimony at 1, ECF No. 150 (filed Apr. 15, 2016).) In ordinary stratified sampling, the researcher "divides the population into relatively homogeneous groups called 'strata,' and draws a random sample separately from each stratum." Federal Judicial Center, Reference Manual on Scientific Evidence 299 (3d ed. 2011). When the sampling fraction varies from stratum to stratum, "sampling weights should be used to extrapolate from the sample to the

population."[5] Id. "Stratified probability sampling can also disproportionately sample from different strata," which may "enable the survey to provide separate estimates for particular subgroups." Id. at 382. "With disproportionate sampling, sampling weights must be used in the analysis to accurately describe the characteristics of the population as a whole." Id.

The sample designed by Dr. Cowan consists of a total of 558 loans drawn from two strata. (Tr. of Hr'g at 21-22, ECF No. 239 (filed July 21, 2017).) The first stratum consists of the subset of loans for which Sand Canyon received notice of an alleged breach, from which Dr. Cowan proposes to draw 293 loans. (Id.) The second stratum consists of the remainder of the loans in the entire Trust-wide population—i.e., excluding loans for which Sand Canyon received notice of an alleged breach—from which Dr. Cowan proposes to draw 265 loans. (Id.) According to Dr. Cowan, structuring the sample in this manner will enable him to calculate reliable estimates of the rate of defective loans in both strata as well as the entire Trust-wide population of loans. (See Expert Decl. of Charles D. Cowan, Ph.D. Concerning the Use of Stratified Random Sampling at 12, ECF No. 152 (filed

---

[5] "For example, if 1 unit in 10 is sampled from stratum A while 1 unit in 100 is sampled from Stratum B, then each unit drawn from A counts as 10, and each unit drawn from B counts as 100." Federal Judicial Center, Reference Manual on Scientific Evidence 299 (3d ed. 2011).

Apr. 15, 2016).) That is, with appropriate weighting, Dr. Cowan states that he can determine the relevant rates of defective loans at a 95 percent confidence level with a maximum margin of error of plus/minus 5 percent. (See id.; see also Tr. of Hr'g at 21-22.)

On June 23, 2017, the Court heard testimony from Dr. Cowan and Dr. Arnold Barnett, Sand Canyon's expert. Dr. Cowan testified regarding the reliability of disproportionate stratified sampling generally and its suitability in the instant case. (Tr. of Hr'g at 18-20.) Dr. Cowan also testified about the size of the sample set, the confidence level and margin of error at which he could estimate the "breach rate" for loans in the strata and the entire Trust-wide population, and the "representativeness" of the loans that he has selected for the sample set. (Id. at 20-22, 26-27.) On direct examination, Dr. Cowan explained that his methodology would not "uniquely determine [which specific loans] are breached if they haven't been examined," but that it would enable him to "calculate a probability that they're breached." (Id. at 27.) Dr. Cowan also stated that, to his knowledge, no re-underwriting of any loans had taken place yet. (Id. at 41.) For his part, Dr. Barnett testified that, with respect to a loan not included in the sample set, a sampling exercise like the one Homeward proposes would not definitively reveal whether that loan breached any

representation or warranty, let alone whether the loan breached

a specific representation or warranty. (Id. at 60.)

The Court heard oral argument on the motion on June 26,

2017.

## II. Legal Standard

Homeward brings its motion pursuant to Rule 26 and Rule

702. Under Rule 26, "[p]arties may obtain discovery regarding

any nonprivileged matter that is relevant to any party's claim

or defense and proportional to the needs of the case[.]" FED. R.

CIV. P. 26(b)(1). Rule 702 governs expert testimony and provides

that a qualified expert may testify if:

> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact
> to understand the evidence or to determine a fact
> in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is
> the product of reliable principles and methods;
> and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

FED. R. EVID. 702. "The proponent of the expert testimony bears

the burden of establishing these admissibility requirements, and

the district court acts as a gatekeeper to ensure that the

expert's testimony both rests on a reliable foundation and is

relevant to the task at hand." In re Vivendi, S.A. Sec. Litig.,

838 F.3d 223, 253 (2d Cir. 2016) (internal quotation marks

omitted); see also United States v. Williams, 506 F.3d 151, 160

(2d Cir. 2007) (proponent of expert testimony has the burden of

16

establishing by a preponderance of the evidence that the requirements of Rule 702 are satisfied).

