UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
:
HOMEWARD RESIDENTIAL, INC., *solely in its* :
*capacity as Master Servicer for the Option One Mortgage* :
*Loan Trust 2006-2, for the benefit of the Trustee and the* :
*holders of Option One Mortgage Loan Trust 2006-2* : 12-CV-5067 (JMF)
*Certificates*, : 12-CV-7319 (JMF)
:
                  Plaintiff, :
: OPINION AND ORDER
   -v- :
:
SAND CANYON CORPORATION f/k/a OPTION ONE :
MORTGAGE CORPORATION, :
:
                  Defendant. :
:
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      These consolidated cases are two of many arising out of the 2008-2010 financial crisis and its effect on residential mortgage-backed securities or "RMBS." Plaintiff Homeward Residential, Inc. ("Homeward"), in its capacity as Master Servicer for two trusts (the "Trusts") and for the benefit of the trustees and beneficiaries of the Trusts, brings claims for breach of warranty and breach of contract against Sand Canyon Corporation ("Sand Canyon"), formerly known as Option One Mortgage Corporation ("Option One"). Now pending are cross-motions for summary judgment and to preclude expert testimony. Although the motions raise many complex issues, the Court need not and does not reach most of them because it agrees with Sand Canyon that, under New York law, Homeward's claims are time barred. Accordingly, and for the reasons discussed below, Sand Canyon's motion for summary judgment is granted.

## BACKGROUND

For purposes of the present motions, the relevant facts in these cases are undisputed. Together, the two cases involve two RMBS transactions. As the New York Court of Appeals has explained (in an opinion that, as discussed below, is significant for this case),

> an RMBS transaction involves the bundling of mortgage loans into a pool that is sold to an affiliated purchaser, which then places the loans into a trust for securitization purposes. The trust then issues certificates that are purchased by investors, or certificateholders. The individual mortgage loans serve[] as collateral for the certificates, which [pay] principal and interest to certificateholders from the cash flow generated by the mortgage loan pool; that is, certificateholders [make] money when the borrowers [make] payments on their loans.

*Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 34 N.Y.3d 327, 331-32 (2019) (citations and internal quotation marks omitted). All was well and good until near the end of the aughts, when "[h]igh default rates by borrowers led to the collapse of the subprime housing market," which, in turn, helped cause a "precipitous market decline and recession." *Id.* at 332. Not surprisingly, litigation followed, including many cases of the sort here, brought on behalf of trusts that purchased RMBS and alleging breaches of representations and warranties regarding the underlying mortgage loans. *See, e.g.*, *Bakal v. U.S. Bank Nat'l Ass'n*, 747 F. App'x 32, 34 (2d Cir. 2019) (summary order) (noting the "seemingly-endless stream of derivative actions brought by plaintiffs who lost money that had been invested in residential mortgage-back securities ('RMBS') when the housing market collapsed" (internal quotation marks omitted)); *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, No. 14-CV-10104 (VEC), 2015 WL 5710645, at *1 & n.1 (S.D.N.Y. Sept. 29, 2015) (collecting cases).

The two RMBS transactions at issue in these cases occurred in 2006. To the extent relevant here, each transaction involved a pair of written agreements. First, in each instance, Sand Canyon entered into a Mortgage Loan Purchase Agreement ("MLPA") with its wholly

2

owned subsidiary, Option One Mortgage Acceptance Corporation ("OOMAC"), pursuant to which Sand Canyon agreed to sell certain loans to OOMAC in exchange for more than $2 billion and — in its capacity as "Originator" — made certain representations and warranties regarding the loans.  *See* ECF No. 375-1 ("Def.'s 56.1 Response"), ¶¶ 3-4, 34-36, 61; ECF No. 383 ("Pl.'s Counter-56.1 Response"), ¶ 17; Calhoon Decl., Ex. 1 ("06-2 MLPA"), §§ 3.01-.02; Calhoon Decl., Ex. 3 ("06-3 MLPA"), §§ 3.01-.02.[1]  Second, in each transaction, OOMAC simultaneously entered into a Pooling and Servicing Agreement ("PSA"), pursuant to which it agreed to deposit the loans with the relevant Trust and to convey its rights under the MLPA to Wells Fargo Bank, N.A., ("Wells Fargo"), as Trustee for the Trust.  *See* Calhoon Decl., Ex. 2 ("06-2 PSA"), §§ 2.01-.02, 2.07; Calhoon Decl., Ex. 4 ("06-3 PSA"), §§ 2.01-.02, 2.07; Def.'s 56.1 Response ¶¶ 3, 38-39.  In exchange, OOMAC received Certificates representing ownership interests in the relevant Trust, which OOMAC then sold to investors (the "Certificateholders") in exchange for cash that it used to pay Sand Canyon for the loans it had obtained under the MLPA.  *See* Def.'s 56.1 Response ¶ 3.  The PSAs designated Sand Canyon as the "Master Servicer" and required it, in that role, to "enforce" — "for the benefit of the Trustee and the Certificateholders" — "the obligations . . . of the Originator under the [relevant MLPA], including, without limitation, any obligation . . . on account of a breach of a representation, warranty or covenant."  06-2 PSA § 3.02(b); 06-3 PSA § 3.02(b).[2]