Rule 702 requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591 (1993) (quoting FED. R. EVID. 702). "This condition goes primarily to relevance," and is "aptly described" as one of "fit." Id. "Expert testimony which does not relate to an issue in the case is not relevant and, ergo, non-helpful." Id. (internal quotation marks and citation omitted).

### III. Discussion

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). In its motion, Homeward proposes to prove that Sand Canyon breached its representations and warranties by testing a sample of loans and extrapolating the results of that test to the relevant populations, thereby generating a probability that a given loan is in breach. Because the Court concludes that the Governing Agreements, as relevant here, call for proof of breach on a loan-by-loan basis, the Court finds that Homeward's proposed sampling will not "assist the trier of fact to understand the evidence or to determine a fact in issue."

17

Daubert, 509 U.S. at 591 (quoting FED. R. EVID. 702).  The Court also rejects Homeward's alternative argument that it should be allowed to proceed with proof by sampling notwithstanding contractual provisions to the contrary.  Accordingly, the Court denies Homeward's motion.

## A. The Governing Agreements Require Proof of Breach on a Loan-by-Loan Basis

The parties vigorously dispute whether the Governing Agreements authorize statistical sampling as a means of proving that Sand Canyon breached its representations and warranties. Homeward argues that the Governing Agreements do not restrict it to offering proof of breach on a loan-by-loan basis and that such a requirement would be inconsistent with another contractual provision, i.e., the All Mortgage Loans Provision. Sand Canyon contends that the Governing Agreements establish a repurchase procedure based on specific breaches of individual loans, and claims that Homeward's approach would be inconsistent with the contractual provisions requiring a "material adverse effect" and "discovery by" or "notice to" Sand Canyon.  Given that Homeward's motion turns on the Governing Agreements and what they say about Sand Canyon's breaches of its representations and warranties, (see Tr. of Hr'g at 117), the Court turns its attention to analyzing the relevant provisions of those documents.

Notably, except for the All Mortgage Loans Provision—addressed in greater detail below—the applicable provisions of the Governing Agreements generally refer to a breach event, the offending loan, and the repurchase price in singular terms.  In the event of a breach that "materially and adversely affects" the value of any loan or loans, "if such breach cannot be cured, the Originator shall, at the Purchaser's option, repurchase such Mortgage Loan at the Purchase Price." (MLPA § 3.04; see also PSA § 2.03(a) ("[I]f the Originator does not . . . cure such defect or breach . . ., the Trustee shall . . . cause the Originator to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price[.]").)  Rather than "repurchase a deficient Mortgage Loan," the Originator may "remove such Mortgage Loan and substitute in its place a Qualified Substitute Mortgage Loan or Loans." (MLPA § 3.04; see also PSA § 2.03(a) ("In lieu of repurchasing any such Mortgage Loan . . ., the Originator may cause such Mortgage Loan to be removed from the Trust Fund . . . and substitute one or more Qualified Substitute Mortgage Loans[.]".)  In the event that "the Originator does not provide a Qualified Substitute Mortgage Loan or Loans, it shall repurchase the deficient Mortgage Loan." (MLPA § 3.04.)