---

[1]   Unless otherwise noted, all record citations are to the docket in 12-CV-5067 (JMF).  The Calhoon Declaration and the exhibits attached thereto are currently sealed and do not appear on the docket.  *See* ECF No. 353.

[2]   One of the two PSAs at issue actually uses the term "Servicer," rather than "Master Servicer," but for ease of reference the Court will use the latter term throughout this Opinion and Order.  In each transaction, of course, Sand Canyon was also the Originator under the MLPA.  Each PSA provides that if the Master Servicer and Originator are one and the same, the terms of the MLPA are to be enforced "by the Trustee."  06-2 PSA § 3.02(b); 06-3 PSA § 3.02(b).

In April 2008, Homeward (then known as American Home Mortgage Servicing Inc.) acquired certain assets from Sand Canyon and assumed the role of "Master Servicer" under each PSA.  *See* Def.'s 56.1 Response ¶¶ 14-18.  Not long after, the financial crisis struck and, like other RMBS trusts, the Trusts sustained large losses due to rising delinquency and default rates among the underlying mortgages.  *See* ECF No. 24, ("Amended Compl."), ¶¶ 4-5.  Eventually, Wells Fargo, as Trustee, authorized Homeward, as the Master Servicer, to sue Sand Canyon for breaches of the representations and warranties in the MLPAs.  *See Homeward Residential, Inc. v. Sand Canyon Corp.*, No. 12-CV-5067 (JFK) (JLC), 2017 WL 4676806, at *2 (S.D.N.Y. Oct. 17, 2017).  On May 31, 2012, Homeward filed the first of these two cases, relating to one of the two Trusts at issue.  *See* ECF No. 1.  It filed the second, relating to the other Trust, on September 28, 2012.  *See* 12-CV-7319, ECF No. 1.[3]  Motion practice and discovery followed and, in 2019, the cases were reassigned to the undersigned and consolidated.  *See* ECF No. 302.  Thereafter, the parties filed cross-motions for summary judgment and motions to preclude expert testimony.  *See* ECF Nos. 346, 350, 352, 356.

## LEGAL STANDARDS

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir.

---

[3] It is undisputed that Homeward was the Master Servicer at the time these cases were filed, but it transferred certain servicing interests to a related corporate party in April 2013, and the parties appear to dispute whether Homeward remains Master Servicer today.  *See* Def.'s 56.1 Response ¶¶ 21-23.  But the parties do not even advert to the issue in their briefs and, thus, have waived any non-jurisdictional arguments relating to it.  And because an "action may be continued by . . . the original party" even "[i]f an interest is transferred," Fed. R. Civ. P. 25(c), the possibility that Homeward transferred its interests does not present a jurisdictional problem, *see, e.g.*, *F.D.I.C. v. Four Star Holding Co.*, 178 F.3d 97, 100-01 (2d Cir. 1999).

2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994). If the moving party shows a prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). In the final analysis, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

Sand Canyon argues that Homeward's claims are time barred. *See* Mem. Law Supp. Def.'s Mot. Summ. J. ("Def.'s Mem."), at 16-20; ECF No. 375 ("Def.'s Reply"), at 5-22.[4] Although Homeward did not assume its role as Master Servicer until 2008, there is no dispute that its claims accrued when the transactions occurred in 2006 and that it filed each case more than five, but less than six, years after the relevant date. *See* ECF No. 373 ("Pl.'s Mem."), at 23-24; ECF No. 385 ("Pl.'s Reply"), at 1. Instead, the parties' dispute turns, in the first instance, on what statute of limitations applies. Sand Canyon argues that the limitations period was four years. *See* Def.'s Mem. 16-20; Def.'s Reply 5-22. Homeward contends that it was six. *See* Pl.'s Mem. 23-34; Pl.'s Reply 1-6. In the alternative, Homeward argues that its claims are timely because the limitations period, even if four years, was tolled. *See* Pl.'s Mem. 34-39; Pl.'s Reply 6-12. Sand Canyon has the better of the argument.