The structure of these provisions—and the nature of the defined terms therein—leads to the conclusion that the parties agreed upon a remedial process that generally calls for proof of

breach on a loan-by-loan basis. Under the Governing Agreements, a breaching loan may be substituted only for a "Qualified Substitute Mortgage Loan." (Id.) A "Qualified Substitute Mortgage Loan" is defined as a loan that shares or nearly approximates many of the characteristics of the specific loan to be replaced, including the outstanding principal balance, mortgage rate, remaining term to maturity, and loan-to-value ratio. (See PSA § 1.01 "Qualified Substitute Mortgage Loan.") In the event that a breaching loan is to be repurchased rather than substituted, "the Originator shall . . . repurchase such Mortgage Loan at the Purchase Price." (MLPA § 3.04; see also PSA § 2.03(a).) Like "Qualified Substitute Mortgage Loan," the "Purchase Price" is a term defined by reference to the specific underlying loan, and is calculated by adding together the entirety of the loan's stated principal balance and accrued interest at the applicable mortgage rate. (See PSA § 1.01 "Purchase Price.") Precisely defining these terms in connection with a sophisticated remedial scheme makes little sense if Homeward may use statistical means to "prove" that a loan is in breach without actually identifying the specific loan (and specific breach). (See Tr. of Hr'g at 27 (Dr. Cowan's testimony that the proposed sampling methodology will not "uniquely determine which [specific loans] are breached if they haven't been examined").)

Although the posture of the case is different, the analysis in MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc. ("MASTR I") is instructive. No. 12-cv-7322 (PKC), 2015 WL 764665, at *11-12 (S.D.N.Y. Jan. 9, 2015). On cross motions for partial summary judgment in a case involving RMBS pools and alleged breaches of representations and warranties, the court closely analyzed the relevant language of the pooling and servicing agreements, which featured singular nouns and defined terms that referenced the characteristics of individual loans. Id. ("Here, the PSAs' cure-or-repurchase remedy is addressed to 'such Mortgage Loan' and the Purchase Price mechanism is loan specific."). Based on these features, the MASTR I court concluded that "the repurchase mechanism established by the parties is targeted to a specific loan, and not to a group or category of loans." Id.; see also BlackRock Allocation Target Shares v. Wells Fargo Bank, N.A., 14-CV-09371 (KPF)(SN), 2017 WL 953550, at *5 (S.D.N.Y. Mar. 10, 2017) (finding that plaintiffs must prove alleged misconduct on "loan-by-loan" basis where "all of the components of the 'Purchase Price' are specific to a particular loan").

Moreover, the sampling evidence that Homeward aims to introduce would not be probative of other contractual terms that give rise to Sand Canyon's repurchase obligation: namely, whether Sand Canyon discovered or had notice of a specific

breach and whether the breach "materially" and "adversely" affected the loan's value. (See MLPA § 3.04; PSA § 2.03(a).) The product of Homeward's proposed sampling exercise—a probability that a loan is in breach, (Tr. of Hr'g at 27)—will not shed light on these questions. See Blackrock Allocation Target Shares, 2017 WL 953550, at *5 ("Sampling may fail to capture whether the nature of the breach had a material and adverse effect at the time a repurchase obligation, if any, was triggered[.]"). Other courts in this District analyzing similar contract language have reached similar conclusions. See id.; MASTR I, 2015 WL 764665, at *10 ("[T]he proposed statistical sampling does not adequately distinguish between breaches that are material and adverse as to a particular loan and those that are not."); see also MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Sec. Inc., No 12-cv-7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015) ("Summary judgment was denied because plaintiffs' theories and expert sampling data did not align with the materiality requirement of the parties' agreements.").

Homeward's arguments to the contrary are not persuasive. Its principal argument is that interpreting the Governing Agreements to require proof of breach at the level of individual loans would violate a cardinal principle of contract interpretation by introducing an internal contradiction. (See

22

Pl.'s Reply Mem. in Further Supp. of its Mot. to Admit Statistical Sampling Testimony at 6, ECF No. 132 (filed Dec. 23, 2015) [hereinafter Pl.'s Reply].) Specifically, Homeward argues that such an interpretation would "wipe out" the All Mortgage Loans Provision, which states:

> In the event that a breach shall involve any representation or warranty set forth in Section 3.02 and such breach cannot be cured within 120 days of the earlier of either discovery by or notice to the Originator of such breach, all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by the Originator at the Purchase Price.