### A. The Relevant Statute of Limitations

Although both MLPAs are governed by New York law, Homeward is a Delaware corporation with its principal place of business in Texas. *See* Def.'s 56.1 Response ¶ 19. Thus, as the parties agree, *see* Def.'s Mem. 16; Pl.'s Mem. 23, New York's "borrowing statute" governs the analysis of what statute of limitations applies.[5] It provides:

> An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without

---

[4] Defendant's memorandum of law is currently sealed and does not appear on the docket. *See* ECF Nos. 352, 353.

[5] "A federal court sitting in diversity . . . must apply the choice of law rules of the forum state. Accordingly, New York choice-of-law rules apply in adjudicating" Homeward's

6

>   the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.

N.Y. C.P.L.R. 202.  Put differently, when "a nonresident sues on a cause of action accruing outside New York," the cause of action must "be timely under the limitation periods of *both* New York and the jurisdiction where the cause of action accrued."  *Deutsche Bank*, 34 N.Y.3d at 334 (emphasis added).  Homeward's claims are timely under the limitations period in New York, which is six years.  Where, then, did Homeward's claims accrue?

Alas, where, as here, the claims at issue stem from a complex transaction involving multiple contracts and multiple parties from different states, identifying the "place of accrual" for purposes of New York's borrowing statute is not necessarily a simple task.  As it turns out, however, the New York Court of Appeals addressed that very issue in an RMBS case nearly identical to these only last year: the aforementioned *Deutsche Bank National Trust Co. v. Barclays Bank PLC*.  The claims at issue in *Deutsche Bank* were materially the same as those here; for present purposes, the only difference between the cases is that, here, the claims are brought by the Master Servicer (Homeward) whereas in *Deutsche Bank* they were brought by the trustee (Deutsche Bank).  The parties in *Deutsche Bank* agreed that the causes of action accrued "in the place where the economic injury was sustained."  *Id.* at 335.  The defendants argued for application of "the plaintiff-residence rule, which states that '[w]hen an alleged injury is purely economic, the place of injury usually is where the plaintiff resides . . . .'"  *Id.* (quoting *Glob. Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)).  By contrast, Deutsche Bank contended that "the plaintiff-residence rule should not apply to determine where the injury occurred where," as there (and here), "the plaintiff [was] suing in merely a representative capacity."  *Id.*  "Instead," it

---

claims here.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (per curiam) (internal quotation marks and citation omitted).

7

argued, "the Court should employ a multi-factor analysis to determine where the economic injury was felt," on the theory that such a test was "a better fit for determining who became poorer, and where they became poorer when the plaintiff sues in a representative capacity." *Id.* (citation, internal quotation marks, and alterations omitted).

Significantly, the Court unanimously rejected Deutsche Bank's argument that a multi-factor test should apply. A majority of the Court agreed with the defendants that the plaintiff-residence rule applied. As the Court explained, the goal of the borrowing statute — "to add clarity to the law and to provide the certainty of uniform application to litigants" — "is better served by a rule requiring the single determination of a plaintiff's residence than by a rule dependent on a litany of events relevant to the center of gravity of a contract dispute." *Id.* at 336-37 (internal quotation marks omitted). The Court did not "foreclose the possibility that an economic loss may be sustained in a place other than where the plaintiff resides." *Id.* at 337. In a breach of contract case, the Court observed, "the place of injury will *usually* be where the plaintiff resides," but "that may not always be true." *Id.* (emphasis added) (internal quotation marks omitted); *see id.* at 338 (noting that "courts may, in appropriate cases, conclude that an economic loss was sustained in a place other than where the plaintiff resides"). Turning to the claims before it, the majority concluded that the law of California, Deutsche Bank's residence, applied. *See id.* at 338-39. "As trustee," the majority explained, "plaintiff is authorized to enforce, on behalf of the certificateholders, the representations and warranties in the relevant agreements. Accordingly, it is appropriate for us to look to plaintiff's residence as the place where the economic injury was sustained and, consequently, where plaintiff's causes of action accrued . . . ." *Id.* at 339. "Application of the plaintiff-residence rule" to Deutsche Bank's claims, the majority continued, "supports [the borrowing statute's] goal of predictability and

8

certainty of uniform application to litigants. That is especially true when we consider that these are representative actions commenced by a trustee for the benefit of numerous, geographically-dispersed beneficiaries." *Id.* at 339 (citation and internal quotation marks omitted).