(MLPA § 3.04.) According to Homeward, the All Mortgage Loans Provision cannot be squared with Sand Canyon's interpretation of the MLPA generally—or the Sole Remedies Provision specifically—as mandating proof of breach at the level of individual loans.

It is not impossible, however, to reconcile the All Mortgage Loans Provision, the Sole Remedies Provision, and a repurchase procedure that generally requires proof of breach on a loan-by-loan basis. True, the MLPA appears to contemplate different procedures for the repurchase of "all of the Mortgage Loans" for a breach of a § 3.02 representation or warranty and the repurchase of a "deficient Mortgage Loan" for other breaches under § 3.04. (Compare MLPA § 3.04 ("In the event that a breach shall involve any representation or warranty set forth in Section 3.02 . . . , all of the Mortgage Loans shall, at the

Purchaser's option, be repurchased by the Originator at the Purchase Price."), with id. ("Within 120 days of the earlier of either discovery by or notice to the Originator of any breach of a representation or warranty made by the Originator that materially and adversely affects the value of a Mortgage Loan . . . the Originator shall, at the Purchaser's option, repurchase such Mortgage Loan at the Purchase Price.").) Elsewhere in § 3.04, the parties agreed that breach of certain § 3.01 representations and warranties—not identified in Homeward's amended complaint—would necessarily have a material and adverse effect on the related loan or loans. (See id. ("It is understood by the parties hereto that a breach of the representations and warranties made in Section 3.01(a)(45), (50), (53), and (54) will be deemed to materially and adversely affect the value of the related Mortgage Loan or the interest of the Purchaser.").) That the Governing Agreements establish different procedures for breaches of different representations and warranties, however, does not mean that there is any internal incoherence.

It is a "cardinal principle of contract construction[] that a document should be read to give effect to all its provisions and to render them consistent with each other." Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002) (quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995)).  In all

the aforementioned instances under the Governing Agreements, the nature of the remedy is the same: repurchase by Sand Canyon. What may vary is the threshold to trigger Sand Canyon's obligation to repurchase. Given the parties' current disagreement, it is likely that the All Mortgage Loans Provision and the Sole Remedies Provision could have been drafted more artfully, but they need not be read as in fundamental conflict with each other. Nor are they incompatible with loan-by-loan proof of breach for representations and warranties under MLPA § 3.01.

Likewise, Homeward's citation to <u>Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB</u>, 920 F. Supp. 2d 475 (S.D.N.Y. 2013) is unavailing. There, a financial guaranty insurance company (i.e., Assured) contracted with a federally chartered savings bank that originated residential mortgage loans to provide insurance on two securitizations of home equity lines of credit. <u>Id.</u> at 478. After many of the loans underlying the securitizations defaulted, Assured paid approximately $90 million in claims. <u>Id.</u> at 486. Assured submitted formal repurchase demands in connection with both securitizations, then sued, alleging that Flagstar breached representations and warranties in the agreements between the parties and was obligated to reimburse Assured. <u>Id.</u> After a twelve-day bench trial, Judge Rakoff granted judgment in favor of Assured. <u>Id.</u>

at 478, 517.  In so doing, Judge Rakoff allowed statistical sampling evidence offered by Assured on the questions of the defendants' liability and damages. Id. at 512, 514.

Several features of Flagstar are distinguishable from the instant case.  Most significantly, although Judge Rakoff carefully considered the relevant contract language, he evidently did not conclude—as this Court does here—that the parties' agreements established a procedure calling for loan-by-loan proof of breach.  Rather, Judge Rakoff permitted sampling on the question of liability because "sampling is a widely accepted method of proof in cases brought under New York law" and on the question of damages because Assured's damages model was based "only on defective, defaulted loans." Id. Furthermore, Flagstar preceded the Second Circuit's decision in Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of New York Mellon, 775 F.3d 154 (2d Cir. 2014).  Although the Second Circuit in Retirement Board did not definitively rule on the propriety of sampling evidence as proof of liability in RMBS actions, see 775 F.3d at 162 n.6, courts in this District have cited to Retirement Board for the proposition that, past the pleading stage, "[p]laintiffs must prove that they have evidence to support their claims loan-by-loan and trust-by-trust." Phoenix Light SF Ltd. v. Bank of N.Y. Mellon, 14-CV-10104 (VEC), 2017 WL 3973951, at *9 (S.D.N.Y.