Judge Wilson dissented. As noted, he agreed with the majority that a multi-factor test should not apply. *See id.* at 350-51 (Wilson, J., dissenting) ("I agree with the majority that we do not — and should not — engage in factor-weighing to determine the location of an injury."). Instead, Judge Wilson faulted the majority for overlooking the fact that Deutsche Bank was not a party to the contracts that were allegedly breached. *See id.* at 342-44.[6] As Judge Wilson noted, the New York Court of Appeals had repeatedly "held that on a claim for breach of representations and warranties for contracts that grouped residential mortgages into securities to market to investors, the injury occurred 'the moment the MLPA was executed' because '[the depositor] was obligated to deliver loans that complied with the representations and warranties at the moment the [MLPA] was executed.'" *Id.* at 348 (quoting, first, *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 598 (2015), and then *Deutsche Bank Nat'l Tr. Co. v. Flagstar Capital Mkts.*, 32 N.Y.3d 139, 148 (2018)). Yet Deutsche Bank was not a party to the MLPAs themselves; instead, it had obtained the right to sue only by subsequent assignment via the PSAs. *See id.* at 346-48. Invoking the fundamental principle that "an assignee stands in the shoes" of the assignor, "with no greater rights, as against the plaintiffs, than his assignors possessed," *id.* at 342 (internal quotation marks omitted), Judge Wilson concluded that Deutsche Bank's domicile was not "relevant to determining the accrual of the breach," *id.* at 349. "Holding that a subsequent assignment to another party alters the accrual of a cause of action,"

---

[6] *Deutsche Bank*, like these cases, involved two different RMBS transactions. Thus, as here, there were two MLPAs, two PSAs, and two trusts. Deutsche Bank was the trustee of both. *Id.* at 331-32.

9

he concluded, "would cause statutes of limitations to shift each time a right to sue for a prior breach was assigned. That is not the law of this (or any) state, and would enable and encourage the forum shopping [the borrowing statute] was aimed to curtail." *Id.* at 349.[7]

If, as in *Deutsche Bank*, the plaintiff-residence rule applies here, the conclusion is plain: Texas's four-year statute of limitations governs, as Homeward's "residence" is indisputably Texas. *See* Def.'s 56.1 Response ¶ 19 ; *see also Nghiem v. Sajib*, 567 S.W.3d 718, 722 n.20 (Tex. 2019) (citing TEX. CIV. PRAC. & REM. CODE §§16.004(a), 16.051). Homeward does not argue otherwise. Instead, emphasizing the *Deutsche Bank* majority's acknowledgment that "courts may, in appropriate cases, conclude that an economic loss was sustained in a place other than where the plaintiff resides," 34 N.Y.3d at 338, Homeward argues that the Court should look to "the residence of the . . . RMBS trustee" to "determine[] where the breach of representation and warranty claims accrued for the purposes of New York's borrowing statute," Pl.'s Mem. 23. Here, the Trustee is Wells Fargo, which — according to Homeward, at least — is a resident of South Dakota (where the relevant statute of limitations is six years). *See id. But see* Def.'s Reply 8 n.6 (suggesting that if the Court were to look to the residence of the Trustee, the law of Maryland — where the relevant statute of limitations is only three years — might apply). But *Deutsche Bank* applied the *plaintiff*-residence rule, not a *trustee*-residence rule. Put differently, Deutsche Bank's status as the RMBS trustee *per se* did not play any role in the Court's decision; instead, the Court relied on the fact that Deutsche Bank, was "authorized to enforce, on behalf of the certificateholders, the representations and warranties in the relevant agreements." 34 N.Y.3d

---

[7]    In a second part of his dissent, Judge Wilson noted that, even if it could be said that representations and warranties made to the trusts had been breached, he would not look to the domicile of the trustee; instead, he "would hold that for accrual purposes, the law under which these trusts were created . . . determines the rule of accrual for breach." *Id.* at 355.

at 339.  Like the trustee in *Deutsche Bank*, Homeward is authorized (indeed, obligated) to enforce, and is seeking to enforce, claims in a representative capacity on behalf of the Certificateholders.  Thus, *Deutsche Bank* would seem to compel application of the Texas statute of limitations here.