26

Sept. 7, 2017) (internal quotation marks omitted); see also Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n, 14-CV-08175 (LGS)(SN), 2017 WL 945099, at *4 (S.D.N.Y. Mar. 10, 2017) ("Because this action has progressed beyond the pleading stage and is well on its way to summary judgment and trial, plaintiffs must be ready to prove HSBC's alleged misconduct loan-by-loan and trust-by-trust." (internal quotation marks omitted)). Accordingly, the Court does not believe that Flagstar compels resolution of the instant motion in Homeward's favor.

## B. No Alternative Equitable Remedy Is Available

In the alternative, Homeward asserts for the first time in its reply brief that equitable principles dictate that the Court should allow Homeward to proceed with proof by sampling notwithstanding the language of the Governing Agreements. (See Pl.'s Reply at 7.) Homeward also urged this theory at oral argument. (See Tr. of Hr'g at 96.) In support of its position, Homeward relies on the decision in Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc., 19 N.Y.S.3d 1 (N.Y. App. Div. 2015). Sand Canyon argues that Nomura is inapplicable and does not support Homeward's position. The Court agrees with Sand Canyon that Nomura stands on different footing from the instant matter and does not call for disregarding the Governing Agreements.

The <u>Nomura</u> court considered whether the trial court erred by permitting the plaintiffs "to seek monetary damages if cure or repurchase of a defective mortgage loan was impossible." 19 N.Y.S.3d at 5. The relevant agreements limited the plaintiffs to "seeking an order of specific performance requiring defendant to repurchase the defective loans . . . or to cure the defects in those loans." <u>Id.</u> Given this limitation, the defendant argued that the plaintiffs had no remedy for loans that had been foreclosed upon or liquidated because such loans could not be repurchased. <u>Id.</u> Rejecting that argument, the <u>Nomura</u> court reasoned that an award of damages may be an appropriate substitute remedy where the granting of equitable relief (i.e., specific performance of the repurchase obligation) appears to be impossible or impracticable. <u>Id.</u> at 5-6. Accordingly, the <u>Nomura</u> court held that the trial court did not err in refusing to dismiss the plaintiffs' cause of action for monetary damages. <u>Id.</u> at 6.

The <u>Nomura</u> court's holding that equity may allow for an award of damages in lieu of specific performance is readily distinguishable from Homeward's request here. The <u>Nomura</u> court had no reason to consider the admissibility of sampling evidence, let alone whether equity permits for the fashioning of "an alternative remedy" such as sampling proof where "a contract . . . mandate[s] a loan-by-loan repurchase." (Tr. of Hr'g at

92.) This Court does not believe that <u>Nomura</u> extends quite so far. Moreover, the <u>Nomura</u> court emphasized the impossible or impracticable nature of the equitable remedy at issue. Here, Homeward concedes that re-underwriting all the loans in the Trust is not "literally impossible." (Pl.'s Reply at 15.) Rather, Homeward argues that loan-by-loan proof is "not practicable" because of the expenses entailed. (<u>Id.</u> at 13.) Under such circumstances, the Court finds that <u>Nomura</u> is inapplicable and does not compel allowing Homeward to proceed with proof by sampling.

### Conclusion

For the reasons above, Homeward's motion for permission to prove Sand Canyon's liability via statistical sampling and to admit Dr. Cowan's sampling testimony is DENIED. The Court, having concluded that the Governing Agreements, as relevant here, call for loan-by-loan proof of breaches of representations and warranties, declines to reach the parties' remaining arguments.

**SO ORDERED.**

Dated:     New York, New York
           November 13, 2017

_John F. Keenan_
John F. Keenan
United States District Judge