Ultimately, however, the Court need not (and thus does not) decide whether the plaintiff-residence rule applies because even if Homeward is right, and this is an "appropriate case[]" in which to depart from the rule, a four-year statute of limitations would still apply.  That is because, following Judge Wilson's persuasive dissent, the Court would look to the residence of the party that possessed the breach claims at the moment they accrued, namely OOMAC.[8]  Looking to the residence of the original holder of the claims at issue is consistent with the well-established rule that an assignee "is not entitled to stand in a better position than that of its assignor."  *Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 416 (2010) (holding that, where a claim has been assigned, a court should look to the residence of the assignor to determine the place of accrual for purposes of the borrowing statute).  It is also consistent with the proposition — reaffirmed repeatedly by the New York Court of Appeals — that the breach of representations and warranties in an RMBS case occurs at "the moment the MLPA was executed."  *ACE Sec. Corp.*, 25 N.Y.3d at 598; *see, e.g.*, *Flagstar Capital Mkts.*, 32 N.Y.3d at 145-47.[9]  And finally, as Homeward itself all but concedes, *see* Pl.'s Mem. 28, it "supports [the

---

[8]   The fact that Homeward did not even exist in 2006 — and did not obtain the right to pursue the claims at issue until the assignment in 2008 — lends some credence to Judge Wilson's critique of the majority opinion in *Deutsche Bank*.  But nothing in the majority's opinion suggests that the timing of the assignment was relevant to its analysis.  And in any event, even if the timing of Homeward's creation and the assignment were a reason to abandon the plaintiff-residence rule in this case, as Homeward asserts, *see* Pl.'s Mem. 23-24, it does not provide a basis to look beyond OOMAC to define the place of accrual.

[9]   That proposition — which Homeward acknowledges, *see* Pl.'s Mem. 23 — is fatal to its argument that the claims "*never*" accrued to OOMAC" because "it did not" — indeed, could not

11

borrowing statute's] goal of predictability and 'certainty of uniform application to litigants.'" *Deutsche Bank*, 34 N.Y.3d at 339 (quoting *Glob. Fin. Corp.*, 93 N.Y.2d at 530). OOMAC's residence is California, Def.'s 56.1 Response ¶ 28, which — like Texas — has a four-year statute of limitations, *see* CAL. CIV. PROC. CODE § 337(a).

It is true, as Homeward argues, that OOMAC was, at the time of the transactions at issue, a wholly owned subsidiary of Sand Canyon (then known as Option One). *See* Pl.'s Mem. 29. But OOMAC was a distinct corporate entity, and Homeward provides no basis to disregard the corporate form. *See, e.g.*, *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998) ("Those seeking to pierce a corporate veil . . . bear a heavy burden."). More broadly, pointing to various facts and circumstances of the transactions at issue, Homeward contends that the Court should ignore "the deals' formalities" and look instead "to the purpose and substance of the transaction[s]." Pl.'s Mem. 32. Doing so, Homeward continues, would lead to the Court to treat as the place of accrual the residence of the Trustee, Wells Fargo. *See id.* at 31-34. Conspicuously, however, Homeward cites no authority for the proposition that a court can, let alone should, disregard the "formalities" of a transaction and look to the residence of a non-party — to *both* the contract allegedly breached *and* the lawsuit, no less — for purposes of the borrowing statute. More fundamentally, Homeward's proposed fact-and-circumstances test suffers from the same flaw that led *all* judges on the Court of Appeals to reject the proposed multi-factor test in *Deutsche Bank*: "[I]t would result in unpredictability and confusion." 34 N.Y.3d at 337; *see id.* at 350-51 (Wilson, J., dissenting) ("agree[ing] with the majority that we do

---

— "perform its obligations to Option One under the MLPAs before the assignment," at which point it obtained the funds used to pay for the loans, *see id.* at 32-34. Moreover, Homeward's argument proves too much: If OOMAC had no breach claim to assign to the Trustee, it follows that *Homeward* has no claim to assert as a matter of New York substantive law.

12

not — and should not — engage in factor-weighing to determine the location of an injury" because, "to give certainty to contracting parties, . . . a rule of single determination" is "require[d]").

Limiting Homeward's proposed rule to RMBS cases — in effect, adopting a "trustee-residence rule" for RMBS cases — would arguably mitigate some of this unpredictability, but it is no answer. For one thing, Homeward disclaims the suggestion that it is pressing a trustee-residence rule, *see* Pl.'s Reply 3 n.2, and thus has waived any such argument. For another, nothing in *Deutsche Bank* suggests that the Court viewed the plaintiff's status as the trustee to be relevant to its analysis. And while adopting a bespoke rule for a particular type of transaction might result in predictability for that type of transaction, it would create more unpredictability in general, as entities entering contracts would be forced to make predictions about the box into which courts would be likely to place the transaction later. On top of that, looking to a trustee's residence for the place of accrual would add an additional layer of uncertainty. As Judge Wilson observed, "[t]rusts can have multiple trustees, they can have corporate trustees with differing states of incorporation and principal places of business, and they can change trustees during the life of the trust, even as replacement loans are being swapped into the trust. . . . A breach of one set of representations could occur at a different time from another set of representations, and if the trustee changed (or went bankrupt, or restructured[]) different claims concerning the same trust could be governed by different state laws, and no rule would exist for trusts with joint trustees with different domiciles." *Deutsche Bank*, 34 N.Y.3d at 354 (Wilson, J., dissenting).[10]

---

[10]  For these reasons, among others, Judge Wilson opined that, where representations and warranties made directly to a trust have been breached, it would make more sense to look to the domicile of the trust itself than to the domicile of the trustee. *See id.* at 350-55 (Wilson, J., dissenting). Homeward alludes to that analysis in passing, *see* Pl.'s Mem. 25-26, but stops short of actually arguing that the domicile of the Trusts here should control. Like the plaintiff in

13

In short, if the plaintiff-residence rule applies, as *Deutsche Bank* would seem to suggest, New York law would call for applying the Texas statute of limitations to the claims in this case. If, instead, this is indeed an "appropriate case[]" to depart from the plaintiff-residence rule, as Homeward suggests, New York law would call for applying the California statute of limitations. In either case, the limitations period would be only four years and Homeward's claims — which were brought almost six years after they accrued — would be presumptively time barred.

## B. Tolling

That does not end the analysis, however, as Homeward argues that, even if Texas or California's statutes of limitations apply, its claims would still be timely because of those states' discovery tolling rules. "New York does not apply the 'discovery' rule to statutes of limitations in contract actions." *ACE Sec. Corp.*, 25 N.Y.3d at 594. But, where "borrowing a foreign jurisdiction's statute of limitations under [the New York borrowing statute], we import that jurisdiction's limitations period, along with the extensions and tolls applied in the foreign state so that the *entire* foreign statute of limitations applies." *Deutsche Bank*, 34 N.Y.3d at 339 (internal quotation marks and alterations omitted). Under California law, the "discovery rule" is an "exception to the general rule of accrual" that, in certain circumstances, "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005). The discovery rule applies most often in cases involving fraud or breach of fiduciary duties, but California courts have "extended" it to "breach of contract cause[s] of action as well." *Gryczman v. 4550 Pico*

---

*Deutsche Bank*, therefore, it has waived the argument. *See* 34 N.Y.3d at 338-39 (majority op.). Moreover, although Homeward asserts that the domicile of the Trusts is New York, *see* Pl.'s Mem. 26, Judge Wilson's opinion and the lower court decisions in *Deutsche Bank* make plain that the test for determining the domicile of trusts like those here is not necessarily settled.

14

*Partners, Ltd.*, 131 Cal. Rptr. 2d 680, 682 (Ct. App. 2003) (citing *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 433-34 (Ct. App. 1983)). It applies, however, only where the breaches "are[] committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." *Id.* at 681 (internal quotation marks omitted). Meanwhile, under Texas law, the discovery rule is "a very limited exception to statutes of limitations," applicable "only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001) (internal quotation marks omitted).[11]

Turning first to California, the Court concludes that tolling does not apply because the alleged breaches here are "not 'secret breach[es]' like those in *April* and *Gryczman*," the cases upon which Homeward relies. *Wakefield v. Wells Fargo & Co.*, No. C-13-05053 (LB), 2014 WL 5077134, at *11 (N.D. Cal. Oct. 9, 2014). In *April*, a television producer sued a television station after it erased videotapes in which the producer had an alleged interest. The question was whether the contract claim accrued when the tapes were erased or when the plaintiff discovered the erasure. *April Enters.*, 195 Cal. Rptr. at 425. The court determined that the discovery rule exception to the general rule of accrual applied, but repeatedly emphasized that the injury occurred "while th[e] tapes were in [the defendants'] exclusive custody and control." *Id.* at 436;

---

[11] Pointing to an earlier opinion by Judge Torres in one of these cases, Homeward invokes the law-of-the-case doctrine in support of its argument that the discovery rule applies. *See* Pl.'s Reply 7-9 (citing 12-CV-7319, ECF No. 124, at 7-8). The Court is not persuaded. Judge Torres's opinion was filed more than three years before *Deutsche Bank* was decided and addressed an entirely different issue: whether a proposed amended complaint would relate back to Homeward's original complaint under Rule 15 of the Federal Rules of Civil Procedure. Moreover, at the time, the parties and the Court assumed (erroneously) that New York's six-year statute of limitations applied. In any event, the law-of-the-case doctrine is discretionary and the Court would decline to apply it here given the totality of the circumstances. *See Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001).

15

*see also id.* at 433.  In *Gryczman*, meanwhile, the plaintiff had a contractual right of first refusal to buy real property, and the contract required notice that the right of first refusal had been triggered.  131 Cal. Rptr. 2d at 681.  The defendant sold the property without providing the plaintiff the required notice, and the court applied the discovery rule because "the failure to give plaintiff notice of the happening of a certain event is both the act causing the injury *and* the act that caused plaintiff not to discover the injury."  *Id.* at 682 (emphasis added).

Each of these scenarios is distinguishable from the circumstances here.  For one thing, Sand Canyon did not maintain exclusive control over the documents and information that provide the basis for Homeward's claims.  To the contrary, Wells Fargo — who, as Trustee, directed Homeward to file — has had access to the documents and information since the PSAs were executed in 2006.  *See* Pl.'s Counter-56.1 Response, ¶¶ 10-12, 21.  And Homeward itself has had access to them at least since it became Master Servicer in 2008.  *See* Def.'s 56.1 Response ¶¶ 14, 17, 152, 221.a; Pl.'s Counter-56.1 Response ¶¶ 19-20. For another thing, the breaches of representations and warranties alleged here are plainly distinguishable from the breach of a contractual obligation to provide notice at issue in *Gryczman*.  Indeed, to accept Homeward's argument for tolling here would be to convert what is a "limited exception" under California law into "the general rule."  *See Wakefield*, 2014 WL 5077134, at *10; *see also, e.g.*, *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1135 (N.D. Cal. 2006) ("The fact that plaintiffs simply did not know about their alleged right to payments under the annuity does not, by itself, convert the alleged breaches into secretive breaches.  Nor does this case concern a breach that was fraudulently concealed or misrepresented by defendant.  Defendants did nothing

16

to hide, mask, or keep secret the terms of the annuity, which were well-known and available in written form to the parties involved.").

Notably, that conclusion is consistent with, if not compelled by, the Court of Appeals's decision in *Deutsche Bank*. The plaintiff there cited the very same cases and raised some of the very same arguments before the Appellate Division that Homeward raises here: that "the Trustee subsequently and justifiably relied on the PSA, which expressly states that . . . the Trustee shall not be bound to make any investigation into the quality of the Mortgage Loans[,] and [that] the Trustee shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement"; that "[the defendant's] failure to notify the Trustee of Defective Loans was an act which prevented plaintiff from discovering the breach"; and "that neither the Trustee nor investors could reasonably have uncovered [the defendant's] Representations and Warranties breaches without first commissioning experts to undertake a costly and time-intensive analysis of loan files," so "finding that the Trustee's repurchase claims accrued on the Closing Date would retroactively impose a duty on the Trustee to continually monitor whether [the defendant] performed some act inconsistent with one of the many terms of the contract." Br. Pl.-Resp't 55-56, *Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 66 N.Y.S.3d 472 (App. Div. 2017), *aff'd*, 34 N.Y.3d 327, 2016 WL 11538283 (internal quotation marks and alterations omitted); *cf.* Pl.'s Mem. 34-39; Pl.'s Reply 6-12. Yet the Court of Appeals affirmed the Appellate Division's conclusion that "the discovery rule is inapplicable because plaintiff 'knew or should have known of the wrongful conduct at issue' more than four years before plaintiff commenced these actions." *Deutsche Bank*, 34 N.Y.3d at 341 (quoting *April Enters.*, 195 Cal. Rptr. at 437)).

The Court would reach the same conclusion if Texas's statute of limitations applied. Texas recognizes the discovery rule as a "very limited exception to statutes of limitations, which

17

defers the accrual of the cause of action until the injury was or could have reasonably been discovered." *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929-30 (Tex. 2011) (internal quotation marks omitted). In particular, the discovery rule applies "only when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable." *Wagner & Brown, Ltd.*, 58 S.W.3d at 734. An injury is "inherently undiscoverable" if, by its nature, it is "unlikely to be discovered within the prescribed limitations period despite due diligence." *S.V. v. R.V.*, 933 S.W.2d 1, 7 (Tex. 1996); *see also Comput. Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996) ("Inherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used."). Notably, although "the Texas Supreme Court ha[d] not foreclosed the possibility" that a breach of contract could qualify as inherently undiscoverable, as of 2009, "no Texas court ha[d] found" that one actually did. *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439-40 (5th Cir. 2009). For the reasons discussed above, these cases are not the "rare" or "exceptional" ones calling for application of the limited exception. *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313, 315 (Tex. 2006). Put simply, the alleged breaches of representations and warranties here were not inherently undiscoverable given that they could be — and, indeed, were — discovered within the limitations period. *See* Amended Compl. ¶ 8 (alleging demand letters from investors to the Trustee, which the Trustee subsequently gave notice to Sand Canyon of, concerning alleged breaches of representations and warranties as early as October 2009).

## CONCLUSION

In sum, applicable New York law compels the Court to conclude that Homeward's claims in these cases are untimely. Either the residence of Homeward controls, in which case Texas's four-year statute of limitations applies. Or the residence of OOMAC controls, in which case

California's four-year statute of limitations applies. And in either case, the discovery rule does not apply. Accordingly, and for the reasons discussed above, Sand Canyon's motion for summary judgment is GRANTED, Homeward's cross-motion for summary judgment is DENIED, and Homeward's claims are dismissed in their entirety. It follows that the parties' motions to preclude expert testimony are DENIED as moot.

One final housekeeping matter remains. The Court granted the parties leave to file many of their motion papers under seal pending a decision on the underlying motions. *See* ECF Nos. 353, 361, 371, 372, 379, 389, 390.[12] It is well established that filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Significantly, assessment of whether the presumption in favor of public access is overcome must be made on a document-by-document basis, *see, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019), and the mere fact that a court does not rely upon a document in adjudicating a motion does not remove it from the category of "judicial documents," *id.* at 50-51. Finally, the mere fact that information is sealed or redacted by agreement of the parties is not a valid basis to overcome the presumption. *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015). That is, a party must demonstrate reasons to justify sealing or redaction separate and apart from a private agreement to keep information confidential.

---

[12] Complicating matters, these filings bridged changes in this District's procedures for filing sealed documents, *see* Standing Order M10-468, 19-MC-583 (CM) (Dec. 19, 2019), so some sealed filings were transmitted directly to the Court in hard copy (or via email) and do not appear on the docket while others were filed on the docket with restricted viewing access.

Accordingly, notwithstanding any prior Order directing the parties to address the propriety of continued sealing, any party that believes, in light of the foregoing principles, that any materials currently under seal or in redacted form should remain under seal or in redacted form is ORDERED to show cause in writing, on a document-by-document basis, why doing so would be consistent with the presumption in favor of public access **no later than three weeks from the date of this Opinion and Order**.  Proposed redactions should be "narrowly tailored" to achieve the aims that justify sealing.  *See, e.g.*, *Brown*, 929 F.3d at 47 (internal quotation marks omitted).  Finally, each party shall ensure that all sealing and redaction requests are made in accordance with Rule 7 of the Court's current Individual Rules and Practices in Civil Cases (and the District's ECF Rules and Instructions).

The Clerk of Court is directed to terminate ECF Nos. 346, 350, 352, and 356, to enter judgment in favor of Sand Canyon, and to close this case.

SO ORDERED.

Dated: November 9, 2020
New York, New York

JESSE M. FURMAN
United States District Judge